FILED - CLERK
U.S. DISTRICT COURT

2003 SEP 10 PM 2: 31

TX EASTERN-BEAUMONT

BY _____

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

LAWRENCE RUSSELL BREWER §
     **Petitioner,** §
        §
**v.** §  Civil No. 6:02cv457
        §
**DOUGLAS DRETKE, Director** §
**Texas Department of Criminal Justice -** §
**Institutional Division.** §
      **Respondent.** §

## INITIAL PETITION FOR WRIT OF HABEAS CORPUS
## UNDER THE AUTHORITY OF 28. U.S.C. § 2254

Comes now, Applicant Lawrence Russell Brewer. By and through his attorney's of

record, Michael B. Charlton and Gerald Bierbaum and files this his Initial Petition for Writ of

Habeas Corpus.[1]

### I.

Mr. Brewer is a death sentenced inmate, currently incarcerated in the Polunsky Unit of the

Texas Department of Criminal Justice - Institutional Division. Mr. Brewer was convicted and

sentenced in a Brazos County Court during September of 1999 in cause number 27,037. The case

was transferred from Jasper County to Brazos County on a change of venue motion. Jasper

---

[1]Lawrence Russell Brewer is referred to as Applicant. Current Counsel is referred to as
Petitioner. It is Petitioner's understanding that this petition is filed to toll statute of limitations and
present counsel will soon be replaced with new counsel..



1

County cause number was 8870.

Mr. Brewer appealed his case to the Texas Court of Criminal Appeals. The Texas Court of Criminal Appeals affirmed his conviction in an opinion handed down on April 02, 2002. The unpublished opinion is case 73,641 in the Texas Court of Criminal Appeals. Mr. Brewer had a petition for habeas corpus pending at the time his case was affirmed. The Texas Court of Criminal Appeals denied post-conviction relief on September 11, 2002.

## II.

## MR. BREWER WAS DENIED DUE PROCESS BY TEXAS DUAL TRACK APPELLATE SYSTEM

Mr. Brewer was denied due process and full and fair review of the conviction and sentence that would terminate his life. Applicant complained on appeal that Dr. Gripon, the State's psychiatrist, was allowed to testify about Dr. Gripon's interview with Mr. Brewer during the State's case in punishment, before trial counsel's expert testified, waiving Mr. Brewer's Fifth Amendment rights[2]. The Texas Court of Criminal Appeals held that trial counsel waived this error by failing to object at trial on this basis. **See Opinion at page 11, Concurrence at page 6.**

Mr. Brewer had a valid and relief warranting issue. Trial court ordered, on the State's motion, that the defense disclose whether or not the defense intended to offer testimony from the psychologist the defense had hired to evaluate Mr. Brewer. Based upon the trial counsel's response, the trial court ordered Mr. Brewer to submit to an examination by the State's expert,

---

[2]Dr. Gripon testified that he had interviewed and spoken with the defendant personally. **28 SF 11.**

Dr. Gripon. **See CR 179.** Importantly, the trial court did not order the report of Dr. Gripon to be

withheld from prosecution until Mr. Brewer's expert testified nor did the trial court order Dr.

Gripon not to share information regarding his evaluation of Mr. Brewer with the State until trial

counsel submitted their expert to the court for testimony.

The State asked the court to order Mr. Brewer to submit to an interview with Dr. Gripon

under the authority of **Lagrone v. State**, 942 S.W.2d 602 (Tex.Crim.App. 1997) and

**Chamberlain v. State** 998 S.W.2d 230 (Tex.Crim.App. 1999). **See State's Motion for**

**Psychiatrist to Examine Defendant,** TR177. As Justice Cochran's concurrence notes, both

**Lagrone** and **Chamberlain** required the State's expert not to reveal any of the conversations,

information, findings or conclusions until after the defense expert takes the stand and waives the

defendant's Fifth amendment rights. The defendant's Fifth Amendment rights not to provide

evidence against himself were not effectively waived until his trial counsel put on a mental health

expert that had spoken to defendant and that expert testified regarding findings based on those

conversations. **See Soria v. State,** 933 S.W.2d 46 (Tex.Crim.App. 1996), **Estelle v. Smith**, 451

U.S. 454, 462-63, 101 S.Ct. 1866, 1872-73, 68 L.Ed.2d 359 (1981). The trial court only ordered

Mr. Brewer to submit to an interview with Dr. Gripon without entering any orders protecting Mr.

Brewer's Fifth Amendment rights until such time as those rights were waived. The trial court's

order allowed the State to have access not only to Dr. Gripon's findings but to Dr. Gripon

immediately after Dr. Gripon's examination of Mr. Brewer. Trial court denied Mr. Brewer the

duration of his Fifth Amendment right by allowing the State unfettered access to Dr. Gripon and

his findings during the preparation of the case, far prior to defense expert testifying.

This error, in turn, allowed the State to have Dr. Gripon testify during the State's case-in-

chief for punishment, denying Mr. Brewer the strategic choice of waiving his Fifth Amendment

rights or putting on mental health opinion testimony based upon data he provided. Denying Mr.

Brewer the choice to preserve his Fifth Amendment rights interrupted the fundamental fairness of

his trial. Mr. Brewer had a valid issue warranting relief.

Mr. Brewer also complained on appeal about trial court's admission of a scrapbook

purported to be Mr. Brewer's writing without any authentication of such. The Texas Court of

Criminal Appeals held that when the scrapbook was introduced, trial counsel merely said 'we

object your honor." Such objection was not specific enough to inform the court of the grounds for

the objection. **Opinion, page 19.**

Prior counsel's state petition for writ was due before the Court of Criminal Appeals

opinion was delivered. Prior counsel was denied the opportunity to include an issue in the initial

writ of ineffective assistance of counsel based on the reviewing court's finding of trial counsel

failing to properly object and preserve this meritorious issue regarding the admission of evidence

against Mr. Brewer without that evidence being properly authenticated. This issue was

meritorious because the scrapbook was critical evidence that allegedly formalized, for the jury, the

motive for the offense. The scrapbook was full of writings by Mr. King indicating, not only was

he a racist but that he was thinking about starting a chapter of the Confederate Knights of

America in Jasper, Texas. Mr. King's alleged motive for the killing of Mr. Byrd was that Mr. King

wanted notoriety to help him start his gang in Jasper, Texas. This notebook solely based that

motive. Without the scrapbook, the jury would not have the alleged motive ecvidence.

The Texas Court of Criminal Appeals held that trial counsel waived Mr. Brewer's

complaints about these errors. Writ counsel was denied the benefit of the Court of Criminal

4

Appeals holdings based upon the mandatory filing date for Mr. Brewer's state petition. Writ counsel could have raised the issues both of trial counsel's waiver and appellate counsel's ineffective assistance regarding these issues because appellate counsel did not raise the meritorious issue of trial counsel's waiver of the errors. Writ counsel was denied the opportunity to raise these issues and include the Court of Criminal Appeals findings of waiver because the petition for writ was due before the opinion was delivered. The dual track system of causing the petition for writ to be filed before the opinion on direct appeal is delivered denied Mr. Brewer and state writ counsel the opportunity to raise these meritorious issues based on findings by the Court of Criminal Appeals. This Court should find Mr. Brewer was denied a full and fair review of his case because initial writ counsel was denied the opportunity to raise the Court of Criminal Appeals findings of waiver as a basis for ineffective assistance claims regarding the trial counsel and appellate counsel's performance. This Court should allow Petition to raise these claims in the stance of an initial petition or allow Petitioner to raise this claim without the burden of meeting the standards of successive petition, exhaustion, or procedural bar.

### TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE ADMISSION OF A SCRAPBOOK AGAINST MR. BREWER THAT WAS NOT AUTHENTICATED AS MR. BREWER'S.

The trial court admitted a scrapbook, State's #41, without any authentication of such. **XXII SF 206.** The Texas Court of Criminal Appeals held that when the scrapbook was introduced, trial counsel merely said 'we object your honor." Such objection was not specific enough to inform the court of the grounds for the objection. Trial counsel were ineffective for not

properly objecting to the admission of this notebook as not authenticated to Mr. Brewer.

This issue was meritorious because the scrapbook was critical evidence because it was full of writings by Mr. King indicating, not only was he a racist but that he was thinking about starting a chapter of the Confederate Knights of America in Jasper, Texas. Mr. King's alleged motive for the killing of Mr. Byrd was that Mr. King wanted notoriety to help him start his gang in Jasper, Texas. This notebook solely based that motive. If trial counsel had objected to lack of proper authentication to Mr. Brewer, this notebook would not have been admitted. The admission fo this evidence questions the reliability of the outcome of the trial and effects the fundamental fairness of the trial.

### APPLICANT IS ACTUALLY INNOCENT OF THE DEATH PENALTY OFFENSE AND BUT FOR THE CONSTITUTIONAL VIOLATIONS OF THE STATE KNOWINGLY OFFERING PERJURED TESTIMONY AND INEFFECTIVE ASSISTANCE OF COUNSEL, NO RATIONAL JUROR WOULD HAVE CONVICTED HIM

### TRIAL COUNSEL OFFERED ONLY INEFFECTIVE ASSISTANCE BY NOT CHALLENGING THE TESTIMONY OF DR. TOMMY BROWN

Mr. Brewer is actually innocent of capital murder and but for a violation of the Constitution, not jury would have found him guilty of capital murder.

Mr. Brewer was convicted of killing James Byrd while in the course of kidnaping him.  To sustain this conclusion, the prosecution relied on the testimony of Dr. Thomas (Tommy) Brown, a pathologist from Jefferson County, Texas who performed the autopsy on the victim James Byrd, Jr.  Dr. Brown testified that based upon his medical expertise, the victim was alive and conscious

while being dragged behind a vehicle. This evidence was inaccurate and but for a violation of the United States Constitution the inaccuracy would have been revealed and no rational juror would have convicted Mr. Brewer of capital murder.

Dr. Tommy Brown testified that Mr. Byrd's injuries occurred while he was alive because in State's exhibit 1B, he could see the margin of the injury where the head and upper body was severed; that margin was red, as if blood was getting to the area at the time of injury. **XXIV SF 264[3].** Trial counsel acted in an ineffective manner by not challenging this statement. The body of Mr. Byrd was allegedly dragged by the feet. This dragging action would have caused any blood in the body, by centrifugal force towards the head. Alive or dead, if the body was dragged by the feet, the blood would go towards the head and out any opening created when the head was absent.

Dr. Brown further testified from the same photo that there were yellow abrasions and red abrasions to the body. The yellow abrasions were post-mortem because no blood was drawn through these abrasions while the red abrasions were pre-mortem because blood was drawn through. **XXIV SF 265.** Trial counsel acted in an ineffective manner by not challenging this statement. The autopsy of Mr. Byrd, Autopsy report case 98-149, states on page 5 that there was no blood in the chest or abdominal cavity when the body was opened. The blood left the body prior to the body being collected and inspected. If Mr. Byrd's heart stopped circulating the blood while there was blood still in the body, then the blood evacuated without benefit of heart created blood pressure. Blood leaving through openings such as the wounds created without the benefit

---

[3]The reporter's record is referred to as "volume SF page," i.e., I SF 1 would be volume one page one of the reporter's record. The Clerk's record is referred to as "CR.page." There is only one volume of the clerk's record.

7

of heart created blood pressure directly contradicts Dr. Brown's testimony that the wounds with red margins indicate that the heart was beating and pumping blood when the wounds were created.

In addition, the fact that there was no blood in Mr. Byrd's cadaver when the autopsy was performed clearly indicates that the blood left his body through a method other than heart created blood pressure. Mr. Byrd's heart could not have pumped all of the blood from his body. He would have died from loss of blood before his heart could pump all of the blood out and there would be some blood remaining.

Dr. Brown also testified, in response to a question about defensive wounds, that Mr. Byrd must have held himself up on his elbows and heels causing the injuries seen on his heels and elbows. Dr. Brown also testified that the absence of a certain type of injury to the back of the head indicated that Mr. Byrd must have been conscious close to the culvert. **XXIV SF 268 - 269.**[4] Trial counsel acted in an ineffective manner by not challenging this statement. Dr. Lloyd White, a pathologist of more than 30 years, reviewed Dr. Brown's testimony while preparing to testify in the trial of a co-defendant, Shawn Berry. Dr. White's opinion, in Shawn Berry's case, was that it could not be determined with any degree of certitude whether, from looking at the injuries on Mr. Byrd's body, he was conscious or unconscious while he was being dragged. As he stated, "the injuries are simply too massive, too extensive, and too non-specific to draw a conclusion one way or the other with any degree of certainty." Dr. White's testimony is attached as an Exhibit to this Petition.

---

[4]Evidence suggested that Mr. Byrd was decapitated when his body struck a cement culvert.

Dr. Brown's unchallenged testimony that some of the wounds occurred when Byrd was

alive because blood flowed to and through them is clearly incorrect on it's face. Dr. Brown's

testimony that Mr. Byrd was alive during the dragging because of the nature of the wounds to the

elbows and heels and the absence of a certain type of wound to the back of the head is incorrect

on it's face. Trial counsel performed unreasonably by not presenting available testimony from a

pathologist contradicting Dr. Brown. Such testimony would have impacted the trial in that the

only evidence of kidnaping, the only evidence that Mr. Byrd was alive when restrained by a chain,

came through Dr. Brown. Without Dr. Brown's inaccurate testimony, there was no evidence of

kidnap and no rational juror could have Mr. Brewer guilty beyond a reasonable doubt of capital

murder.


### TRIAL COUNSEL OFFERED ONLY INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO PERFORM A THOROUGH BACKGROUND INVESTIGATION AND FAILING TO THOROUGHLY PREPARE FOR THE PUNISHMENT PHASE OF MR. BREWER'S TRIAL

The sentence of death assessed for Mr. Brewer is Constitutionally unsound because trial

counsel failed to conduct a thorough and detailed investigation of Mr. Brewer's background

Petitioner bases his this claim on **Wiggins v. Smith**, 02-311, (U.S. 2003). **Wiggins**

declares "'Strategic choices made after less than complete investigation are reasonable' only to

the extent that 'reasonable professional judgments support the limitations on

investigation.'**Strickland.**, at 690-691. A decision not to investigate thus 'must be directly

assessed for reasonableness in all the circumstances.' **Id.**, at 691. " While **Wiggins** implies that it

is merely interpreting **Strickland,** this interpretation had not been followed by the Fifth Circuit

9

prior to the Supreme Court's delivery of **Wiggins,** therefore this interpretation of **Strickland** was unavailable to prior counsel at the time of filing the initial writ.

The Fifth Circuit, in interpreting **Strickland** has long held that a decision not to investigate based upon an investigation that is less than complete constitutes effective assistance of counsel. For example, in **Smith v. Cockrell**, 311 F.3d 661 (5th Cir. 2002), the Fifth Circuit held that "So long as counsel made an 'adequate investigation,' any strategic decisions made as a result of that investigation 'fall within the wide range of objectively reasonable professional assistance.' **citing Moore v. Johnson**, 194 F.3d 586, 591 592 (5th Cir. 1999). An adequate investigation clearly is not the compelled complete investigation that would support strategic decisions.

The Fifth Circuit has also stated "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances.. In particular, counsel's strategic decisions not to conduct further investigation in pursuit of mitigating evidence are entitled to substantial deference under Strickland." **Foster v. Johnson**, 293 F.3d 766 (5th Cir. 2002). A strategic decision not to investigate seems to have deference here whether or not it was complete or reasonable.

The Fifth Circuit has even held that an Mr. Brewer's reluctance to provide information necessary to counsel relieves counsel of the burden to investigate. **Soria v. Johnson**, 207 F.3d 232 (5th Cir. 2000) ("Soria has failed to show that counsel's investigation was constitutionally inadequate. Counsel talked to the family members and encouraged Soria and his family to be candid regarding his past behavior and family background. . . .  counsel should not be faulted for Soria's decision to conceal any such evidence. Cf. **Moore v. Johnson**, 194 F.3d 586, 607 (5th

10

Cir. 1999) (explaining that petitioner's ability to meet his burden of demonstrating inadequate investigation by counsel was substantially undermined when petitioner chose to present an alibi defense). Accordingly, we conclude that counsel's investigation and the strategic decisions based thereupon were reasonable."). Neither Terry Williams from **Williams v. Taylor**, 529 U.S. 362 (2000) nor Kevin Wiggins from **Wiggins v. Smith** spontaneously offered all of the information to the trial attorneys that habeas counsel later unearthed. Yet in each of these cases their was a finding of ineffective assistance of counsel. Each defendant, presumably knows his own background but counsel is charged with making a complete investigation into that background anyway.

The Fifth Circuit, prior to the Supreme Court's delivery of **Wiggins**, did not interpret Strickland in a manner that required complete investigations of the background of capital clients. The interpretation of **Strickland** that compels a complete background investigation was not available to prior counsel at the time the initial writ was filed.

Trial counsel failed to conduct a thorough background investigation for Mr. Brewer. Trial counsel retained a psychologist, Dan Roberts, and provided Roberts with Mr. Brewer's prison records and allowed the psychologist to interview Mr. Brewer, his mother and father and his fiancé, and allowed the psychologist to perform some testing. There is no evidence that trial counsel performed any background investigation or inquired of any witness about potential mitigating evidence available.

The psychologist, Dan Roberts, testified that based upon his testing, Mr. Brewer is a passive, submissive person with average intelligence. The psychologist testified that Mr. Brewer would not be threat of future dangerousness based upon his reading of the prison records and

11

meeting with Mr. Brewer.

Mr. Brewer's mother, Helen Brewer, testified that Mr. Brewer was kicked out of the family home at 14 years old because of conflicts with his dad over drug use. She testified that Mr. Brewer had nowhere to go once he was kicked out. She testified that Mr. Brewer would come back to the house and she would have to make him leave even though he didn't know where to go. Ms. Brewer testified that Mr. Brewer went to Jasper because he had no where else to go after his girlfriend kicked him out of the house. **XXVIII 60**

Mr. Brewer's father, Lawrence Russell Brewer Sr. testified that Mr. Brewer was easily influenced and a follower. Mr. Brewer Sr. Said that Mr. Brewer had never been in a fight to his knowledge. **XXVIII SF 153**

A family member and a friend testified that Mr. Brewer was a follower, not aggressive, and would not be threat of violence in the future. **See Shirley Brown, Paula Cruz, XXVIII SF 71 , 89.**

Mr. Brewer had volumes of detailed mitigation evidence available had trial counsel investigated. Ms. Brewer has informed counsel that Mr. Brewer had nowhere to go once he was expelled from the house. He had no friends that could take him in. There was no homeless center or shelter in the region where Mr. Brewer's family lived. Mr. Brewer used to sleep in old cars, " a little old piece of a trailer," open fields. Mr. Brewer was often hungry and had nowhere to turn. Mr. Brewer would come to the house hungry and Ms. Brewer would feed him but she was forced to make him leave before his father returned.

Mr. Brewer had no friends to speak of as a teenager. Before his dad returned, Ms. Brerwer kept her kids near the house, allowing them out only for church and school. Mr. Brewer

12

was close only to his brothers and the preacher of the church, Sister Scott. By the time Mr.

Brewer was kicked out of the house, he had only one friend outside of the household, a boy that

lived up the street. Mr. Brewer was so alone during this time that Ms. Brewer saw him sitting out

in a pasture, just staring off into space.

There was testimony that Mr. Brewer was kicked out of his house as a teenager but trial

counsel failed to gather data regarding the impact of that abandonment on Mr. Brewer's daily life

or on his development. Mr. Brewer was later evaluated using psychological instruments in

preparation for trial. The psychological testing revealed that Mr. Brewer was very dependent,

submissive, and fearing of rejection by others. **See Defendant's Ex. #18, trial record.** The

interaction between the depth of Mr. Brewer's early abandonment by his family and his later

dependent personality functions was never explored by trial counsel. Any nexus between Mr.

Brewer's abandonment, his dependence, his later need to go be with a friend in Jasper when

abandoned by his girlfriend was not explored or brought to the jury's attention. There is no basis

for trial counsel not to investigate such issues nor bring evidence of these issues to the attention of

the jury once investigated. In accord with **Wiggins,** trial counsel performed in an ineffective

manner. This Court should vacate Mr. Brewer's sentence and remand his case to the trial court.

## THE STATE KNOWINGLY OFFERED FALSE AND INADMISSIBLE TESTIMONY THROUGH THEIR EXPERT DR. GRIPON VIOLATING THE 8TH, 5TH AND 14TH AMENDMENTS

Mr. Brewer's death sentence is constitutionally unsound because Dr. Gripon provided

false expert testimony.

Dr. Edward Gripon testified in the punishment phase of Mr. Brewer's trial. Dr. Gripon told the jury that Mr. Brewer has a substantial propensity for committing acts of criminal violence in the future. **XXVIII SF 29.**

Dr. Gripon based this assessment on Mr. Brewer's lack of remorse, his gang affiliation, his writings, and his criminal history. These factors were used by Dr. Gripon to arrive at  a "diagnosis" of future dangerousness.  Trial counsel did not object to Dr. Gripon's expertise, credentials, ability to make such predictions or his methodology. His testimony was the centerpiece of the prosecution's case at the punishment phase as his was the only expert testimony presented by the State at that phase of the trial.

Dr. Gripon was never qualified to testify on the issue of future dangerousness and was never qualified by the Court, but was simply tendered as an expert in the filed of psychiatry. **XXVIII SF 5 - 8, 54.** His testimony was received despite his own admission at trial that the position of the American Psychiatric Association is that psychiatrists have no special ability to predict future dangerousness. **XXVIII SF 35, 51.**  In addition, such testimony on future dangerousness violates the Eighth Amendment, as it is not reliable, misleads the jury, and deprives the defendant of the individualized sentencing hearing to which he is entitled.

Dr. Gripon and his methodology are virtually without support amongst forensic psychiatrists.  The psychiatric community as a whole has repeatedly rejected his methods.[5]  An APA task force found his methods of practicing psychiatry to be both unreliable and

---

[5] *See, e.g.,* Applebaum, Paul S., M.D., "Hypotheticals, Psychiatric Testimony, and the Death Sentence," *Bulletin of the American Academy of Psychiatry and the Law* 12.2 (1984): 169-77; Dix, George E., "The Death Penalty: 'Dangerousness,' Psychiatric Testimony and professional Ethics." *American Journal of Criminal Law* May, 1977; Ewing, Charles P. "'Dr. Death' and the Case for an Ethical ban on Psychiatric and Psychological

unprofessional.[6]

The wholesale refutation of Gripon is based on the widespread belief among the psychiatric profession that future dangerousness cannot be reliably predicted, and to testify otherwise is simply unethical.  Forensic psychiatrists as a profession oppose "recommending the death penalty specifically or expressing an opinion on a state's legal criteria virtually amounting to such a recommendation."[7]  The language of the Task Force on Clinical Aspects of the Violent Individual  underscores why Gripon's claims are unsupported by his peers:

> Neither psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or "dangerousness."  Neither has any special psychiatric "expertise" in this area been established.[8]

Nevertheless, at the time of Mr. Brewer's trial Gripon, who frequently gives this testimony at the punishment phase of Texas capital trials, testified unequivocally that Mr.  Brewer holds a substantial risk of propensity for future violent criminal acts despite the widespread discrediting of his methods. **XXVIII SF 29.**

Gripon claims he is able to do what his profession as a whole recognizes cannot be done: reliably predict future dangerousness.  The APA Task Force on the Role of Psychiatry in the Sentencing Process pointed out that "[c]onsiderable evidence has been accumulated by now that

---

[6]   American Psychiatric Association, "Clinical Aspects of the Violent Individual"  (1974).

[7]   Weinstock, Robert, "Perceptions of Ethical Problems by Forensic Psychiatrists," *Bulletin of the American Academy of Psychiatry and the Law,* Vol. 17, No. 2, p. 194 (1989).

[8]   Clinical Aspects,  at 28. Gripon acknowledged these criticisms of the "accuracy" of predictions of future dangerousness at trial but made the predications anyway. **See XXVII SF 8, 51.**

long-term prediction by psychiatrists of future violence is an extremely inaccurate process."[9]  The

APA Task Force on Clinical Aspects of the Violent Individual concluded "the ability of

psychiatrists or any other professionals to reliably predict future violence is very unsatisfactory."[10]

Yet, Dr. Gripon continues to give sworn testimony including predictions of future criminal violent

acts.

> In an *amicus curiae* brief filed in **Barefoot v. Estelle,**[11] the American Psychiatric

Association minced no words in arguing to the Supreme Court why Gripon's testimony should

not be allowed in capital cases:

> > Psychiatrists should not be permitted to offer a prediction
> > concerning the long-term future dangerousness of a defendant in a
> > capital case, at least in those circumstances where the psychiatrist
> > purports to be testifying as a medical expert possessing predictive
> > expertise in this area. Although psychiatric assessments may permit
> > short-term predictions of violent or assaultive behavior, medical
> > knowledge has simply not advanced to the point where long-term
> > predictions---the type of testimony at issue in this case--may be
> > made with even reasonable accuracy.  The large body of research in
> > this area indicates that even under the best of conditions,
> > **psychiatric predictions of long-term future dangerousness are
> > wrong in at least two out of every three cases.**
> > Brief, at 8-9 (emphasis added).

Analyses not based on full clinical exams are rejected by the APA.  Gripon consistently

violated professional standards in basing his assessment of future dangerousness on extremely

---

8  Task Force Report at p. 14.

9  American Psychiatric Association, Task Force Report No. 8: "Clinical Aspects of the Violent Individual" (July 1974).

10  **Barefoot v. Estelle**, 463 U.S. 880 (1983), *Amicus Curiae* Brief of the American Psychiatric Association. (Exhibit 34 herein)

limited information.  Despite the fact that literature in the mental health field consistently recommends using a full battery of tests when diagnosing a patient, Gripon did not test this defendant and made his "diagnosis" of "a substantial risk for the propensity for future violent acts," based *solely* on an interview with the defendant, material about the crime and the defendant furnished by the State. This method has been rejected by the APA Task Force on Sentencing.[12] In fact, Dr. Gripon testified that he performed no testing on Mr. Brewer even though testing data would be helpful for his prediction. **XXVIII SF 31, 46.**

In **Barefoot v. Estelle**, the Supreme Court ruled--over the protestations of the American Psychiatric Association--that admitting opinion testimony based on a hypothetical to predict future dangerousness did not violate due process.  463 U.S. 880, 904, 905 (1983). Essentially, it found that the jury was capable of independently evaluating the strength of such scientific testimony. *Id.* at 898, 899.

However, in **Daubert v. Merrill-Dow Pharmaceuticals, Inc.**, 113 S. Ct. 2786 (1993), the Supreme Court continued the trend it began in **Rock v. Arkansas**, 483 U.S. 44 91987), rejecting the unfettered introduction of scientific testimony and acknowledging the need for the trial court's gatekeeping role missing from **Barefoot**.

In **Daubert**, the Supreme Court ruled that the **"Frye"**[13] requirement that such evidence be 'generally accepted' in the field to which it belongs must be superceded by the requirements of Federal Rule of Evidence 702. **Id.**, 113 S. Ct. at 2794.  Rule 702, the Court concluded, does not make "general acceptance" an absolute prerequisite to admittance, for doing so would "be at odds

---

[13]  *See Frye v. United States*, 293 F. 1014 (D.C. 1923).

17

with" the 'general approach of relaxing the traditional barriers to opinion testimony." *Id.,* 113 S. Ct. at 2794, citing **Beech Aircraft v. Rainey**, 488 U.S. 153, 169 (1988).

Thus, the Court replaced **Frye** by placing the onus on the trial judge to determine "whether the expert is proposing to testify to (1) 'scientific knowledge' that (2) will assist the trier of fact to understand or determine a fact in issue." **Daubert**, 113 S. Ct. At 2796. "Scientific" is defined as having "a grounding in the methods and procedures of science[,]"; "knowledge" as "more than a subjective belief or unsupported speculation." *Id.* at 2795.

To balance out this expansion of admissibility standards, the **Daubert** Court explicitly assigned to the trial judge the gatekeeping task of making this initial assessment, and the task of monitoring its use if the court allows it to be heard. *Id.* at 2795-96. With regard to "gatekeeping," the **Daubert** Court now requires the trial judge to make a preliminary assessment of the evidence *outside the presence of the jury* to see that it meets the two pre-requisites outlined above. *Id.*

If the evidence is admitted, the trial court's monitoring function begins. This monitoring should work to assure and encourage "[v]igorous cross-examination, presentation of contrary evidence, and careful instructions on the burden of proof"---for those are "the traditional and appropriate means of attacking shaky but admissible evidence." **Id.** at 2798.

The monitoring process continues after the testimony is heard. If the trial judge concludes that the evidence, though already admitted, is nonetheless "insufficient to allow a reasonable juror to conclude that the position [taken] more likely than not is true, the court remains free to direct a judgment..." *Id.* at 2798. In other words, not even admissibility guarantees that this information can ultimately present a jury issue.

The Texas Court of Criminal Appeals was prescient in foreseeing this change in the Supreme Court's perspective, as it had announced the abandonment of the **Frye** test one year earlier. Specifically, in **Kelly v. State**, 824 S.W.2d 568 (Tex. Crim. App. 1992), **Frye** was abandoned in favor of a requirement that the proponent of novel scientific evidence prove:

> [T]o the trial court, by clear and convincing evidence and outside the presence of the jury, that the proferred evidence is relevant. If the trial court is so persuaded, then the evidence should be admitted for the jury's consideration, unless the trial court determines that the probative value of the evidence is outweighed by some factor identified in Rule 403.

**Kelly** at 573. The Court recognized "the difficulty lay persons have in evaluating the reliability of novel scientific testimony."[14] The proponent's burden is satisfied only if (1) the scientific theory upon which the evidence is based is valid, and (2) the technique applying the theory is valid, and (3) the technique was properly applied in the instance in question.[15]

In upholding the use of Texas' special issues in order to satisfy minimal requirements of due process in capital sentencing, the **Jurek v. Texas** Court conditionally permitted a jury to make its own prediction of a capital defendant's future dangerousness upon its "hav[ing] before it all possible relevant information about the individual defendant whose fate it must determine." 428 U.S. 262, 274-76 (1976). Likewise, in **Barefoot**, the Court relied upon the "adversary

---

[14]  **Kelly**, at 573, relying on **Zani v. State**, 824 S.W.2d 568 (Tex. Crim. App. 1992. *Zani* is how the Texas courts have addressed the standards set forth in *Rock v. Arkansas*, discussed *infra*.

[15]  The Texas Court of Criminal Appeals cited the factors to be taken into account: for example the expert's qualifications; acceptance of the theory in the scientific community; the potential error rate; the availability of other experts to test and evaluate the technique and the clarity with which it can be explained to the court. Even when all these factors are evaluated, the court must still "balance" the admissibility of the evidence.

system" to "uncover, recognize and take due account of [the evidence's] shortcomings"--thereby

assuring due process. **See Barefoot**, 463 U.S. at 898-901.

Since then, however, the Court has deemed these methods inadequate in favor of a

process that makes admissibility of scientific testimony contingent upon a showing of *reliability*--

first in **Rock v. Arkansas**, 483 U.S. 44(1987), and most recently in **Daubert**. In **Rock**, the Court

conditioned the admission of hypnotically-enhanced testimony (thereby conditioning recognition

of hypnosis as a useful litigation tool) upon a showing of reliability. In that case, the reliability

was found in the trial judge's ability to review and assess the method used by reviewing

recordings of the hypnosis sessions--before the jury heard any of the testimony. **Daubert**, of

course, prescribes similar gate-keeping measures. *See generally, supra.*

Based on the same principles set forth in **Rock, Daubert**, and **Kelly v. State**, it has been

suggested that the Texas courts no longer give this testimony on future dangerousness such a free

hand:

> Although Dr. Grigson's[16] testimony is not incompetent *per se*, his testimony should not receive our judicial stamp of approval...[T]he trial judge is required to independently determine the admissibility of Dr. Grigson's testimony in each case.

**Fuller**, 829 S.W.2d at 214 (Baird, J., concurring and dissenting). State courts across the country

already have found that Gripon-like purported expert scientific opinions based on hypothetical

---

[16]  Dr. Grigson, who gave testimony similar to that of Dr. Gripon's in Mr. Brewer's case, was expelled from the APA in 1995 for making these predictions of future dangerousness without ever having personally examined the defendant.

scenarios fail the **Daubert** requirements.[17]  Likewise, in applying the **Daubert** standards, Gripon's

testimony in Mr. King's case fails the prerequisite test.  His methodology does not have a known

or potential error rate, is not accepted in the scientific community, has not withstood peer review,

and cannot be fully tested.  **See Daubert**, 113 S. Ct. At 2796-97.

### 3. The *Rock/Daubert/Kelly* change in the law has Eighth Amendment implications as well.

In the context of a capital criminal prosecution, the change in the law governing scientific

evidence also has Eighth Amendment implications.  At its core is the Eighth Amendment's

demand for "heightened reliability" of capital sentencing determinations and the corresponding

requirement that they be individualized.[18]  In short, jurors must be able to assess fully and

correctly "the character and record of the individual offender and the circumstances of the

particular offense" in determining whether death is the appropriate punishment.  **Woodson**, 428

U.S. at 304.

---

[17]  For instance, the Supreme Court of New Hampshire recently looked to **Daubert** in rejecting a psychologist's conclusion about a child being the victim of sexual abuse based on the expert's "blind interpretation" of the child's drawings from the witness stand. *State v. Luce*, 628 A.2d 707, 709 (N.H. 1993).  In particular, it grounded its **Daubert**-ian finding of unreliability on the fact that the expert "had not reviewed the drawings prior to trial, had no knowledge of the circumstances surrounding their creation, and had not interviewed the child who drew them. *Id.* (Conviction reversed).  **See also People v. Johnson**, 19 Cal.App.4th 778, 788-91 (Cal. App. 1st Dist. [Div. 5] 1993)(citing **Daubert**, upholds trial court's preventing defense from presenting expert sociologist's testimony and other expert opinion testimony about the incredibility of prosecution witnesses on the grounds that these experts had not been shown to "research the particular inmates in question, or had made any scientific study of their credibility").

[18]  **See Woodson v. North Carolina**, 428 U.S. 280, 305 (1976) ("Because of [the qualitative difference between a term of years and a death sentence], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."); **Eddings v. Oklahoma**, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978).

In **Penry**, the Supreme Court determined that without special instructions from the trial judge, the jury had no way to express its "reasoned moral response" to Penry's mitigating circumstances by imposing a sentence less than death.  Thus, there was an unacceptable risk that Penry was sentenced to death in spite of factors that might have called for a less severe penalty. Under this analysis, the Eighth Amendment required resentencing.  **Penry**, 492 U.S. at 328; *see* **Lockett v. Ohio**, 438 U.S. 586, 605 (1978).  **Penry** made clear that the trial court has an affirmative responsibility in assuring that a truly individualized and reliable sentencing determination be made in capital cases.

A hallmark of Gripon's testimony in Mr. Brewer's  case was the problematic brevity of his analysis.  He never interview Mr. Brewer's associates or family or reviewed school or probation records nor did he test Mr. Brewer. He only spoke with Mr. Brewer and reviewed reports on the case.  Meanwhile, the defense and the  trial court stood by and let this happen.  Under **Barefoot**, this may have been acceptable, but **Barefoot's** allowance of such testimony can no longer be considered good law in light of **Daubert.  Kelly** heralds that this is the position of the Texas Court of Criminal Appeals, as well.

All Dr. Gripon presented was unsupported speculation, cloaked in the false respectability of "expert testimony."  The improper admission of this testimony unfairly swayed the jury's evaluation of Mr. Brewer's  propensity for future dangerousness and moral culpability. Consequently, he was denied his right to an individualized sentencing determination under the Eighth and Fourteenth Amendments to the United States Constitution and their counterparts in the Texas Constitution.

The virtually unique  sanctioning of  such "future dangerousness" testimony by Texas

courts here worked in deadly partnership with Texas's history of appointing woefully inadequate trial counsel in capital cases.

The concurring opinion in **Flores**, 210 F.3d 450, by Justice Garza, analyzes in detail the history, application and interpretation of the Texas capital sentencing structure. "While states have discretion to structure their capital sentencing system as they please, the Supreme Court has made clear that whatever form they choose, individualization of the sentencing scheme 'selection' hearing is constitutionally mandated." Flores, 210 F.3d at 460.[19] As that opinion notes, the Supreme Court in **Barefoot v. Estelle**, 463 U.S. 880, 103 S. Ct. 3383 (1983), held that there was no constitutional problem with prosecutors supplying juries with psychiatric predictions of future dangerousness even though the psychiatric profession itself found such predictions to be unreliable more than 50% of the time. As Justice Blackmun noted in dissent: "In no area is purportedly 'expert' testimony admitted for the jury's consideration where it cannot be demonstrated that it is correct more often than not. It is inconceivable that a judgment could be considered an 'expert' judgment when it is less accurate than the flip of a coin." **Barefoot**, at 931.

But the majority of the **Barefoot** court relied on the adversarial process to assist the jury in deciding whether to credit such testimony, indicating that the normal process of cross-examination and presentation of opposing theories was all that was required. The majority there agreed with the district court's finding that the jury's purpose "is to sort out the true testimony

---

[19] At the time of Mr. Flores' conviction, at the sentencing phase of a capital trial, jurors were asked three questions, two of which were: whether there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and whether there were sufficient mitigating circumstances to warrant that a life sentence rather than death be imposed. Tex. Code Crim. P. Ann. Art. 37.071(b). A third issue was given in Mr. Brewer's case.

from the false, the important matters from the unimportant matters, and, when called upon to do so, to give greater credence to one party's expert witnesses than another's." **Barefoot**, at 902. The **Barefoot** court buttressed its conclusion that the practice is constitutional by noting that this stance was embraced by the Federal Rules of Evidence:

> [T]he rules of evidence generally extant at the federal...[level[] anticipate that relevant, unprivileged evidence should be admitted and its weight left to the fact-finder, who would have the benefit of cross-examination and contrary evidence by the opposing party. **Id**. at 898.

At the time **Barefoot** was written, "no federal appeals courts had ever ruled that judges could condition the admissibility of expert testimony in a civil case on a demonstration of its reliability."[20] In **Barefoot's** time, the courts screened proposed expert testimony merely to assure that the expert was qualified and to assure that the testimony was relevant to the issues, but not for reliability. The majority in the 1983 **Barefoot** decision stated that "[w]e are unconvinced...*at least as of now*, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence..." **Barefoot**, at 910 (emphasis added). Thus, they left the issue open for re-examination in light of future developments.

A decade after **Barefoot**, in **Daubert v. Merrell-Dow Pharmaceuticals, Inc**, 509 U.S. 579, 113 S. Ct. 2786 (1993), the Supreme Court shifted course, declaring that "under the [Federal Rules of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." **Id.** at 589. The Court in **Daubert** found this

---

[20] Michael H. Gottesman, *From Barefoot to Daubert to Joiner: Triple Play or Double Error?*, 40 Ariz. L. Rev. 753, 755 (1998), cited in the concurring opinion, 210 F.3d at 465 n.11 ( mentioning the argument developed herein, the "viability of the *Barefoot* majority's analysis post-*Daubert.*" *Id*.).

requirement implicit in Rule 702's description of expert scientific testimony as testimony about

"scientific...knowledge." Fed. R. Evid. 702. As this Court stated:

> The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds."... Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science...But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method...In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.
> **Daubert,** 509 U.S. at 590.

Given this shift from the qualifications of the expert and relevance to the reliability of the

evidence, it is Petitioner's contention that **Barefoot** is no longer good law regarding the specific

question of the admissibility of predictions of dangerousness. As the footnote in the concurring

opinion points out, "several commentators have questioned the viability of the **Barefoot**

majority's analysis post-**Daubert**." **Flores**, 210 F.3d at 465, n. 11.

Even outside the sphere of **Daubert** and the Federal Rules of Evidence, the Supreme

Court is raising the requirement of reliability in similar evidentiary matters. For example in

**United States v. Scheffer**, 118 S. Ct. 1261 (1998), the Court held that polygraph evidence was

not admissible for the defense in criminal trials. The Supreme Court noted that "the exclusion of

unreliable evidence is a principal objective of many evidentiary rules." **Id.**, at 1265. The Supreme

Court has affirmed in **Kumho Tire v. Carmichael**, 119 S. Ct. 1167 (1999) that the **Daubert**

factors may apply to all expert testimony, scientific or otherwise. In **Kumho Tire**, the Court also

observed that "an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the

25

practice of an expert in the relevant field." **Kumho**, 119 S. Ct. at 1176, cited in **Flores**, 210 F.3d

at 464 (Garza, J., concurring).

As Judge Garza's concurring opinion indicates, psychiatric predictions of future

dangerousness are rarely reliable. When the jury in this case was called upon to make the ultimate

determination whether Mr. Brewer would commit future acts of violence, the inherent

unreliability of psychiatric predictions of violent behavior was so great that the jury was not

assisted in any way by the use of such prognostications.[21]  **See also E.I. du Pont de Nemours &**

**Co. v. Robinson**, 923 S.W.2d 549 (Tex. 1995)(Approving **Daubert** and requiring proponent to

show relevance and reliability of scientific expert testimony). Rather their predictions belong in

the realm of what has become known to the courts as "junk science."[22]

While the use of psychiatric predictions of future dangerousness is not new, such

---

[21] *See* Tex.R.Crim.Ev. 702: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[22] *See* Peter W. Huber, *Galileo's Revenge: Junk Science in the Courtroom* (1991); *Brock v. Merrell Dow Pharmaceuticals*, 884 F.2d 167 (5th Cir. 1989); *Lust by and through Lust v. Merrell Dow Pharmaceuticals*, 89 F.3d 594 (9th Cir. 1996); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 554 (Tex. 1995) (discussing need to stem the flow of "junk science" and "kitchen chemistry" in our courts). *See also* Odom, J., quoted in George E. Dix, *The Death Penalty, "Dangerousness," Psychiatric Testimony, and Professional Ethics*, 4 Am. J. Crim. Law 151, 164: "I am unable to find that much of the testimony offered [regarding future dangerousness] was from this side of the twilight zone." Judge Garza commented on the reliability of such predictions as follows: "[o]ne commentator recently reviewed the psychological research on the issue post-*Barefoot* and concluded that "whereas first generation research suggested that perhaps one out of three people predicted to engage in some kind of violent behavior will actually go on to do so, more recent studies suggest that one out of every two people predicted to be violent would go on to engage in some kind of legally relevant, violent behavior." Randy Otto, On the Ability of Mental Health Professionals to "Predict Dangerousness": A Commentary on Interpretations of the "Dangerousness" Literature, 18 LAW. & PSYCHOL. REV. 43, 63 & n.63 (1994)." *Flores, supra*, 210 F.3d at 465, n. 11.

predictions remain novel in the sense of being unusual in the realm of psychiatric practice.
Scientific endeavors are not frozen in time: theories that in one era are widely approved may be
later disproved, and the historical respect accorded them should not create an automatic
presumption of admissibility. "[Science] is advanced by a broad and wide-ranging consideration
of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and
that in itself is an advance." **Daubert**, at 597.

In light of the acknowledgment in **Daubert** that scientific thinking can be called into
question as the passage of time brings out its weaknesses, the precedential value of **Barefoot** can
no longer be considered constitutionally valid. The trend toward exclusion of unreliable evidence,
even evidence claimed to be scientific in basis, is a growing one, and one which tends to promote
trustworthy fact-finding. **See United States v. Scheffer**, 118 S. Ct. 1261 (U.S. (1998)(exclusion
of polygraph evidence promoted interest in reliability of trial process).

Predictions of future dangerousness are not the product of any legitimate scientific
research, methodology or practice. They have no legitimate medical purpose. The error rate for
such "scientific" predictions is far higher than if the jury chose to "predict" future dangerousness
by flipping a coin.[23]  **See Ohio Adult Parole Authority v. Woodard**, 118 S. Ct. 1244, 1254
(1998)(concurring opinion of O'Connor, J.)(it would be due process violation to make clemency
decision on basis of a coin toss). In light of the considerably lesser due process rights that attach
to clemency proceedings, there certainly would be a due process violation for a sentencing
decision to be based on a prediction that has even less reliability than a coin toss. No professional

---

[23] See, American Psychiatric Association Task Force Report, Clinical Aspects of the
Violent Individual 28 (1974) "90% error rate [u]nfortunately ... is the state of the art").

27

literature accepts the practice of making predictions of future dangerousness based less than a full evaluation in any circumstance. In fact, the psychiatric community utterly rejects the practice.[24] They are in fact the antithesis of the types of scientific evidence upon which the courts have traditionally chosen to rely:

> The scientific community virtually unanimously agrees that psychiatric testimony on future dangerousness is, to put it bluntly, unreliable and unscientific. It is as true today as it was in 1983 that "[n]either the Court nor the State of Texas has cited a single reputable scientific source contradicting the unanimous conclusion of professionals in this field that psychiatric predictions of long-term future violence are wrong more often than they are right." *Id.* at 920, 103 S.Ct. at 3409 (Blackmun, J., dissenting) (citing studies). As those in the field have often noted, nothing within the training of a psychiatrist makes him or her particularly able to predict whether a particular individual will be a continuing threat to society... In fact, not even the *Barefoot* majority could identify a "scientific" basis for predictions of future dangerousness; its opinion expressly rests on the analysis that "even a lay person" could make such predictions.
> **Flores**, *supra*, 210 F.3d at 463-464 (Garza, J., concurring).

The inherent unreliability of these predictions is made still more prejudicial by the fact that juries may be influenced by the mere labeling of a witness as "expert," with the connotations of scientific impartiality and learned authority that appellation brings. "[T]o the jury an expert is just an unbridled authority figure, and as such he or she is more believable." Charles R. Richey, *Proposals to Eliminate the Prejudicial Effect of the Use of the Word "Expert" Under the Federal Rules of Evidence*, 154 F.R.D. 537, 544 (1994). Although the traditional methods of attacking scientific evidence -- vigorous cross-examination or the presentation of rebuttal evidence -- remain available, some commentators contend that "ostensibly scientific testimony may sway a

---

[24]American Psychiatric Association, *Draft Report on the Role of Psychiatry in the Sentencing Process*, 32-33: "Needless to say, responding to hypotheticals is just as fraught with the possibility of error as testifying in any other way about an individual whom one has not personally examined. *Although the courts have not yet rejected the practice, psychiatrists should.*" (Emphasis added).

jury even when as science it is palpably wrong." Black et al., *Science and the Law in the Wake of Daubert: A New Search for Scientific Knowledge*, 72 Tex.L.Rev. 715, 801 (1994).

The Supreme Court in **Daubert** outlined five non-exclusive factors to assist trial judges in determining the reliability, and hence admissibility of scientific evidence: Those factors are:

(1) whether the theory has been tested,
(2) whether the theory has been subjected to peer review and publication,
(3) the known or potential rate of error
(4) the existence of standards controlling the operation of the technique, and
(5) the degree to which the theory has been generally accepted by the scientific community.
**Daubert,** 509 U.S. at 593-94, 113 S.Ct. at 2796-97; **Flores,** 210 F.3d at 464.

As pointed out in Judge Garza's concurring opinion,

it appears that the use of psychiatric evidence to predict a murderer's "future dangerousness" fails all five **Daubert** factors. First, "testing" of these theories has never truly been done, as "such predictions often rest ... on psychiatric categories and intuitive clinical judgments not susceptible to cross- examination and rebuttal." **Barefoot**, 463 U.S. at 932, 103 S.Ct. at 3414-15 (Blackmun, J., dissenting)... *see also* APA Br. at 17 ("Because most psychiatrists do not believe that they possess the expertise to make long-term predictions of dangerousness, they cannot dispute the conclusions of the few who do."). Second, as is clear from a review of the literature in the field, peer review of individual predictions is rare, and peer review of making such predictions in general has been uniformly negative. *See, e.g.*, Grant Morris, *Defining Dangerousness: Risking a Dangerousness Definition*, 10 J. CONTEMP. LEGAL ISSUES 61, 85-86 (1999) (citing studies) ("More than twenty years ago, Alan Stone acknowledged that psychiatrists cannot predict whether a person will engage in dangerous behavior with a certainty, or beyond a reasonable doubt, or by clear and convincing evidence, or even by a preponderance of the evidence. As to clinically-based predictions of dangerousness, the passage of time has not altered the accuracy of Stone's judgment."). Third, the rate of error, at a minimum, is fifty percent, meaning such predictions are wrong at least half of the time... Fourth, standards controlling the operation of the technique are nonexistent. See APA Br. at 13 (noting that "the professional literature demonstrate[s] no reliable criteria for psychiatric predictions of long-term future behavior"). Overall, the theory that scientific reliability underlies predictions of future dangerousness has been uniformly rejected by the scientific community absent those individuals who routinely testify to, and profit from, predictions of dangerousness.
**Flores, supra**, 210 F.3d at 463-64 (Garza, J., concurring).

29

It is axiomatic that capital cases require a heightened degree of reliability in their

resolution, because of the grave consequences of a flawed decision at the sentencing phase.[25] As

Judge Garza points out in his concurring opinion, although in federal courts the rules of evidence

do not apply at a sentencing hearing,

> the cardinal concern of the rules of admissibility for expert testimony--reliability, see
> **Daubert**, 509 U.S. at 589, 113 S.Ct. at 2794 ("[T]he trial judge must ensure that any and
> all scientific testimony or evidence admitted is not only relevant, but reliable.")--is also the
> paramount concern in addressing the constitutionality of capital sentencing procedures.
> This cannot be mere coincidence.
> **Flores, supra**, 210 F.3d at 464, n.10 (Garza, J., concurring).

Widely recognized in the condemnation of such testimony is the danger that an unreliable

opinion, when clothed in an unwarranted aura of legitimacy, actually misleads the jury:

> As some courts have indicated, the problem here (as with all expert testimony) is not the
> introduction of one man's opinion on another's future dangerousness, but the fact that the
> opinion is introduced by one whose title and education (not to mention designation as an
> "expert") gives him significant credibility in the eyes of the jury as one whose opinion
> comes with the imprimatur of scientific fact. As has been previously recognized, when a
> medical doctor testifies that "future dangerousness" is a scientific inquiry on which they
> have particular expertise, and testifies that a particular defendant would be a "continuing
> threat to society," juries are almost always persuaded.
> **Flores, supra**, 210 F.3d at 465-66 (Garza, J., concurring).

This problem is reinforced in Mr. Brewer's case by the final argument at punishment of District

Attorney Gray. Mr. Gray told the jury that Dr. Gripon had called Mr. Brewer a 'psychopath," and

---

[25] *See, e.g.,* **Gardner v. Florida**, 430 U.S. 349, 359 (1977)("time invested in
ascertaining the truth would surely be well spent if it makes the difference between life and
death"); *Woodson v. North Carolina*, 428 U.S. 302, 305 (1976)(because of qualitative difference
between death and life, there is correspondingly heightened need for reliability in determination
that death is appropriate punishment); *Caldwell v. Mississippi*, 427 U.S. 325, 333 (1985)
(intolerable danger presented when jurors tempted to minimize importance of their role, and to
rely on authority of others to make sentencing decision). *See also Dawson v. Delaware,* 503
U.S. 159 (1992)(where state could not prove rational connection between evidence and
aggravating circumstance, introduction of evidence was constitutional error).

reminded them that Dr. Gripon thought Mr. Brewer was a threat of future danger because he was

part of a racist group. **XXIX SF 11, 42.** Surely Mr. Gray's reinforcing of Dr. Gripon's testimony

cause the jury to assume that Gripon's opinions were scientific fact.

   The additional problem with this testimony is that it  does not satisfy the Supreme  Court's

repeated insistence on

> an individualized sentencing hearing, *see, e.g., Lockett v. Ohio*, 438 U.S. 586, 604 (1978),
> "[i]t is not enough simply to allow the defendant to present mitigating evidence to the
> sentencer.  The sentencer must also be able to consider and give effect to that evidence in
> imposing sentence.  Only then can we be sure that the sentencer has treated the defendant
> as a uniquely individual human being and has made a reliable determination that death is
> the appropriate sentence." *Penry*, 492 U.S. at 319, 109 S.Ct. at 2947, 106 L.Ed.2d at 279
> (emphasis added) (citations omitted);  see also *Woodson*, 428 U.S. at 304, 96 S.Ct. at
> 2991 ("A process that accords no significance to relevant facets of the character and
> record of the individual offender or the circumstances of the particular offense excludes
> from consideration in fixing the ultimate punishment of death the possibility of
> compassionate or mitigating factors stemming from the diverse frailties of humankind.  It
> treats all persons convicted of a designated offense not as uniquely individual human
> beings, but as members of a faceless, undifferentiated mass to be subjected to the blind
> infliction of the penalty of death.").
> *Id.* at 469.

> As  Judge Garza writes,

> what separates the executioner from the murderer is the legal process by which the state
> ascertains and condemns those guilty of heinous crimes.  If that process is flawed because
> it allows evidence without any scientific validity to  push the jury toward condemning the
> accused, the legitimacy of our legal process is threatened.  The Supreme Court has made
> clear that the constitutionality of a state's capital sentencing scheme is dependent on the
> individualized basis in which defendants are considered.  I question whether that concern
> for individuality exists under a system which not only admits expert testimony deduced
> without examining the subject but also, as in this case, accepts the possibility that jurors
> will allow that evidence, rather than factors more personal to a defendant's crime and
> character, to effectively condemn that individual to death.
> **Flores, supra**, at 469-470.

The  gravity of the  flawed sentencing decision in this  capital case  is such that Mr. Brewer  must

at least be granted a new sentencing phase , as **Barefoot** is no longer constitutionally valid in light

of **Daubert** and **Kumho Tire**. "Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly ... Conjectures that are probably wrong are of little use ... in a quick, final and binding judgment -- often of great consequence -- about a particular set of events." **Daubert**, 509 U.S. at 597.

There is no **Teague v. Lane**, 489 U.S. 288 (1989) bar to this claim because it would be similar to the Supreme Court's decision in **Penry v. Lynaugh**, 492 U.S. 302 (1989), where it was held that the Texas statute as it had come to be applied was unconstitutional, and the Supreme Court's saying so was not "new." Here too, the Texas practice of offering this discredited testimony, in light of accumulating evidence of its unreliability, is now unconstitutional. Even if it is held to be a "new rule," **Teague** would still not apply as the claim would qualify under the second **Teague** exception, for rules "implicit in the concept of ordered liberty," **Teague, supra**, 489 U.S. at 313, and it is certainly implicit in the Supreme Court's death penalty jurisprudence that a defendant not be sentenced to death on the basis of fundamentally unreliable and misleading evidence. The hallmarks of cases which meet this exception are those that implicate the reliability and fundamental fairness of adjudications, and can be described as "fundamental" or "watershed" rules.[26]

Petitioner is thus entitled to relief on this claim.

.

**MR. BREWER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO CHALLENGE THE ADMISSIBILITY OF DR. GRIPON'S TESTIMONY AND FAILED TO CHALLENGE IT**

---

[26] **See, e.g., O'Dell v. Netherland**, 117 S. Ct. 1969, 1978 (1997); **Graham v. Collins**, 506 U.S. 461, 478 (1993).

32

### IN FRONT OF THE JURY

Dr. Edward Gripon, a Beaumont psychiatrist, testified for the prosecution at the punishment phase. **XXVIII SF 5** . He discussed the various factors that he relied upon in reaching an assessment of future danger, including statistics, though he did not specify them, interviews with the defendant and review of the circumstances of the offense. **Id** at 7.   He characterized the process as difficult and subject to a lot of criticism. **Id**.   The criteria he claimed the experts relied upon included ethnic background, educational levels, socio-economic levels, early life experiences, some 25-30 criteria. **Id at 10.** It was the kind of assessment he did everyday. **Id at 11.** He interviewed Mr. Brewer and asked him about his history of legal difficulties, whether he had every been on probation, released on parole etc.  "Past behavior tends to be a significant indicator of future behavior to a significant degree." **Id at 12.**  He also asked about prior drug use and prior mental health history. **Id.**

According to Dr. Gripon, Mr. Brewer had spent a substantial amount of his life incarcerated.   **ID at 15.**  He had no significant work history but had lived a largely hand to mouth existence with no stable employment or living up to responsibilities.   There was substantial history of drug abuse. **Id at 16.**

Dr. Gripon claimed to have extensively studied inmates and their ability to function outside of prison. **Id at 17.**  He knew that Mr. Brewer had committed a number of burglaries in the past.  To Dr. Gripon, this indicated someone who could not learn from his past mistakes. **Id at 18.** He argued that Mr. Brewer had made a choice to associate himself with other criminals. **Id at 19**. Mr. Brewer's participation in forming a group known as the Confederate Knights of America was a factor that demonstrated a propensity for violence. **Id at 20.**  It increased the size

33

of the potential victim pool. **Id**. Associating in prison with members of minority groups would suggest an increase in violent behavior. **Id at 22.** Committing a crime such as the murder of James Byrd would also indicate a propensity to commit other crimes against minorities in the future; such a defendant would have frequent contact with minorities in prison. **Id at 23.**

Dr. Gripon found no evidence of mental disorder based on his two and one half hour interview with Mr. Brewer. Though Mr. Brewer cried a lot, Dr. Gripon felt that emotion was a reaction to his current circumstance of being charged. **Id at 23.** He felt that Mr. Brewer had no social conscience and suffered from antisocial personality disorder, a diagnosis that used to by called psychopathy. **Id at 24.** People in this category tended to blame others for their problems, engaged in self pity, accepted no responsibility, had no remorse, ( Mr. Brewer was just upset at being caught, not remorseful) **Id at 24-5.** That he played volleyball and went back to the apartment to drink beer after the offense indicated to Dr. Gripon a lack of remorse. **Id at 25.** Mr. Brewer's letters to John King also indicated a desire to act out of self interest, what the prosecution, over objection, characterized as an effort to fabricate evidence. **Id at 28.** Based on these factors, the defendant would run a substantial risk of propensity for future violent criminal acts. **Id at 29.**

Dr. Gripon admitted he did no psychological testing. **Id at 31.** He admitted that the American Psychiatric Association had concluded that psychiatrists were no better at predicting future danger than laypersons who reviewed the same facts. **Id at 35.** He admitted there was no history of significant violent behavior. **Id at 36.**

Dr. Gripon's methodology was clearly faulty and objectionable under Texas law for several reasons:

1. Dr. Gripon's testimony was so lacking in scientific reliability or validity that it failed  to pass muster under **Tex.R.Evid. 702**;

2. Dr. Gripon was being called upon to provide expert testimony on a subject by reviewing the same evidence the jury is to review. His testimony was thus, of no assistance to the jury in resolving its issues. **Tex.R.Evid. 702.** Further, Dr. Gripon simply lent his "expertise" and his expert credentials to the state's case and his testimony, therefore, was far more prejudicial than probative and should have been excluded under **Tex.R.Evid. 403**.

3. Dr. Gripon's testimony was so lacking in reliability as to amount to a violation of due process;

A.

A **Rule 702** analysis is a two part one: (1) whether the evidence is sufficiently reliable to justify its admission and (2) whether the expert's opinion will be of substantial assistance to the jury in its fact finding function. Implicit in the latter requirement is a **Rule 403** analysis: if the opinion does not provide substantial assistance to the jury, then its probative value is greatly outweighed by its prejudicial impact and it should be excluded.

In **Jordan v. State,** 928 S.W.2d 550  (Tex.Crim.App. 1996), the Court of Criminal Appeals adopted **Daubert v. Merrell Dow**, 113 S.Ct. 2786 (1993) as the controlling standard for the admission of scientific evidence. Citing its prior decision in **Kelly v. State,** 824 S.W.2d 568 (Tex.Crim.App. 1992) and that of the Texas Supreme Court in **E.I. du Pont de Nemours  v. Robinson**, 923 S.W.2d 549 (Tex. 1995), this Court stated that the focus of these reviewing courts:

35

was on assessing the scientific reliability of the evidence at issue, rather than its relevance.
. . [R]eliability depends upon whether the evidence has it basis in sound scientific
methodology. This demands a certain technical showing. Accordingly, it is upon the
reliability inquire that trial courts can weed out testimony pertaining to so-called "junk
science." . . . While "junk science" or otherwise inadequately tested scientific theories
might be shown to relate to the facts of a case and to that extent be of assistance to the
jury, it will not have a sufficiently sound scientific basis to be reliable.

To that end, the Court identified the same "general observations" as the Supreme Court to

use as non-exclusive guidelines for evaluating the reliability of such evidence: (1) whether the

scientific theory or technique can be and has been tested; (2) whether the theory or technique has

been subjected to peer review and publication; (3) the known or potential rate of error in a

particular scientific technique, and (4) general acceptance of the scientific theory or technique.

**Daubert** has subsequently been reaffirmed. See **Kumho Tire Company v. Carmichael**, 119

S.Ct. 1167 (1999).

It is clear that the **Daubert** rationale applies to any expert testimony, not just scientific

testimony and that the **Daubert** factors of whether a theory can be tested, whether it has been

subjected to peer review, whether there is a known or potential rate of error, and whether the

theory or technique enjoys general acceptance with the scientific community, apply to all expert

disciplines. See **Kumho Tire Company v. Carmichael**, supra.

The Seventh Circuit has applied **Daubert** to social sciences. In **Tyus v. Urban Search**

**Management**, ___ S.W.2d ___ (7th Circ. Cause no. 95-3793, handed down on 12/6/96), the

Court held:

[w]e have noted a number of times since the Supreme Court decided **Daubert** that its
framework for assessing expert testimony is applicable to social science experts, just as it
applies to experts in the hard sciences. See e.g. **United States v. Hall**, 93 F.3rd 1337 (7th
Circ. 1996) (requiring application of **Daubert** standard to social psychologist tendered as
expert witness); **Rosen v. Ciba-Geigy Corp.** 78 F.3rd 316, 318-19 (7th Circ. 1996);

36

**Frymire-Brinati v. KPMG Peat Marwick**, 2 F.3rd 183, 186 (7th Circ. 1993) requiring application of Daubert standard to accountant tendered as expert witness). Social science testimony, like other expert testimony proffered under Fed. R. Tex.R.Evid.. 104(a) for admission under Rule 702, must be tested to be sure that the person possesses genuine expertise in a field and that her court testimony "adheres to the same standards of intellectual rigor that are demanded in [her] professional work." (citations omitted). At that level of generality, the Daubert framework is appropriate for all kinds of expert testimony. . . .

While the Court noted that the measure of intellectual rigor will vary by the field of expertise, the court stated that in all cases, the district court had to "ensure that it is dealing with an expert, not just a hired gun."

The Court then set forth the appropriate methodology for these types of cases. The trial court must first consider whether the proffer demonstrated that the work the expert has done meets the requisite intellectual rigor standards, using the **Daubert** criteria as guidelines. The court must then determine whether the proffered testimony is based on the expert's special skills, and then decide whether the proffered testimony will assist the trier of fact.

The Fifth Circuit has also adopted **Daubert** standards outside the narrow field of strict scientific inquiry. In **USA v. Posado**, the Court held that a district court must inquire, under **Daubert**, before deciding the admissibility of polygraph evidence. 57 F.3rd 428 (5th Circ. 1995). The Sixth Circuit has applied **Daubert** to all expert testimony. See **Cook v. American S.S.** 53 F3rd 733 (6th Circ. 1995); **Ohio v. Trauth Dairy**, 925 F.Supp. 1247 (So.Dist. Ohio, 1996) (applying 6th Circ. standards to all expert testimony, specifically economist in an antitrust case). The Eighth Circuit, noting problems with applying **Daubert** strictly in the area of social science, applied a heightened standard of reliability in determining admissibility of the dangers of relying on children as witnesses in sexual abuse cases. **USA v. Rouse**, ___ F.3rd ___ (8th Circ. 1996).

37

See also **U.S. v. Dorsey**, 45 F.3rd 809 (4th Circ. 1995) (application of **Daubert** criteria to forensic anthropologists).

There is no evidence to support the conclusion that testimony such as Dr. Gripon's is at all reliable under the standards of Rule 702. Rather their predictions belong in the realm of what has become known to the courts as "junk science."[27]

B.

As noted, a **Rule 702** analysis is a two part one (1) is the expert testimony reliable and (2) does it assist the jury.

In **Holloway v. State,** 613 S.W.2d 497 (Tex.Crim.App. 1981) the Court held that Dr. James Grigson could not base his opinion of future dangerousness based on interviews he conducted with people who knew the defendant before the offense, and based on a review of the offense report, in short, the very same type of information relied upon by Gripon in the instant case. The Court's holding is set forth in detail:

---

[27] *See* Peter W. Huber, *Galileo's Revenge: Junk Science in the Courtroom* (1991); *Brock v. Merrell Dow Pharmaceuticals*, 884 F.2d 167 (5th Cir. 1989); *Lust by and through Lust v. Merrell Dow Pharmaceuticals*, 89 F.3d 594 (9th Cir. 1996); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 554 (Tex. 1995) (discussing need to stem the flow of "junk science" and "kitchen chemistry" in our courts). *See also* Odom, J., quoted in George E. Dix, *The Death Penalty, "Dangerousness," Psychiatric Testimony, and Professional Ethics*, 4 Am. J. Crim. Law 151, 164: "I am unable to find that much of the testimony offered [regarding future dangerousness] was from this side of the twilight zone." Judge Garza , in his commented on the reliability of such predictions as follows: "[o]ne commentator recently reviewed the psychological research on the issue post-*Barefoot* and concluded that "whereas first generation research suggested that perhaps one out of three people predicted to engage in some kind of violent behavior will actually go on to do so, more recent studies suggest that one out of every two people predicted to be violent would go on to engage in some kind of legally relevant, violent behavior." Randy Otto, On the Ability of Mental Health Professionals to "Predict Dangerousness": A Commentary on Interpretations of the "Dangerousness" Literature, 18 LAW. & PSYCHOL. REV. 43, 63 & n.63 (1994)." *Flores, supra*, 210 F.3d at 465, n. 11.

38

Initially we note that it is a general rule of evidence that opinion testimony, like hearsay, is inadmissible because it is not based upon personal knowledge of the existence of facts capable of being proved by direct evidence. Clearly, there is nothing to be gained by permitting a witness to proffer an opinion on a subject when any other person in the courtroom, any member of the jury, could form an opinion on the issue equally readily and with the same degree of logic as the witness. But when the jurors are not competent to infer, without the aid of greater skill than their own, the probable existence of the facts to be ascertained, or the likelihood of their occurring from other facts actually proved, expert opinion evidence is rendered admissible.

"The opinions of experts are received upon the theory that by reason of study or experience, they have upon the subject of inquiry a special knowledge which jurors generally do not possess and are therefore better equipped to draw conclusions from the facts than the jurors themselves. *** The practical test for receiving such opinion is: On the subject in issue can the jury receive any appreciable aid from the person offered?"

16 R. Ray, Law of Evidence, 2 Texas Practice °1400 (3rd ed. 1980)

Because of the theory upon which a purported expert's testimony may be admitted, the burden of establishing the admissibility of the expert's opinion rests on the party offering such evidence; thus, whether the subject in issue is one upon which expert opinion would assist the jury and, if so, whether the proffered witness possesses the requisite qualifications, are preliminary questions for the trial court to decide and are not a matter of "weight" only, to be determined by the jury.

Merely that the witness has professional credentials or occupational status in a calling which relates to the matter in question is insufficient to qualify him. Rather, it must be shown that he possesses special knowledge upon the specific matter about which his expertise is sought. And indeed, "even though a witness' qualifications as an expert may be established or admitted, his opinion may be inadmissible if there is no evidence of technical or scientific support for it." The special knowledge which qualifies a witness to give an expert opinion may be derived entirely from a study of technical works, or specialized education, or practical experience or varying combinations thereof; what is determinative is that his answers indicate to the trial court that he possesses knowledge which will assist the jury in making inferences regarding fact issues more effectively than the jury could do so unaided. (citations omitted)

Furthermore, expert opinion evidence must be tested and limited by the same considerations as other evidence in determining its admissibility: whether its probative value outweighs its prejudicial potential. Thus the admission of the expert's opinion is dependent upon the offering party's showing that it is appropriate because of the unfamiliarity of lay jurors with a body of expertise which is relevant to the resolution of the litigation. Concomitantly, relevance of the opinion to an issue in litigation is established only if the expert's conclusion is based upon facts either proved

or assumed.  **Barefoot v. State**, 596 S.W.2d 875  (Tex.Cr.App.1980); (citations omitted) and see also Ray,  ° 1402,    wherein it is stated:

"The expert's opinion testimony derives its value  not from [actual personal] observation but from special knowledge or experience, enabling  him  to draw inferences more reliably than the jury can unaided. Thus the expert witness is not confined to opinions on facts within his own knowledge."

It is clear that the portion of the **Holloway** opinion that held that an expert could not rely on hearsay evidence has been abrogated by the Rules of Evidence, See Rules 703, 705, TEX.R.EVID. and overruled by the Court of Criminal Appeals. **Aguilar v. State**, 887 S.W.2d 27 (Tex.Crim.App. 1994). The remainder of the opinion, however, remains the rule of law and was "codified" as that portion of Rule 702: "If scientific, technical, or other specialized knowledge **will assist** the trier of fact to understand the evidence or to determine a fact in issue. . . " As noted in **Holloway** and in Ray's Law of Evidence the issue is whether the jury can draw any appreciable aid from this testimony.

Gripon simply made the same determination the jury is required to make and from the same data. He was not relying on any psychiatric expertise.

The Seventh Circuit in **US v. Hall**, 93 F.3rd 1337 (7th Circ. 1996), decided a similar issue. The Court held that the test of the admissibility of expert testimony is whether it will assist the jury. It makes no difference that the testimony may overlap somewhat with the jury's experience. If it, however, duplicates the jury's knowledge, Rule 403 excludes the evidence because of the prospect of an expert label unduly influencing the jury. In **US v. Whitted**, 11 F.3rd 782 (8th Circ. 1993), the Court held that while an expert's testimony is not inadmissible merely because it embraces an ultimate issue but such testimony cannot be used merely to lend "expertise" to a device to tell the jury what result to reach.

In **US v. Esch**, 832 F.2d 531 (10th Circ. 1987), the Court upheld the exclusion of psychological evidence about the defendant from an expert. The defendant had testified about her upbringing and her attitudes about nudity and sexuality. The jury was capable of making an intelligent evaluation of that evidence without the aid of an expert.  See also **Scott v. Sears, Roebuck**, 789 F.2d 1052 (4th Circ. 1986); **Peters v. Five Star Marine**, 898 F.2d 448 (5th Circ. 1990) (maritime expert precluded from testifying that it was unreasonable for an employer to tell an employee to manually move heavy equipment on a boat deck during heavy seas and that spilled diesel fuel made the deck slippery; the court held that a jury could infer this as easily as the expert using their common sense.).  See also **US v. Cruz**, 981 F.2d 659 (2nd Circ. 1992) ( expert testimony should have been excluded that recited the function of a broker in a drug transaction; the "expertise" was offered to merely buttress the credibility of the government's witness); **US v. Castillo**, 924 F.2d 1227 (1991).

C

Finally Due Process mandates that all evidence be sufficiently reliable to satisfy the demands of fundamental fairness. **Daubert,** is, in effect, the implementation of these concerns. Evidence can, however, be so unreliable that due process is violated and a trial rendered unfair. See **US v. Wade**, 388 U.S. 218 (1967); **Kirby v. Illinois**, 406 U.S. 682 (1972); **Gilbert v California**, 388 U.S. 263 (1967).

D.

To understand the factual basis for Mr. Brewer's challenge, a summary of the relevant scientific principles is necessary.

**The Science Underlying Predictions of Future Dangerousness**

41

Predictions of future dangerousness have a scientific basis.  They are rooted in what is called "base rates."  As explained in materials designed to prepare psychiatrists for the examinations required for board certification in forensic psychiatry., "[t]he base rate is defined as the statistical prevalence of violence behavior in a given group, i.e., the frequency with which violence is committed in a given period of time, usually one year."  Smith, S.M., The Prediction of Dangerous Behavior, in P.J. Resnick (ed.), FORENSIC PSYCHIATRY REVIEW COURSE 539 (American Academy of Psychiatry and Law 1993) [hereafter referred to as "Smith"].  In a capital sentencing proceeding, assessments of future dangerousness must examine whether the defendant will be a future danger if he is sentenced to life rather than death.  Thus, the "base rate" that is relevant for such assessments looks to the frequency of violent behavior in the population of people who have been sentenced to life instead of death in capital trials.

In the mental health professions, the base rate "is considered to be the single most important piece of data necessary in making an accurate risk estimate (Monahan, 1981; Webster, Harris, Rice, Cormier, & Quinsey, 1994)."  Cunningham, M.D. & Reidy, T.J, Don't Confuse Me with the Facts: Common Errors in Risk Assessment in Capital Sentencing, 26 CRIM. JUSTICE AND BEHAVIOR 20, 23 (1999) [hereafter referred to as, "Cunningham"].  *See also* Smith, at 540 ("[k]nowledge of the appropriate base rate is the most important single piece of information necessary to make an accurate prediction").  Base rates are so significant that "[w]ithout this anchor of a comparative reference point, individual risk estimates may be little more than speculation."  Cunningham, at 23.

The use of base rates is especially important when the base rates for violence in a particular group are not what one would expect.  Thus, while intuition suggests that murderers,

especially those convicted of capital murder and sentenced to life, would be the most likely prisoners to engage in further violence, the base rates for such prisoners demonstrates otherwise. As Dr. Cunningham explained in examining the relevant studies, "base rates of serious institutional violence in capital commutees, murderers, long-term inmates, and federal high-security prisoners do not significantly exceed and in some studies are below inmates convicted of less serious offenses. Bedau, 1964; Cunningham & Reidy, 1998b; Flanagan, 1980; Harer, 1992; Marquart, Eckland-Olson, & Sorenson, 1989; Sorenson & Wrinkle, 1996)." Cunningham, at 23. When such prisoners are paroled, their base rates for violence continue to be lower than the base rates for violence of non-homicide parolees. Cunningham, at 24 (citing studies). "Base rates such as these demonstrate why multiple authors (Hall, 1987; Monahan, 1981; Morris & Miller, 1985; Serin & Amos. 1995) have asserted that base rates are essential to an accurate violence risk assessment." Cunningham, at 24-25.

The established and accepted method for estimating the risk of dangerousness of a particular capital convict, therefore, must begin with establishing the base rate of similar prisoners' and parolees' violence. Once that has been done, there is also an established method for individualizing the risk assessment of the individual. This involves examining prisoners within the cohort of convicted murderers who do commit violence and "identifying particular characteristics of [these] research subjects who subsequently engaged in violent behavior." Grisso, T. & Appelbaum, P.S., Is It Unethical to Offer Predictions of Future Violence?, 16 LAW AND HUMAN BEHAVIOR 621, 628 (1992). With these characteristics identified, the characteristics of the person whose risk of dangerousness is being assessed can then be compared and an estimate made – taking this and the base rate into account – of the risk that this person will be

dangerous in the future.  *Id.*

Again, this aspect of the process may seem counter-intuitive to mental health professionals who are not expert in the field of violence risk assessment.  Many untrained mental health professionals make assessments of future dangerousness on the basis of clinical "judgment" alone, *i.e.*, predicting the risk of dangerousness on the basis of the prior criminal behavior, personality characteristics, personality disorders, and/or symptoms of mental illness or brain damage observed in the defendant.  Without comparing these characteristics and historical data to objective research concerning the relevant prisoner population and the individual characteristics of persons within that population that are correlated with incidents of subsequent violence, the mental health professional's clinical judgment is likely to be wrong.  As Dr. Smith has explained,

> Systematic errors of observation have consistently been linked with the clinician's prior expectations about which characteristics imply dangerousness.  The six most frequent responses elicited from psychiatrists as most characteristic of dangerous persons include, "often acts on impulse, has no conscience whatsoever, is addicted to heroin, is utterly irresponsible, fears that people are out to get him, and resents even the slightest criticism."  Hartogs, (1970), has listed 48 alleged predictors of violence including "lack of family interest, love, support, or acceptance" and "conflict over basic identity."  Such descriptions lack scientific validity and have been repeated so often that unfortunately, they have become part of accepted clinical practice.

Smith, at 540.  Even the factors most strongly thought to be predictive of future violence, on the basis of clinical judgment, are not:

> Studies sponsored by the U.S. Justice Department (Alexander & Austin, 1992; National Institute of Corrections, 1992) have concluded:
>
> 1.    Past community violence is not strongly or consistently associated with prison violence.

2.   Current offense, prior convictions, and
     escape history are only weekly associated
     with prison misconduct.

3.   Severity of offense is not a good predictor of
     prison adjustment.

Prison violence does not predictably follow from preconfinement
violence or the capital offense of conviction.

Cunningham, at 27 (citing Alexander, Jack & Austin, James, HANDBOOK FOR EVALUATING

OBJECTIVE PRISON CLASSIFICATION SYSTEMS, United States Department of Justice, National

Institute of Corrections (June, 1992)).

     Dr. Cunningham provides one telling example of the fatal flaw in a mental health

professional's reliance on clinical judgment in predicting future dangerousness.  He notes that

many professional who rely on clinical judgment rather than empirical data find that a person is

likely to be dangerous in the future because he has an antisocial personality disorder.  As he

explains, however,

> Antisocial personality disorder [APD] is not in and of itself an
> indication of a particularly dangerous or incorrigible inmate.  Again,
> base rates are instructive.  The prevalence or base rate of APD in a
> prison population is about 75% (Meloy, 1988).  Thus a diagnosis of
> APD alone describes little about prison behavior and recidivism
> outcome except that the individual is similar to other prison
> inmates.

Cunningham, at 30.  Because of the prevalence of the traits associated with antisocial personality

disorder in the prison setting, these traits are "of little benefit in distinguishing those inmates likely

to be a particular violence risk."  Cunningham, at 29.

     Notably, in the data that is available concerning the accuracy of predictions of future

45

dangerousness which were based solely on clinical judgment, time has shown the predictions to be

egregiously <u>inaccurate</u>. In an informal study of such persons sentenced to death in Dallas County,

the District Attorney's office found that <u>10 out of 11</u> person sentenced to death prior to 1988,

who were found to present a risk of future dangerousness, were not – in fact most had become

model inmates without ever having had a disciplinary infraction. Similarly, in a study conducted

of former death-sentenced Texas inmates, researchers found that the level of violence in prison or

thereafter was generally <u>lower</u> than the level of violence for non-capital inmates.

Finally, the science of violence risk assessment requires that the expert making such an

estimate take into account two variables in addition to those already discussed. First, such risk

assessments must take into account the clearly established "[l]ower likelihood of criminal activity

and violence with aging...." Cunningham, at 31. "Risk assessments that fail to address the

reduced likelihood of violence with progressive aging are fundamentally flawed." Cunningham, at

32. Second, "Assessment of risk is not simply a static enterprise. It also involves consideration of

what preventive measures can be undertaken that would modify or reduce the level of violence

risk posed by a particular inmate." Cunningham, at 32. "Capital risk assessment, then, calls for

consideration of how the probability of institutional violence would be affected by confinement of

the defendant under special conditions of increased security, supervision, and isolation."

Cunningham, at 33.

In sum,

> Clinicians who rely on traditional mental health evaluation sources
> of information in performing a capital risk assessment are woefully
> data deficient. Violence risk assessment at capital sentencing is a
> broadly data intensive task. These assessments require knowledge
> of multiple applicable base rates, various prison contexts, differing

> empirical correlates of violence risk factors in the community and
> within prison, parole recidivism risk correlates, institutional records
> of the defendant, patterns of criminal conduct, and situational and
> interpersonal variables.

Cunningham, at 34.

The use of clinical evaluations or crime scene evidence as the basis for a prediction of future dangerousness has been completely and thoroughly repudiated by all experts in the field of psychology. It cannot be gainsaid that Dr. Gripon's theories lack any acceptance in the requisite field whatsoever.   The characteristics used by Dr. Gripon to base his prediction are characteristics shared by most of the inmates in TDC; TDC's own figures for inmate violence belie Dr. Gripon's conclusions.   TDC is well able to protect its inmates from other inmates.

Had defense counsel in this case adequately challenged the underlying reliability of Dr. Gripon's testimony, it would have proved instrumental in excluding his testimony.

**MR. BREWER'S RIGHTS UNDER THE FIRST AND FOURTEENTH AMENDMENTS WERE VIOLATED BY THE ADMISSION OF EVIDENCE DURING BOTH PHASES OF HIS TRIAL, RELATING TO HIS ABSTRACT BELIEFS AND ASSOCIATIONS WITHOUT A SUFFICIENT "NEXUS" TO THE CRIME, CONTRARY TO *DAWSON V. DELAWARE.***

**TRIAL COUNSEL OFFERED INEFFECTIVE ASSISTANCE BY NOT CHALLENGING THE ADMISSION OF IRRELEVANT**

## EVIDENCE REGARDING MR. BREWER'S BELIEFS AND ASSOCIATIONS

During Mr. Brewer's trial, much evidence was submitted regarding his abstract beliefs, racism, alleged affiliation with a group called the Confederate Knights of America, and reading material.  The introduction of this evidence violated his rights under the First Amendment, denied him due process, and biased his jury against him to such a degree that a fair trial was impossible. Trial counsel performed unreasonably and ineffectively in not challenging the admission of this material. All such evidence should not have been introduced against Mr. Brewer at trial.

At the opening argument, the prosecutor asserted that "The next category of evidence is motive evidence. . . . in this country it's not illegal to hate somebody, it's not illegal to have tattoos all over body, it's not illegal to belong to a white supremacy gang. In this country it's even not illegal to preach hate towards other people." **XXI SF 20.**.   Through the guise of motive evidence, Mr. Brewer was  held to account for the views of every book they seized, whether his property, Mr. King's property, or Shawn Berry's property, a situation that is not tenable with basic free speech. Mr. Brewer was even held accountable for Mr. King's tattoos and letters. Pictures of Mr. King's tattoos and Mr. King's letters were both introduced against Mr. Brewer to prove motive. **See State's 37A, 42A, 41, 103, 103B, 103C, 103D, 103E, 103F, 103J, 103K, 103L, 105 [summary photo], 106 [summary photo King], 114, 114 [summary titled Lawrence Brewer Klansman].** Trial counsel did not object to the introduction of this material.

Rich Ford, of the Jasper County Police Dept., was allowed to testify as an expert on the meaning of tattoos, without any qualifications. **XXII SF 156 - 192.** He testified that he determined a motive for the crime by looking at <u>Mr. King's</u> tattoos. **XX II SF 168.**  He testified that in law enforcement work, one looks for tattoos in "a crime that might or might not be racial."

**XXII SF 169.** Mr. Ford testified as to the meaning of the "SS" and those on King's head. **XXII SF 170.** He testified that Mr. King has a tattoo of "Aryan Pride," and a tattoo of a lynching of a black man. **XXII SF 172 - 173.**

Mr. Ford testified that Mr. Brewer has a tattoo with a Klan symbol that says "Death before Dishonor." Mr. Ford testifies over defense objection that the tattoo means Mr. Brewer would rather die than abandon his KKK beliefs. **XXII SF 181.** Mr. Ford interpreted one tattoo as "an evil-looking figure." **XXII SF 181.** Mr. Ford testified that the "FTW" tattooed on Mr. Brewer means "Fuck the World." **XXII SF 182.** Mr. Ford ultimately testified that out of the three fall partners, Mr. Brewer and Mr. King are gang affiliated because of their tattoos. **XXII SF 185.**

Jade Dickens, a TDCJ officer, testified that she searched Mr. Brewer's cell and found gang related material. The material included oaths of several people signed upon joining the Confederate Knights of America. The material seized indicated that Mr. Brewer was a chief officer of Confederate Knights of America after another inmate, Daniel Barker, left. **XXI SF 84**

William Kirk, a TDCJ gang officer from the Beto I unit, testified regarding documents from John King's gang file at the Beto I unit as well as material from Mr. Brewer's file. Officer Kirk testified that the by-laws of the Confederate Knights of America include commands that members are not to associate with members of the 'mud races,' which are all non-white races. **XXI SF 144**

Mark Postell, a TDCJ inmate, testified that Mr. Brewer was a ranking member of the Confederate Knights of America during part of his stay at Beto I.. Mr. Brewer often talked about Turner Diaries and the Silent Brotherhood and other racist literature. **XXI SF 249**

Jasper County Detective Joe Sterling testified that he recovered a notebook of racist

49

literature from John King's apartment during a search. Joe Sterling read, to the jury, a letter, signed by John King, that indicated King wanted to start a CKA chapter in Jasper, Texas. **XXII SF 232.**

Tommy Faulk, a friend of John King, testified that King had a tattoo of a lynching of a black man. King was very proud of the tattoo. Both John King and Mr. Brewer held racist beliefs. **XXIV SF 4.**

Heather Hough, an employee of Jasper Cinema and friend of Shawn Berry, told the jury that John King was proud of, and showed her, "my little niggerman hanging from a tree." **XXIV SF 86.**

At closing argument in guilt, King's non-Christian beliefs and Mr. Brewer's alleged beliefs were held against Mr. Brewer. The District Attorney at the closing of guilt argued "Russell Brewer is just exactly like Bill King – belongs to the same gang, he's got the same tattoos on him – got the same lightning bolts, got the same neo-Nazi way of thinking, and he's a racist and white supremacist just exactly like Bill King. The mind set is the same and they think alike. . . . ." **XXV SF 25.**

In the punishment phase, this evidence was re-introduced by the prosecution. The prosecution argued that the jury should consider all of the evidence from guilt in determining punishment. The prosecution also argued, in their final argument at punishment "This man is just as dangerous as Bill King. Thank you."

Mr. Brewer was endowed by the First Amendment to the Constitution with unfettered rights to associate with groups of his choosing and to hold religious and political beliefs of his choosing. If trial counsel had objected to the admission of evidence of Mr. Brewer's political

beliefs and associations, such objection would have either been sustained or created reversible error. The evidence of Bill King's political beliefs was not only protected by the First Amendment but it was irrelevant to Mr. Brewer and did not show that Mr. Brewer, by association, had the same beliefs.

The State asked several witnesses, and argued, that a person with racist beliefs might be motivated to kill a member of a minority race. **See Rich Ford, Dr. Gripon, Dan Roberts.** The motive argument and the admission of this evidence that based that argument, in a conservative, heavily-Christian community like Brazos County, was overwhelmingly prejudicial and totally ignored Mr. Brewer's first Amendment rights to the religion of his choice. The admission of this argument and evidence was error that made the out come of the trial unreliable and the trial processes fundamentally unfair.

Due process was violated by the admission of Mr. Brewer's beliefs and associations because there was no nexus developed between those beliefs and associations and this offense. This Court should reverse Mr. Brewer's conviction and remand his case to the trial court.

**Mr. Brewer's rights under the Fifth and Fourteenth Amendments to the United States Constitution, were violated by ordering the defendant to submit to a psychiatric evaluation, failing to advise Mr. Brewer of his right to remain silent, and by the State's agent testifying and waiving Mr. Brewer's right not incriminate himself.**

Trial court ordered, on the State's motion, that the defense disclose whether or not the defense intended to offer testimony from the psychologist the defense had hired to evaluate Mr. Brewer. Based upon the trial counsel's response, the trial court ordered Mr. Brewer to submit to an examination by the State's expert, Dr. Gripon. **See Opinion page 9, CR 179.** Mr. Brewer

51

submitted to an interview with Dr. Gripon. At no point during that interview, did Dr. Gripon warn Mr. Brewer that he was waiving his Fifth Amendment right not incriminate himself by taking part in the interview. Dr. Gripon never warned Mr. Brewer that Dr. Gripon would use the information Mr. Brewer provided to help secure a death sentence for Mr. Brewer.

The State called Dr. Gripon to testify during the case-in-chief for punishment. Dr. Gripon, in front of the jury,  used the information Mr. Brewer gave him to declare Mr. Brewer possesses a substantial risk of propensity for future criminal violence. **XXVIII SF 29.** Mr. Brewer constructively testified through Dr. Gripon during the state's chief case in punishment. At that time, Mr. Brewer had not waived his Fifth Amendment rights by offering testimony from his own mental health expert based upon interviews with him. Dr. Gripon's testimony violated Mr. Brewer's Fifth Amendment rights.

Mr. Brewer did not waive his rights during the prior interview with Dr. Gripon. He was not advised of his rights. He gave no knowing a voluntary consent to the interview. He was compelled by order of the Court to submit to the interview. **See CR 179.** The trial court compelled Mr. Brewer to submit to an interview with an agent of the State who later provided information to the State before trial and the jury during trial in violation of Mr. Brewer's Fifth Amendment rights without any valid waiver by Mr. Brewer. The Fifth Amendment right to not incriminate onself is a fundamental right. This court should identify this error, vacate Mr. Brewer's sentence and order another sentencing hearing.


**The Texas Death Penalty Statute violates the 8th and 14th Amendment to the U.S. Constitution because the statute is overbroad and vague**

The Texas Death Penalty statute allows prosecution for capital murder when an offender commits or attempts to commit kidnaping and a murder occurs.[28] **See Texas Penal Code §19.03.** The Texas Statute that defines kidnaping says a person commits kidnaping if he intentionally or knowingly abducts another person. The **TPC** defines "abduction" as restraining a person with intent to prevent his liberation. **See Texas Penal Code §20.01, 20.03.** The Texas Court of Criminal Appeals has interpreted "restraint" to mean substantial interference with a person's liberty. **Rogers v. State** 687 S.W.2d 337 (Tex.Crim.App. 1985).

According to Texas statute and case law, any murder in which the offender intentionally substantially interferes with the victim's liberty qualifies as a capital murder. Very few murders can occur in which the offender does not substantially interfere with the victim's liberty. Any situation in which the offender threatens before the murder or controls the area he and the victim occupy would qualify as a kidnaping and a capital murder. This situation in which almost any murder qualifies as a capital murder violates to 8th Amendments and 14th Amendments. The 8th and 14th Amendment require a capital statute to narrow the class of murders that make an offender death eligible. The Texas death penalty statute, kidnap aggravator does not meaningfully narrow the class of murders that qualify for potential death sentence,  This Court should find the Texas death penalty statute, encompassing kidnaping as an aggravator, unconstitutional, vacate Mr. Brewer's sentence and remand his case to trial court.

## The evidence was factually and legally insufficient

---

[28]Petitioner realizes that some level of intent or awareness that a death could occur is required but *mens rea* for murder is not a component of this argument.

### to support Mr. Brewer's conviction and sentence

Mr. Brewer was convicted on an indictment that alleged he had intentionally committed murder in the course of committing or attempting to commit kidnaping. Under Texas Penal law, a person has to have the intent to substantially interfere with the victim's liberty by restraining them while using or threatening to use deadly force or by secreting them in a place where the victim is not likely to be found to commit kidnaping. **TPC §20.01, 20.03**. There is no evidence in the record that supports an inference that Mr. Brewer had the intent to restrain Mr. Byrd with the intent to substantially interfere with his liberty. The State's evidence suggests that Mr. Brewer may have taken part in beating Mr. Byrd. The State's evidence suggests that Mr. Byrd was drug behind an automobile. The State's evidence suggests that Mr. Byrd died at some point after he was beaten. The State's evidence nowhere suggests that Mr. Brewer had any intent to restrain Mr. Byrd or substantially interfere with his liberty. The act of dragging Mr. Byrd, the State suggests was meant to cause harm or injure Mr. Byrd, not restrain him. The evidence is both factually and legally insufficient to support a conviction and sentence of death in Mr. Brewer's case. The evidence viewed in alight most favorable to the prosecution does not support a finding of intent in kidnaping. The great weight of the evidence is against finding of intent in kidnaping in Mr. Brewer's case.  This Court should overturn Mr. Brewer's conviction and remand his case to the trial court.

### The evidence is insufficient to support the jury's finding on special issue #1, future dangerousness

Texas death penalty scheme requires the jury to return an affirmative answer to the special

issue on future dangerousness before a death penalty can be assessed. The special issue on future

dangerousness asks:

> Whether there is a probability that the defendant would commit criminal acts of violence
> that would constitute a continuing threat to society.

**Texas Code of Criminal Procedure,§37.071(b)(1).**

The evidence presented in punishment included the indictment offense, an alleged lack of

remorse for the indictment offense, a personality disorder suffered by Mr. Brewer, Mr. Brewer's

non-violent criminal history that spanned from juvenile offense to the indictment offense and Mr.

Brewer's alleged racist beliefs / membership in a racist prison gang. There was considerable

evidence from a psychologist, Mr. Brewer's parents, and friends of Mr. Brewer's family that Mr.

Brewer is not leader, is mousy, and had not history of violence in the community. The State's

expert, Dr. Gripon opined for the jury, that given the evidence, Mr. Brewer had a "substantial risk

of having a propensity for future violent acts."**XXVIII SF 29.** Even the State's expert did not

conclude absolutely that there is a probability that Mr. Brewer would commit criminal acts of

violence that would constitute a continuing threat to society. The State's expert, Dr. Gripon told

the jury "what you're looking for – you're looking at is a propensity or a potential for something

to occur, not trying to predict that it is actually going to occur, is going to occur at any particular

time." **XXVIII SF 10.**

The jury had insufficient evidence before them to be able to find there is a probability that

Mr. Brewer would commit acts of criminal violence that constitute a continuing threat to society.

The State's expert did not conclude there is a such a probability. There was no evidence of

violence in Mr. Brewer's past outside of the indictment offense. This Court should vacate Mr.

Brewer's sentence and remand him to trial court.

### Trial counsel offered only ineffective assistance of counsel in in the trial of Mr. Brewer's case

The Sixth Amendment of the U.S. Constitution guarantees Mr. Brewer effective

assistance of counsel in the trial of the case against him. Trial counsel performed in an ineffective

manner by failing to object to Dr. Gripon's testimony for the State that waived Mr. Brewer's Fifth

Amendment rights. Trial counsel performed ineffectively in not objecting to the admission of

State's exhibit #41.

Dr. Gripon testified for the State during their case-in-chief at punishment. Dr. Gripon

informed the jury, during his testimony that Mr. Brewer met with him for more than two hours in

preparation for Dr. Gripon's testimony. Dr. Gripon told the jury that Mr. Brewer related his

juvenile history of interactions with criminal justice system. Mr. Brewer also related, among other

things, his history of drug use and his unstable employment history. **XXVIII SF 14, 15,16.** Dr.

Gripon testified that Mr. Brewer had a "substantial risk of having a propensity for future violent

acts." **XXVIII SF 29.** Dr. Gripon used the information that he gathered from Mr. Brewer to

make this determination, against Mr. Brewer, in front of the jury. **XXVIII SF 11, 12, 29.**

Trial counsel did not object to Dr. Gripon testifying against Mr. Brewer and using the

information gained during a compelled interview with Mr. Brewer in that testimony. At the point

in time  when Dr. Gripon testified, Mr. Brewer had not waived his Fifth Amendment rights by

offering testimony from a mental health expert that would testify based upon interviews with Mr.

Brewer. If trial counsel had object to Dr. Gripon waiving Mr. Brewer Fifth Amendment rights, the

56

trial court would have been compelled to sustain the objection and bar Dr. Gripon from testifying.

Dr. Gripon was the sole source of expert testimony supporting the State's proposition that there was a probability that Mr. Brewer would commit criminal acts of violence that would constitute a continuing threat to society. Without supporting expert testimony, the jury would have believed defense expert Dan Roberts. Dan Roberts opined that there was not a probability that Mr. Brewer would commit acts of criminal violence in the future. **XXVIII SF 100.** Trial counsel's error on not objecting to Dr. Gripon was harmful.

Trial counsel also erred in not objecting to the admission of State's #41, a notebook, authored by John King. The notebook contained a pledge developed by King for potential members of a racist gang to take upon initiation. The notebook contained a letter to new members of Mr. King's proposed racist gang. The notebook had a sheet describing the requirements for new members and an application form for new members. This material alleged that John King was a racist and wanted to start a new racist gang in Jasper, Texas. This information in no way reflected any of Mr. Brewers attitudes or intents. The notebook was never shown to be in Mr. Brewer's presence or to contain any of Mr. Brewer's writing. This notebook was not admissible against Mr. Brewer. If trial counsel had objected, the notebook would have been denied admission.

Trial counsel's error was harmful because this was crucial motive for the indictment offense. The notebook, the state maintained, proved John King wanted to form a new racist Gang. John King killed a black man. Therefore John King killed a black man to aid in notoriety and assist in recruitment for his new gang. **See State's closing argument, Dr. Gripon, Rich Ford.** This argument, fallacious as it is, would not have been possible without the notebook. Without this

argument, the State lacked motive for the offense. Without this evidence, there is a reasonable probability of a different outcome for Mr. Brewer's case. The admission of this evidence questions the reliability of the verdict and undermines the fundamental fairness of the trial.

### Appellate counsel offered only ineffective assistance of counsel

Mr. Brewer is guaranteed, by the Sixth Amendment to the U.S. Constitution, effective assistance of counsel during his initial appeal.

Appellate counsel failed to raise issues regarding the constitutionality Texas Capital Murder statute, sufficiency of evidence, and trial counsels' performance at guilt/innocence as well as punishment.  Mr. Brewer incorporates these issues here as raised above. As argued above, these were meritorious issues. If appellate counsel had argued these issues, Mr. Brewer would have been granted Relief by the Texas Court of Criminal Appeals. This Court should review this issues, find them meritorious and remand Mr. Brewer's case tot he trial court so that he may be allowed another initial appeal of his case.

Respectfully submitted,



58

Gerald Bierbaum
TBC#24025252
1744 Norfolk
Houston, Texas 77098
(713) 572-2333
fax (7130 572-2483

Michael B. Charlton
TBC# 04144800
1744 Norfolk
Houston, Texas 77098
(713) 572-2333
Fax (713) 572-2483

COUNSEL FOR LAWRENCE RUSSELL BREWER II

## CERTIFICATE OF SERVICE

I, Gerald Bierbaum, have forwarded a copy of this Initial Petition for Writ of Habeas

Corpus to Gina Bunn of the Texas Attorney General's Office, Capital Litigation Division, P.O.

Box 12548, Austin, Texas 78711  by depositing a copy in the U.S. Mail on this _____ day

of _____ 2003.

Gerald Bierbaum

# AUTOPSY REPORT

## CASE 98 - 149

## June 8, 1998

## ON THE BODY OF

## James Byrd, Jr.

## Jasper, Texas

**CAUSE OF DEATH:**  Multiple severe injuries with separation of the head and right upper extremity from the rest of body.

**MANNER OF DEATH:**  Homicide.

_____     _____
Tommy J. Brown, D.O.        6/15/98
Forensic Pathologist        Date

3804

## POSTMORTEM EXAMINATION ON THE BODY OF

### James Byrd, Jr.

### Jasper, Texas

**HISTORY:** This 49 year old, Black male was found dead on June 7, 1998, in Jasper County, Texas.  The decedent was assaulted, then drug behind a pickup truck for a distance.  The head, shoulder and right arm were separated and found at a different location than the rest of the body.

**AUTOPSY:**   The autopsy was performed by Dr. Tommy J. Brown, at the request and upon the written authorization of The Honorable  Ronald K. Billingsley, Justice of the Peace, Precinct 1, Jasper County, Texas, beginning at 7:30 a.m., on June 8, 1998, in the Jefferson County Morgue.

**EXTERNAL EXAMINATION:**   The body was that of a well developed, well nourished, Black male measuring estimated 69 inches in length, weighing 165 pounds and appearing the stated age of 49 years.  There was no clothing on the body.  The head, upper chest and the right arm were separated from the rest of the body.  The hair was black, curly and measured 1/2 inch in length.  A 7 by 3 inch laceration was present in the temporal area.  Another large 6 by 4 inch gaping laceration was present of the left frontal, parietal and extending into the left and right occipital scalp.  There were severe abrasions of the posterior head and upper neck.  There were contusions and abrasions of the forehead, more prominent on the left side.  A 5-1/2 by 3 inch area that was ground down, was found along the left chin and following the jaw to in front of left ear.  This has a flattened, ground appearance.  The left eye was swollen with periorbital hemorrhage.  There was conjuntival hemorrhage of both eyes more prominent on the left.  A 2 by 1 inch abrasion was present across the tip of the nose.  A moustache and chin beard was present.  A beard stubble was present along both jaws.



There were numerous missing upper teeth.  Numerous anterior and central teeth were absent.  The lower jaw had natural teeth.  The tip and underneath tongue was severely lacerated.   There was a large, deep laceration of the inner mucosa of the right lower lip.  A 3 by 2 inch area of abrasion was present beneath the chin and extending to the upper neck.  There was a small skin attachment of the right neck with the supraclavicular area joining the right shoulder and the upper extremity.  The right clavical was fractured with the lateral portion attached to the right shoulder.  A large abrasion is adjacent to the right, separating the main body from the head and upper extremity, chest laceration which extends to the posterior shoulder.  A 10 by 3 inch area of abrasion extends from the right elbow to the distal right upper arm.  The bones of the right elbow were ground down, flattened and fractured.  The laceration around the right elbow measured 4-1/2 by 3 inches.  Abrasions of the thenar iminence and thrumb are present.  Abrasions with sloughed skin was present of the tips of the right fingers.  The posterior right upper arm has a 10 by 3-1/2 inch area of abrasions.  An 8 by 3-1/2 inch area of abrasions were present of the right forearm.  Abrasions extend from the right wrist along the back of the hand and knuckles.  The rest of the body showed the retention of C-2 vertebra inferiorly with retention of the neck vertebra.  The anterior neck structures and the soft tissue had been stripped off exposing the trachea in the lower neck.   Only the muscles that cover the anterior cervical vertebra remained.  The laceration margin extends from the top of the left shoulder, down across the left mid chest, to the right mid to low chest, then into the lateral right chest and back area.  Numerous brush burn abrasions were present with the skin being denuded and exposing the underlying ribs.  The left pectoralis muscle is still intact on the main torso.  An abrasion extends inferiorly over the entire abdomen, lower pelvis and along both thighs.  The skin and soft tissue was denuded over both knees.  The bare area over the left knee measures 6 by 2-3/4 inches exposing the patella, ligament attachments and muscle.  The denuded skin and soft tissue over the right knee measures 5-1/2 by 2-3/4 inch exposing the right patella and the underlying muscles.  A 5 by 2-3/4 inch laceration on the right distal lower leg and extends medially to the posterior leg exposing the bone, soft tissue, muscles and ligaments.  A 4-1/2

3506

by 1-1/4 inch laceration extends from the anterior lateral left lower leg medially into the posterior medial left lower leg.  The distal right foot was ground down.  The right great toe and 2nd toe were absent.  The 3 remaining toes were severely lacerated and fractured.  The ground area over the distal foot and toes measure 3 by 2 inches.  The lateral left lower chest and abdomen had 3 oval abrasions over the ribs, one measuring 1-1/2 inches, another 1-1/4 inches and the more inferior one, 1-1/4 inches.  A 4-1/4 by 4-1/2 inch abrasion, exposing the underlying fat and muscle, was present of the mid abdomen.  There were multiple fractures of the right anterior lateral ribs. The right clavicle was severely fractured.  The posterior right arm, shows abrasions from the right shoulder down the arm and forearm and includes the palmar surface.  The fingertips had abrasions.  A 5-1/2 by 3 inch ground down right elbow was present exposing the soft tissue and bones about the right elbow.  The penis was severely shredded and denuded of its skin and some muscles.  Both testicles were absent from the scrotal sac.  Small gravel was found in the remaining scrotal sac.  The back showed the posterior cervical vertebra with skin and soft tissue removed.  There was a large oblique laceration down the medial right upper back to the right mid lateral back that joins with the previously described anterior laceration to the right chest.  This laceration was the margin where the entire right shoulder, arm and head were removed.  The remaining skin of the upper, mid and low back showed severe brush burns abrasions. There is a 6 by 7 inch circular area over the sacrum and buttock area in which the skin, soft tissue, muscles and fat are exposed in the deep margin. Gravel was present in this area.  There were severe abrasions of the posterior lateral buttocks, posterior thighs with denudement of the epidermis over both posterior thighs and the posterior right lower leg.  Numerous brush burn abrasions were present over the entire posterior legs.  The anus was intact and showed no areas of abrasions, lacerations or contusions.  There were no injuries.  There were abrasions and lacerations encircling the lower legs.  The posterior right lower leg had 3-1/2 inch abrasions with a 2 inch laceration.  A 2 inch abrasion was present of the distal left lower leg which was contiguous with an anterior laceration.  There were oval circular grind

3807

down areas over both heels, the right one measuring 2-1/2 by 2-1/2 inches with the calcaneous being ground down and fractured.  The left heel had an oval 2 by 1-1/2 inch gound down left caleaneous which was fractured and had a flattened appearance.

INTERNAL EXAMINATION:  The lower body was opened with a Y-shaped thoracoabdominal incision to reveal red-brown muscles of the upper anterior thorax.  The abdominal panniculus measured 3/8 inch.  The internal organs showed no lacerations.  There was no blood in the chest or abdominal cavities.

HEART:   The heart weighed 400 grams.  It had a smooth and glistening epicardial surface with a moderate amount of fat.  The coronary arteries followed a normal distribution.  The left anterior descending coronary artery showed moderate to severe atherosclerosis.  The right coronary artery showed moderate atherosclerosis and the circumflex had mild to moderate atherosclerosis.  On sectioning, the myocardium was red-brown.  There was no fibrosis.  The walls of the right and left ventricles were of normal thickness.  The cardiac valves were of normal size.  The aorta had a mild atherosclerotic involvement.

LUNGS:    The right lung weighed 470 grams and the left 360 grams. Bullae and blebs were present of both upper lobes.  The upper lobes were pink-tan becoming darker red-brown in the more dependent portions.  On sectioning, the parenchyma was red-brown.  Small cyst-like spaces were present of the upper lobes.  There was a coarseness present on the cut surfaces.  There was no tumor, or infectious process.

3508

LIVER:   The liver weighed 1,420 grams.  It had a dark red-brown external and cut surface.  On sectioning, there was no tumor, infectious process, or hemorrhage.  There were no lacerations of the liver.  The gallbladder contained 10 milliliters of bile.


PANCREAS:   The pancreas had the usual size and shape.  It was tan and lobulated on external and cut surface


ADRENALS:   Both adrenals were surrounded by a moderate amount of fat.  On sectioning, the cortex was yellow and of normal thickness.  The medulla was gray-tan.


SPLEEN:   The spleen was intact.  It had a purple-gray intact capsule.  The spleen weighed 95 grams.  There were no injuries to the spleen.  On the cut surface the malpighian corpuscles were prominent.


GENITOURINARY TRACT:   The left kidney weighed 180 grams and the right 150 grams.  The urinary bladder contained 75 milliliters of urine.  The bladder mucosa was gray-tan.  The prostate was of normal size and had a homogeneous pink-tan cut surface.  There were no nodules.  Both testicles were absent from the scrotal sac which had a large anterior laceration.


GASTROINTESTINAL TRACT:  The esophagus had a gray-tan mucosa.  The stomach contained 15 milliliters of a semi-solid to soft digestate.  The duodenum, small and large bowel were unremarkable.  The appendix was present.


NECK:   The internal structures of the neck were removed.  The proximal esophagus had a gray-tan mucosa.  The larynx contained a small amount of

3509

1    there's a massive abrasive, grinding injury to the head;

2    and I don't know how in the world we could assume that

3    he would not have been able to turn his head or didn't

4    turn his head or if he was dead or unconscious, the head

5    would not have turned one way or the other.

6        Q    We're going to get to that in just a minute.

7    On the back of his head, there's none?

8        A    I would agree, yes.

9        Q    All right.  On his face, on the direct

10   straight-on face, there's none?

11       A    It's predominantly on the left side.

12       Q    On the right side, there's none?

13       A    None in the terms of a deep kind of a grinding,

14   abrasive injury, no; that's correct.

15       Q    The only abrasive injury on that face is on the

16   left side right in here (indicating)?

17       A    No, there is an abrasive injury on the right

18   side.  There are abrasions on the right side of the

19   face.

20       Q    The type that goes through the skin, that

21   causes it to bleed?

22       A    They don't go through the skin.  They might

23   cause it to bleed, however.

24       Q    The only significant abrasive dragging type

25   injury on his head is on his left face, right, Doc?

Donnece Foster, CSR

1      A    No, I wouldn't agree with that at all.  The

2  worse injury is on the left side of his face.  He has

3  significant injuries almost everywhere over his face and

4  around his head.

5      Q    Okay.  The jury can look at that and form a

6  commonsense opinion as good as anybody, right?

7      A    Yes.

8      Q    Okay.  Now, then, would you agree with me that

9  the injury to his face doesn't actually go down to the

10  bone?

11     A    That, I don't know.  I didn't examine the body

12  myself.  So, I don't know the extent to which the bone

13  was actually exposed.

14     Q    Comparing the injury to the elbow that was

15  decapitated and found, the one that's left with the head

16  at the deal, did you compare the extent of injury with

17  that elbow to the extent of injury on his face?

18     A    Only in a very general sense.

19     Q    Okay.

20     A    I don't know any other way of comparing it.

21     Q    Would you agree with me that the injury to his

22  elbow is far more of a longer grinding period than any

23  injury to his face?

24     A    No.

25     Q    You would not agree with that?

Donnece Foster, CSR

261

1       A    Again, that to me would be too subjective.

2   That would be a subjective opinion that we get into the

3   realm of speculation, trying to quantitate the injury to

4   that degree when these injuries are so extensive.

5       Q    Well, let me just get it this way:  If a person

6   were conscious and if that person were using his elbows

7   to hold his head off the surface, would you not expect

8   to find injuries like you see on the elbows?

9       A    Yes.

10      Q    And if a person were conscious and they were,

11  in fact, holding their head off, would you not expect to

12  find about what you see in these pictures, the absence

13  of real serious stuff?

14      A    That would be possible, yes.

15      Q    So, you agree with Dr. Brown in every way;

16  you're just saying he can't be as certain as he says it

17  is?

18      A    I would have to let Dr. Brown speak for himself

19  as far as the degree of certainty; but I agree with

20  Dr. Brown that it can't be determined, with any degree

21  of absolute certainty or reasonable medical probability,

22  as to at what point he may or may not have been

23  conscious.

24      Q    Do you agree that the cause of death -- that he

25  was alive up until the impact with the culvert and the

1    cause of death was the impact with the culvert?

2         A    Yes.

3         Q    Regarding the blood clot -- you've never been

4    out to the dirt logging road, right?

5         A    That's correct.  All I've seen is photographs.

6         Q    Have you seen a video of that road?

7         A    No.

8         Q    The road has sand in some spots.  It has grass

9    in some spots.  As matter of logic, if you're pulling an

10   object behind a truck, depending upon the length of the

11   chain, as a truck makes turns, the object would go to

12   the inside or the outside as turns are made, correct?

13        A    Yes, I would agree.

14        Q    Now, when we're talking about whether or not

15   the officers should have seen blood or the quantity out

16   there, that would actually determine on length of the

17   chain, whether the body was in the grass at the time it

18   stopped or not?

19        A    Those might be variables that would affect

20   their ability to find blood, yes.

21        Q    If there had been an injury to the head -- a

22   real significant injury to the head in the area where

23   that original blood clump was and in a sandy soil type

24   area, would you expect to find sand debris in it?

25        A    Not at the time of examination of the body, no.

Donnece Foster, CSR

1    Let me put it this way:  I would say not necessarily.

2    It looked to me, from the photographs that I saw, there

3    was sand debris in many areas over the body surface.

4        Q    Okay.  Just as a matter of common sense and

5    logic, when the head hit the culvert and the torso was

6    severed, you would expect, I think, to see fresh

7    injuries there, that would be less likely to contain

8    sand than injuries as the body continued on down the

9    road?

10       A    I would know of no reason to make that

11   conclusion, no.

12               MR. GRAY:  No more questions, Judge.

13                    REDIRECT EXAMINATION

14   BY MR. HAWTHORN:

15       Q    Doctor, the testimony in this case has been

16   that when the sheriff was walking up that logging road

17   and came to the particular area where he thought that

18   the body had come off of the chain, he roped that area

19   off, didn't let anybody in the scene; got the specialist

20   there to examine it with a fine tooth comb; took

21   photographs of the area, photographs of what he said are

22   sandal prints that were found there, a nut driver that

23   was found there.  They went over it as closely as they

24   knew how to do it within their professional competency.

25               Now, an examination like that is bound to have

                    Donnece Foster, CSR

1    turned up the kind of blood that should have been left

2    there had that body rested in that particular spot·

3    isn't that correct?

4        A    I would say that it would be unusual not to

5    find blood under those circumstances, yes.

6        Q    And as far as the consciousness or

7    unconsciousness of Mr. Byrd, you're not saying that he

8    was conscious; you're not saying that he was

9    unconscious, correct?

10       A    That's correct.   I don't know of any way to

11   determine that from examining the injuries.

12       Q    You're just saying that any opinion concerning

13   that matter would be speculative because of the

14   extensive injuries that were on the body that could have

15   been accounted for in any number of different ways?

16       A    Yes.

17       Q    For instance, Mr. Gray was talking to you about

18   the elbows.   And not to belabor the point; but if both

19   of the elbows had about the same degree of injury, that

20   doesn't mean that at the time that the upper body

21   separated, that both of them had the same degree.   One

22   of them could have had more and then the body that had

23   been dragged further could have picked up the rest of

24   them.   There's all kinds of possibilities?

25       A    Yes.

Donnece Foster, CSR

1    Q    And you can pick out whichever one you want to

2    fit the scenario you want to make, but you could also

3    pick out -- if you wanted a different scenario, you

4    could also pick out the ones that satisfy what you want

5    it to show; is that correct?

6    A    From my point of view, I would simply describe

7    the injuries and not try to arrive at any particular

8    conclusion about his state of consciousness.

9              MR. HAWTHORN:  Thank you.  That's all I

10   have.

11             MR. GRAY:  I don't have any more

12   questions.

13             THE COURT:  You may come down.

14             Your next witness.

15             THE COURT:  Come around, please, raise

16   your right hand.

17             (The witness was sworn)

18             THE WITNESS:  Yes, sir.

19             THE COURT:  Have a seat.

20                  PAULETTE SUTTON,
     was called as a witness by the Defendant, having been
21   first duly sworn, testified as follows:

22                  DIRECT EXAMINATION

23   BY MR. HAWTHORN:

24   Q    State your name, please.

25   A    Paulette Sutton, the last name is spelled

                    Donnece Foster, CSR

THE STATE OF TEXAS            (
COUNTY OF JASPER             (

    I, Donnece Foster, Official Court Reporter in and

for the 1st District Court of Jasper County, State of

Texas, do hereby certify that the above and foregoing

contains a true and correct transcription of all

portions of evidence and other proceedings requested in

writing by counsel for the parties to be included in

this volume of the Reporter's Record, in the

above-styled and numbered cause, all of which occurred

in open court or in chambers and were reported by me.

    I further certify that this Reporter's Record of the

proceedings truly and correctly reflects the exhibits,

if any, admitted by the respective parties.

    I further certify that the total cost for the

preparation of this Reporter's Record is $_____ and

was paid by _____.

    WITNESS MY OFFICIAL HAND this the _18th_ day of

_____April_____, 2000.


_____
Donnece Foster, Texas CSR 3089
Expiration Date: 12-31-2000
Official Court Reporter, 1st District Court
Jasper/Newton/Sabine/San Augustine County, Texas
103 Riverbend Road
Hemphill, Texas 75948
(409) 787-2355

                  Donnece Foster, CSR

Also Admitted in:
Colorado
Florida
Hawaii
Missouri
Nebraska
Nevada
Texas
District of Columbia

# A. Richard Ellis

**Attorney at Law**
**75 Magee Avenue**
**Mill Valley, CA 94941**
**Tel.: (415) 389-6771**
**FAX: (415) 389-0251**
**a.r.ellis@worldnet.att.net**

## FAX COVER SHEET

**Date: Sept. 8, 2003**

**No. of Pages Including Cover:**

**To: Mike Charlton**

**FAX No.: (713) 572-2483**

**From: A. Richard Ellis**

**RE: _Russell Brewer_**

Exhibit 29 to federal writ.

The information contained in the following materials or message is **CONFIDENTIAL, LEGALLY PRIVILEGED** information, intended only for the use of the individual or entity named on this cover sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. If you receive this telecopy in error, please notify me immediately.

Task
Force
Reports

This is the eighth report in a monograph series authorized by the Board of Trustees of the American Psychiatric Association to give wider dissemination to the findings of the Association's many commissions, committees, and task forces that are called upon from time to time to evaluate the state of the art in a problem area of current concern to the profession, to related disciplines, and to the public.

Manifestly, the findings, opinions, and conclusions of Task Force Reports do not necessarily represent the views of the officers, trustees, or all members of the Association. Each report, however, does represent the thoughtful judgment and consensus of the task force of experts who formulated it. These reports are considered a substantive contribution to the ongoing analysis and evaluation of problems, programs, issues, and practices in a given area of concern.

John P. Spiegel, M.D.
President, APA, 1974-1975

July, 1974

# CLINICAL ASPECTS
# OF THE
# VIOLENT INDIVIDUAL

A report of the APA Task Force on Clinical Aspects of the Violent Individual

John R. Lion, M.D., Co-Chairperson
Donald P. Kenefick, M.D., Co-Chairperson
Joel Albert, M.D.
George Bach-y-Rita, M.D.
Dietrich Blumer, M.D.
Russell R. Monroe, M.D.
Loren H. Roth, M.D.
Joe P. Tupin, M.D.
Frank R. Ervin, M.D. (Consultant)
Saleem Shah, Ph.D. (Consultant)

Approved for publication by the APA Council on Research and Development

Russell R. Monroe, M.D., Chairperson
Seymour S. Kety, M.D.
Bernard Glueck, M.D.
Louis J. West, M.D.
John J. Schwab, M.D.
Walter W. Shervington, M.D. (Consultant)

American Psychiatric Association
1700 18th Street, N.W.
Washington, D. C. 20009

Library of Congress Catalogue Card No. 74-83007
©1974 by the American Psychiatric Association
1700 18th Street, N.W., Washington, D.C. 20009

# TABLE OF CONTENTS

Introduction ............................................... v

Who Is the Patient? ...................................... 1

Where Is The Patient From? ............................. 3

Who Asks About The Patient? ........................... 6

What Problems Does He Have? .......................... 7

What Is His History? ..................................... 11

What Is The Patient Like Now? ......................... 14

What Special Examinations Should Be Performed? ... 15

What Are Predisposing and Contributing Factors? ... 19

What Can We Offer The Patient? ....................... 23

What Can We Predict? ................................... 31

How Do We Communicate Our Findings? ............. 32

What Disposition and Follow-Up Do We Make? ...... 33

Summary And Conclusions .............................. 34

References ................................................ 35

iii

## INTRODUCTION

The mission of this Task Force was to assemble the body of knowledge concerning the individual violent patient and the clinical issues surrounding his care. The Task Force was specifically formed to focus on the individual patient rather than on broader social issues of violence (group violence, civil disturbances) previously considered by the former Task Force on Violence and Aggression of the Council on National Affairs and Social Issues.

This report is aimed at the practicing clinician. It attempts to describe the current state of the art and provides an overview of selected literature and clinical opinion on matters of evaluation, management, and predication of violent behavior.

# WHO IS THE PATIENT?

## Clinical Definitions

The Task Force defines the violent patient as a patient who acts or has acted in such a way as to produce physical harm or destruction. The emphasis of this definition is on the patient's behavior. Clinicians may also be asked to see patients who fantasize or talk about violence and in certain such cases the patient may be considered, at that point in time, as a potentially "violent patient"; however, it should be noted that violent thoughts or verbalizations not uncommon among psychiatric patients (1, 2). We have labored long on this definition in an attempt to clarify those persons of clinical concern to the psychiatrist, realizing that not all violent persons are mentally ill and that violence can result from adverse social conditions. For example, we are aware that a rioter in an intolerable urban slum condition is not necessarily a candidate for a psychiatrist. Aggressiveness when appropriately channeled can be a positive social force.

## Types of Patients

Currently, we identify the following groups of patients as suitable candidates for clinical concern to psychiatrists. First, and most clearly, are those patients who themselves seek psychiatric help because of repetitive problems with aggression and impulsivity. Such "self-referred" violent patients verbalize fears of running "losetk," losing control over violent urges, or direct homicidal idealion. These patients often turn out to have characterological disorder but borderline patients or psychotic individuals may also have difficulties with violent urges.

A group of persons of concern to psychiatrists are not self-referred. They are those who are already incarcerated or who are in legal difficulty because of violent criminal acts (4). Persons who have committed such acts as murder, rape, or assault and those who have been incarcerated for recidivistic violent acts may merit psychiatric attention for purposes of diagnosis, pre-sentence or pre-parole evaluation, or treatment. In legal settings, however, the term "patient" should be reserved for those persons where there exists an ongoing therapeutic relationship between the psychiatrist and the patient;

1

Task Force Report 8

forensic evaluations would more frequently be of briefer duration and would be oriented more towards such issues as diagnosis or assessment of suitability for psychiatric treatment. Included within this group of persons with legal difficulties are those whose previous behavior may or may not have come to legal attention, but who are atypical offenders with a history of sudden, unexpected, senseless, bizarre acts with or without psychotic behavior [5, 6]. The following characteristics have been found to be associated with murder committed by mental patients [7]: absence of apparent motive, no attempt to conceal the crime, action impulsive in nature, near and dear ones are the victims, murder is brutal in nature, complete emotional indifference, usually only one victim, and past history of mental disorders. There would be considerable disagreement, however, about this last point [8].

Persons with a history of child abuse may be referred for evaluation [9].

Another group of patients are those with certain childhood behavior disorders which are accompanied by psychomotor agitation, aggressiveness and belligerence. Such patients may come to psychiatric attention [10, 11].

Patients may also be seen by the psychiatrist because of assaultive or destructive behavior in association with toxic or 'organic states' such as an amphetamine psychosis [12] or a viral encephalopathy [13, 14].

There is also a large group of individuals who misuse the automobile and are responsible for violence of epidemic proportions [15]: society has not yet seen fit to label these patients as "violent" on the basis of this behavior alone, though histories of automobile misuse are frequently elicited from violent patients [16].

It must again be stated that not all violent behavior is symptomatic of mental disorder: neither should all violent persons be labeled or handled as 'patients'. Patients who are of clinical concern to psychiatrists may be distinguished from other violent persons on the basis of some or all of the following characteristics: they perceive their violent acts or urges as unwanted, as ego-alien or ego-dystonic; they exhibit a diagnosable mental disorder; their violence is associated with an underlying psychobiological abnormality, e.g. an organic state or an intoxication; their individual management is within the competence and scope of the psychiatric clinician.

# WHERE IS THE PATIENT FROM?

## Social and Cultural Factors

Not only must the medical milieu be considered in the evaluation of the violent patient, but the immediate social milieu as well. The rebellious and aggressive adolescent may be propelled towards violence by destructive family forces. On a psychiatric ward a patient may become destructive in response to pressures in the milieu which, when alleviated, result in a prompt reduction in aggressive behavior.

Cultural forces which may contribute to a patient's violence must also be weighed. Aggressiveness may be an important requisite of manhood ("machismo") in certain subcultures. For example, one study of cultural factors associated with homicide in Philadelphia has noted that males of a particular subculture are expected to accept no derogation about their race (even from a member of their own race), their age, or their masculinity [17]. Quick resort to physical combat as a means of defending honor on these issues is sanctioned by the subculture.

Transient dissociative-like states leading to severe violence such as the "amok" syndrome have been described in other cultures [18, 19]. Comparison of amok homicide with other homicides showed significant differences in the weapons used, the precipitating personal loss and incidence of suicide of the killer [10]. Shame appears to play a prominent role in the culture-bound act of amok, and thus the culture can both shape and define violence and perceive the violent act as ritualistic or criminal. The patient's background should be considered when judging the explanation of the violence.

## Epidemiological Considerations

The majority of violent offenders are men. Rates of violence are higher for individuals in the 10-24 and 15-17 age groups than for other ages, and higher for poor under-educated individuals with few employment skills than for persons higher up in the socioeconomic ladder [20]. Women account for only 10% of violent crimes [21] and a lower percentage of individuals seen in populations of violent psychiatric patients [16]. Psychosocial theories have described the more

# CLINICAL ASPECTS OF THE VIOLENT INDIVIDUAL.

and the assessment of their violent tendencies become urgent. Potentially violent patients who bear weapons such as policemen, or operators of motor vehicles require careful evaluation since they are capable of harm while working.

passive role women play in society and various cultures as a possible reason for their lack of participation in violent crimes. Consistent with this theory is the fact that women generally acted as supporting players to men who acted violent in the case of robbery and burglary: female offenders robbed few healthy males by themselves. Differences in the participation of women in ferences also emerge with regard to the participation of women in assault and homicide. Women tended to attack persons with whom they had affectional relationships, such as spouses, rather than strangers who were assaulted or killed in the course of a robbery. Women picked weaker victims when committing assault or homicide, such as an elderly person or an individual who was asleep [22].

A rising rate of violent crimes has been recently reported for women [21]. This trend has been theorized to possibly result in part from the social emancipation of women [22].

The milieu of violence rather typically involves the family or other interactions between friends or associates. For example, in 1972 spouse killing spouse, parent killing child, other family killings, romantic triangles and lover's quarrels, and other arguments accounted for more than 70% of all murders. Less than 30% of all murders were of a felony or suspected felony type [23]. If the amount of violence accomplished but not reported among families were better known, however, especially with regard to non-lethal assault, these figures might be even more impressive [24].

Patients with fears of losing control over violent urges may be seen by the psychiatrist at any time or in various settings. Epidemiological studies, however, have rather consistently indicated that the rates of accomplished violence are very much higher within poorer areas of dense, overcrowded populations (e.g. the central city) and vary as a function of social need [25, 26]. There is a remarkable concentration of reported episodes of homicide or aggravated assault occurring on Fridays, Saturdays and Sundays between evening hours and early morning [25, 27].

## Evaluation Issues

With respect to the evaluation, the economic status of the patient often plays a role in the examiner's assessment of violence. The assaultiveness of a patient from an upper socioeconomic class, or that of a private psychiatric patient may be too quickly dismissed. A violent patient in a conventional psychiatric setting may be labeled accurately "alcoholic" or "psychopathic." A skew in the other direction may occur when the patient is seen in prison and when a propensity toward violence may be too readily assumed.

Certain patients are in delicate social or occupational positions.

RICHARD ELLIS, Attorney

## WHAT PROBLEMS DOES HE HAVE?

The patient may fear, threaten, or act; or he may be anxious about impending violent acts which he contemplates, or he may be brought to psychiatric attention because he has verbalized homicidal threats, or because he already committed a violent act. The violent patient may direct hostilities against property and people. With regard to property, he may destroy articles in his home, become involved in auto accidents, or commit arson. The violent patient may also be assaultive or sexually violent to children or adults [30, 31, 32].

### Typologies

The patient's pattern of violent behavior may reveal recurring, labile outbursts such as encountered in the Antisocial or Explosive or Passive-aggressive personality types. In contrast to these types of "undercontrolled" patients, the clinician may see patients who are more "overcontrolled" and who demonstrate brittle defenses against hostile urges [33, 34, 35]. Such patients may demonstrate rare aggressive outbursts which are extremely violent in character. Finally, the patient may be overtly psychotic and harbor hallucinations which propel him towards violence to justify a delusional belief [36, 37, 38]. A variety of studies have categorized murderers on the basis of motives or personality types. One worker has classified murderers as "normal, sociopathic, alcoholic, avenging, schizophrenic, temporarily psychotic, genocidal, homosexual, passive-aggressive and sadistic" [39]. Other authors have described "jealous" murderers [40] or murderers who are depressed [41], while another worker has listed [female] murderers as falling into groupings of "masochistic, overtly hostile violent, covertly hostile violent, inadequate, psychotic, overtly hostile violent, and amoral" [42]. Classifications of the above type must be reconciled with a formal psychiatric diagnosis.*

*"A 1969 classification of violent offenders devised in California included the following: the "culturally violent" who grew up in a subculture where violence is an accepted way of life; the "criminally violent" who will commit violence, if necessary, to gain some end, as in robbery; the "pathologically violent" who are mentally ill or who suffer brain damage; the "situationally violent" who under extreme provocation commit a rare act of violence; the "accidentally violent" who commit violence while others accidentally; and the "institutionally violent" who commit violence while incarcerated. These classifications have subsequently been related to the types

## WHO ASKS ABOUT THE PATIENT?

Clinicians may be asked to see a violent patient because another therapist or individual is frightened of him. This fear may be rational or irrational; strong countertransference elements come to play in the evaluation and treatment of violent patients [28]. For example, anger at a violent patient may be handled by projection, and the clinician may distort the patient's dangerousness by defensively viewing him as very threatening. Colleagues can shunt violent individuals to state facilities, fearing involvement with them. In such cases, clinicians may have to deal with their colleagues' anxieties as well as with the need patient himself. In a school setting teachers may ask about the need for medication for an aggressive youngster, and the appropriate treatment may be psychotherapeutic instead, and oriented towards pathological interaction between patient and teacher. Other members of the patient's family may request that he be seen.

Intense social pressure can be generated on the psychiatrist to evaluate a violent adolescent, senile patient, or psychotic individual. In some cases, the patient can advantageously be hospitalized on a voluntary basis so that he can be evaluated without urgency [29]. Requests for evaluation of a violent patient usually have a disposition quality and the clinician must avoid merely being an accomplice of the referring agent. A member of the legal or judicial profession may request data about a patient's potential for future violence, his tendency to repeat a crime or engage in further criminal acts. The response to such questions will require a formal report which will have a profound effect on the patient's future. This aspect of prediction will be discussed further below.

# CLINICAL ASPECTS OF THE VIOLENT INDIVIDUAL

Task Force Report 8

## Dynamics

The chief complaint of the violent patient reveals something about the intensity and target of any anger that is present, the state of his inner controls, and the precipitants for his current crisis. Some patients present to the clinician vague fears of doing "something" terrible; no object of harm is verbalized. The diffuseness of the patient's anger in such cases may be defensive, and may prevent him from realizing the true aim of his anger which is usually directed at an ambivalently held object [3]. For example, such patients may have intense mixed feelings about early parent figures which they cannot resolve. They adopt a brittle reaction formation against negative feelings for the parent which results in an exquisite sensitivity to any slur on the parent's name or character. The defenses against rage break down under appropriate psychological stress and lead to a pervasive anger which protects the patient from realizing the true source of his rage.

A core dynamic theme seen in violent patients is helplessness [45]. Patients may defend against passivity, helplessness and under-lying homosexual strivings by adopting a hypermasculine stance whereby they become aggressive as a way of preserving their masculinity. A child-battering patient may have a brittle reaction formation against her own helplessness; when she sees her children become ill and cry excessively this helplessness may become revived and her unexpressed rage may erupt into assaultiveness. In another patient, unresolved maternal abandonment can become reactivated in situations when a spouse leaves the patient. Morbid jealousy is well described as one dynamic of importance in certain violent patients, both psychotic and nonpsychotic, and in clinical experience is a frequent manner of presentation [36, 40, 40]. Violent patients are seldom randomly or irrationally violent but respond with violence in response to dynamically significant stresses and situations.

Murder followed by suicide, which was the case for one third of all murders in England from 1952 to 1960, is remarkable in the marked predominance of domestic type killings of spouse, child, or lover. Feelings of despair, as much or more than that of hostility, would seem to characterize these cases [47].

## Organic Aspects

Brain dysfunction such as epilepsy as a prime or contributing etiology in a violent patient's behavior has been described by some workers [40, 49, 50, 51] but questioned by others [32, 53]. A patient with repetitive, paroxysmal outbursts of violence such as seen in an Explosive Personality may occasionally have an underlying seizure disorder of a psychomotor type [16, 45, 40, 54]. Electroencephalographic (EEG) recordings may confirm a clinical diagnosis or may reveal nothing [45, 55]. Neurophysiologic studies have shown that epileptogenic foci may be detected only with depth electrodes in patients with clinical psychomotor seizures and a normal surface EEG [50]. Violence as a direct seizure manifestation is very rare [52, 57, 50, 59]. Some workers have described hostile attacks which correlate with seizure EEG discharges [48, 50], but other workers have found that any violence that patients might show during a seizure disorder would be a function of attempts to restrain the patient or might result from some higher level of irritability which accompanied the interictal phase [52, 60].

Literature exists on the issue of whether or not psychomotor epileptics are more prone to violence than other types of epileptics [61, 62]. This issue remains unresolved at the present time; all that can be said is that the vast majority of epileptics are not violent [63, 64, 65].

In those patients who are violent and are demonstrated at si. epilepsy, attention should be paid to environmental and social factors which may play a role in the genesis of the aggressive behavior [52, 53].

Abnormal EEG patterns have been found to be of increased frequency in association with certain types of violence such as un-motivated murderers, psychotic murderers, and recurrently violent individuals [66, 67, 80]. The casual nature of these findings is undetermined and the abnormal patterns could not be said to be specific for violence.

The term "minimal brain dysfunction" has more recently been used in conjunction with the psychological and neurological findings in certain young adult patients who are prone to impulsiveness and aggressiveness [69, 70]. This clinical area deserves further study.

---

... criminal career, occupational-educational history, and demographic features of offenders [43]. Such classifications have not, however, found widespread usage to this.

Another group of workers have distinguished two groups of violent patients who markedly differ from each other in regard to diagnosis, course, prognosis, and family history. The first group of patients are distinguished by the early onset of violent behavior and include a number of individuals who can be diagnosed as "antisocial" or "explosive" personalities. The second group is more heterogeneous and includes diagnoses such as paranoid syndromes, psychosis, or severe manic excitement. The prognosis in this latter group depends on the treatability of the primary disorder [44].

In the absence of accepted "typologies" of violent persons the Task Force has elected to identify those types of patients encountered by the psychiatric clinician [see above] and to discuss factors relevant towards understanding and treating their violence.

## WHAT IS HIS HISTORY?

Questions about the violent patient's history should be frank and direct, much as though one were questioning the suicidal patient. The patient should be asked how much he has thought about violence, what he has done about it, what weapons does he have, what preparations he has made, how close has he come to being violent, and what is the most violent thing he has done. Corroborative data and what is the most violent thing he has done. Corroborative data from a spouse, relative, or friend is sometimes necessary in problem cases.

A detailed anamnesis is essential for some determination of risk, treatment, and prognosis. The violent patient should be queried with regard to neuropathic traits indicative of violence, such as temper tantrums, enuresis, pyromania, and cruelty to animals; histories of such traits are frequently obtained from violent patients in different clinical settings (75). It should be noted, however, that the prognostic value of these traits is undetermined. The existence of psychosomatic problems such as dermatological conditions, gastrointestinal disorders, hypertension, or migraine gives a clue regarding the somatic expression of aggression and the conflicts which the patient has about expressing violent urges. School behavior, military adjustment and work history give clues to the clinician about the patient's ability to function under stress and cope with impulsivity. A thorough criminal history should be elicited tactfully, and corroborated, by formal police reports in certain high risk cases. A driving history gives clues regarding danger on the highway. The physician must inquire about lethal skills, ownership of weapons and any past use of these.

A social history frequently reveals that the violent patients have come from homes where there was previous violence or parental deprivation. Alcoholism and parental brutality are commonly noted in violent patients' histories (5, 76, 77). The prognostic value of these findings is uncertain, but may help the clinician in certain instances to better understand the patient's behavior. Inquiry should be made into the patient's current marriage, violence within that marriage and disciplinary attitudes toward children. A prenatal, birth, or early childhood history may reveal traumatic conditions conducive to brain dysfunction. In the developmental history, in-

---

On the basis of prevalence studies of the proportion of chromosomal variants found in institutionalized populations, certain investigators suggested a link between the XYY variant and violence and aggression. Four recent and thorough reviews of the more extensive data now available in this area would all indicate, however, that such an assertion is presently not justified (21, 72, 73, 74). The earlier prevalence studies did not take into enough account such items as selection factors that might lead to institutionalization, as well as other social determinants (e.g., poor family background of the studied cases) which might have explained the findings.

quiries should be made about head injury, events suggestive of learning disabilities, motor clumsiness or hyperkinesis (69, 70).

Dynamic, situational, and organic factors are not mutually exclusive. A patient's history may reveal organic dysfunction which impairs his ability to deal with specific psychological stress.

## WHAT IS THE PATIENT LIKE NOW?

Delusional patients with violent fantasies should be taken seriously. Suicidal patients should also be carefully evaluated; in certain instances, they may be homicidal, and questions should be asked regarding this. The patient may consider, for example, killing his family prior to killing himself, and his hopelessness may signal serious risk. Borderline patients can internalize and externalize aggression freely in states of ego dissolution (78).

The mental status examination reveals some aspects of the patient's immediate potential for violence. Patients may present states of incipient psychosis and their fear of losing control over aggressive urges is prominent. Anxiety is often present in such cases. Delusional patients with violent fantasies should be evaluated carefully as they may be propelled toward violence on the basis of a thought disorder. Certain more schizoid or obsessive patients may report violent urges in a clinically detached way, without much anxiety. The calmness of these patients is defensive and such patients should be carefully evaluated. Patients with personality disorders such as those of the Explosive, Antisocial, or Passive-aggressive types must be asked questions about past acts of violence as they are apt to reveal little overt psychopathology.

The ability of the patient to translate agitation and anger into some degree of verbalization is important in assessing immediate risk. Sullen, negativistic and recalcitrant patients who refuse any degree of introspection remain capable of translating stress into behavior and hence require close follow up.

A prime determinant of the evaluation of the patient is the relationship which is established between the patient and the clinician. Trust and the formation of a therapeutic alliance are factors which are vital in assessing the patient's potential for violence and his willingness to change through treatment.

The above types of observations are derived from clinical material and experience. It should be emphasized that from the epidemiological perspective, no positive association has been demonstrated to exist between actual clinical diagnosis (e.g., schizophrenia) and crimes of violence (30, 79).

## WHAT SPECIAL EXAMINATIONS SHOULD BE PERFORMED?

Special examinations include psychological testing, when complemented with observational data and past history regarding violence. Projective portions of the test can assess impulsivity and hostility [80]. Important dynamic themes may emerge. A variety of rating scales such as the Buss-Durkee or Schler-Cattell have been used to derive an objective measure of hostility and agitation [81]. Pugnicity and impulsivity can be detected by certain tests, such as the Bender-Gestalt or Porteus Maze test [82]. Other tests, the 4-3 MPI profile and the Hand Test, are noted in the following section concerning predictions of violence.

The physical exam may demonstrate old scars resulting from knife or bullet wounds.

Physical tests include a neurological exam for brain dysfunction. When seizure disorders are suspected, repeated sleep EEGs are recommended [83].

## WHAT ARE PREDISPOSING AND CONTRIBUTING FACTORS?

### Previous Mental Illness

Whether the existence of psychiatric illness or past hospitalization can be considered a predisposing factor towards violence is very doubtful. Follow-up studies of released psychiatric patients have given mixed results. Some studies have found higher than expected rates for certain crimes against persons for such patients, e.g., robbery committed by men, aggravated assault committed by women, crimes against persons committed by functionally psychotic discharged male veterans [84, 85, 86]. Other studies suggest certain conclusions [87, 88, 89]. The interpretation of these studies is complicated by methodological inadequacies. The statement of certain authors seem relevant: "We think it is fair to conclude that an individual with a label of mental illness is quite capable of committing any act of violence known to man but probably does not do so with any greater frequency than his neighbor in the general population" [90]. Additional and more adequately designed studies are required to determine whether any subpopulation of the mentally ill are at any higher risk for violence.

### Drugs

Alcohol is a common contributing factor to violence, both in crime and automobile fatalities [91, 92]. Alcohol may lead to what has been described as a state of "pathological intoxication", a transient psychotic-like condition sometimes accompanied by violent behavior [3, 10]. Alcohol has been reported to activate psychomotor epilepsy [93]. Other work indicates the drug to have no activating EEG properties when administered in a laboratory setting to men who complained of such violent "blackouts" [94]. The interpretation of such data of this type is perhaps one illustration of the of conflicting data in the pathophysiology of importance of environmental setting in the violence.

Isolated reports of violence associated with amphetamine use and usage of hallucinogens such as LSD has been reported [12, 95, 96]. Barbiturates have been reported to enhance the expression of violence in aggressive youths [97, 98]. One recent study indicates that among a large population of arrestees, barbiturate users had a

15

CLINICAL ASPECTS OF THE VIOLENT INDIVIDUAL

Task Force Report 8

higher rate of aggravated assaults when compared with amphetamine and heroin users [99]. The same study also found a greater concentration of arrest charges for non-drug users compared to drug users (irrespective of type of drug used) for serious crimes against persons, including criminal homicide, forcible rape, and aggravated assault [100]. A weakness of this study was that alcohol use was not considered. Base rate data among general populations is necessary to resolve controversies in the area of drug use and violence.

There is much public concern linking heroin to violence. Available data [101, 102, 103, 104] does not, however, show heroin users to be over-represented and very probably they are under-represented, among those who accomplish violence. A difficulty in interpretation in the above types of studies depends upon whether or not the crime of robbery is included as a crime of violence. Including robbery as a crime of violence does increase the number of person crimes associated with heroin use [102, 104]. It should be noted that the relationship between drugs, including alcohol, and violence is not simple. Needed to be considered is the social setting accompanying the use, the pharmacologic effects of the drug as well as related behavioral or group patterns which might predate or be associated with the drug or alcohol consumption [105].

Victims

Victims should be considered contributing factors toward violent behavior [106, 107]. Victims can subtly or very directly provoke violence. It is known that violence occurs more between people who are friends or acquaintances and much violence occurs within families. The fact that the patient has intimate acquaintance with his potential assailant is no deterrent to violence actually taking place.

Weapons

The availability of weapons is a contributing factor [108, 109]. The possession of guns and ammunition, knives, and other weapons should be asked about by the clinician. The epidemiology of aggravated assault and homicide is very similar [27]. The difference between the two may well lie in the type, lethality, and availability of firearms weapons involved [110]. The proportion of homicides due to firearms is increasing [111]. In light of the problems relating to predictions of lethal violence discussed below, a decrease in the availability of lethal weapons to potentially violent persons and to their victims should be regarded as a prime strategy in the prevention of violence. Not only should the clinician ask about the availability of weapons to the patient, but also the availability of weapons to the patient's potential victim.

Medical and Organic Conditions

Another contributing factor to be considered is premenstrual tension in women, a period in which various emotional outbursts, including those of a criminal and aggressive type, have been noted [112]. In one study, nearly one-half of all crimes (49%) were committed by women during menstruation or in the premenstruum; a correlation between "bad behavior" in prison and menstruation has also noted [112]. Other endocrine concomitants of aggression, hostility and violence, such as testosterone levels, have been studied [113, 114, 115]. No definite conclusions can be made regarding their predisposing role in violent behavior in man. Other organic factors have been noted in association with violent behavior. For example, tumors of the limbic system [116, 117, 118], normal pressure hydrocephalus with dementia [119] and, as noted above, certain encephalitic disorders [13, 14] or metabolic conditions such as hypoglycemia [120] have been related to aggressiveness. There is insufficient information which would allow the clinician to reliably sort out patients with these conditions from other aggressive patients; however, these differential diagnoses should be entertained especially in patients manifesting medical or neurological abnormalities and demonstrating behavior quite out of character with pre-morbid functioning or in patients whose violence or aggressiveness would be quite untypical for the age group concerned. The type of violence or aggression described in these "organic" cases is frequently of a primitive sort, e.g., reports of biting or scratching [13, 117, 119].

Social Environment

The clinician should look not only at the violent patient, but at the environment. Work regarding the body buffer zone would suggest that spatial overcrowding might be a precipitant of violence in predisposed individuals [121]. Certain situations are conducive to violence and create role demands whereby clues are provided and violence is sanctioned or elicited. In one study, volunteers acting as prison guards very quickly became aggressive toward other student volunteers acting as prisoners [122].

Whether or not patients in mental hospitals are dangerous to the employees and other patients in the hospital was studied [123]. The author, reviewing assaults in Swedish hospitals, concluded that mental hospitals run only a small risk of employees and patients in mental hospitals run only a small risk of being seriously injured by patients and that examples ... from legal punishment and patients already labeled as "dangerous" were apt to be more physically dangerous to others. Other conditions involving risk were male sex, diagnosis of schizophrenia, recent admission,

Track Force Report 0

unfamiliarity with the language, understaffing of the ward, and the mixing of young aggressive patients with older, feeble patients. The various social and psychological factors on a ward setting and their interaction which may have led to violence have been retrospectively studied for assaultive psychiatric patients (124).

This last cited work is illustrative of the multiple factors that might need to be considered in assessing the "contributing" factors or social precipitants to violent behavior. For example, it is noted that the following considerations associated with hospitalization might, in a given instance, tip the scales and produce a violent response: patient boredom, the feeling of helplessness of the patient before hospital authorities, the provocation of other patients, overcrowding, or staff "abuse" of the patient of a subtle or psychological and, in the cases discussed, the use of psychotropic drugs, the role of intoxicants and possible-provocation by victims is also considered. The author concludes, however, that the increase in assaultive behavior during a certain period in his hospital was due primarily to social tensions and the social climate at that time, even though the assaultive patients were all psychotic and nearly all suffered from significant personal feelings.

# WHAT CAN WE OFFER THE PATIENT?

## Immediate Management

In the acutely agitated stage, the violent patient benefits from measures which restore a sense of mastery over impending loss of control of violent urges. Patients who verbalize fears of becoming aggressive must be told that the clinician will protect them (in becoming dangerous. Agitated, angry, and potentially violent patient respond to verbal acknowledgment that anger is an unpleasant affective state. Verbal catharsis is important and medications such as the phenothiazines or benzodiazepines may be offered the patient (45). Hospitalization may also be offered certain patients who are afraid of becoming violent: violent patients, like suicidal individuals, issue a "cry for help" which should be responded in by the setting of limits. The clinician may encounter agitated and aggressive patients who do not respond to verbal measures and refuse medication. Chemical restraints, though always preferable, may be ineffective and physical restraints, humanely applied, may be necessary [125]. To physically subdue a violent patient requires a team effort of sufficient staff personnel and demonstration of such personnel is often in itself sufficient to calm a patient. It should be remembered that simple sedation or restraint is not the end of treament of a violent patient. The clinician should determine the origins and nature of any psychopathology and not assume that his job is done once the patient is quiet and no longer belligerent.

## Continuing Treatment

In the non-acute stage, treatment is more diverse. A large literature exists on the various psychotherapeutic treatments of psychopathic, criminal, and delinquent populations of patients; unfortunately, the patients described in various reports are not necessarily violent or aggressive and there is little literature which discusses the treatment of the violent patient specifically. Several reports have described individual psychotherapy with the violent patient or patients judged dangerous to society (45, 120, 127, 128, 129), group psychotherapy with such patients (130, 131, 132), milieu approaches (133, 134), and behaviorally-oriented approaches designed to bring about more constructive and socially acceptable conduct (135).

mucus but was otherwise unremarkable.  The hyoid bone, thyroid cartilage, and cricoid cartilage were intact and had no fractures.  The thyroid gland had the usual butterfly shape.  It was red-brown on both external and cut surfaces.  There were no nodules.  The tongue was sectioned and had no areas of fibrosis or hemorrhage.

HEAD:   The scalp was incised and reflected in the usual manner.  There were subscalp hemorrhages beneath the large laceration sites over the right temporal and posterior occipital area.  The top of the skull was removed and had no fractures.  The brain weighed 1,360 grams.  It had a small amount of subdural hemorrhage over both cerebral convexities more prominent on the right side.   A large amount subarachnoid hemorrhage was present over both cerebral convexities and at the base of the brain.  The vessels at the base of the brain were intact and were unremarkable.  On sectioning the cerebrum and brainstem, cerebellum, there was no tumor or infectious process.  The upper cervical spinal cord was severed.  There was blood in the lateral ventricles.  The septum pellucidum was ruptured.

SKELETON SYSTEM:  The head was separated from the spine between the 1st and 2nd cervical vertebra.  The C2 vertebra was attached to the lower, separated body.  There was a fracture of the right clavical.  There were fractures of all of the anterior right ribs and fractures of the 1st through the 8th anterior left ribs.  There was a fracture through the 8th thoracic vertebra.  There was a fracture of the 5th lumbar vertebra.  There were no pelvic fractures.  The patella and bones about both knees were ground down and fractured.  The 1st and 2nd toes on the right foot were absent.  The 3, 4, and 5th toes on the right foot were fractured.  The right arm was disarticulated at the shoulder.  Both elbows were ground down and showed fractures of the underlying bones.



## PATHOLOGIC FINDING

1. Multiple severe injuries with separation of the head and right upper extremity from the rest of the body.
2. Severe lacerations and abrasions of the head.
3. Separation of the head above the C-2 level.
4. Severe abrasions and lacerations of the right arm.
5. Multiple bilateral rib fractures.
6. Fractures of the 8th thoracic vertebra and the 5th lumbar vertebra.
7. Severe abrasions and shredding of the penis with traumatic absence of testicles.
8. Severe lacerations and ground down bones over the elbows, knees, heels and the toes of the right foot.
9. Multiple brush burn abrasions over the anterior and posterior surfaces of the body.

CAUSE OF DEATH:  Multiple severe injuries with separation of the head and right upper extremity from the rest of body.

MANNER OF DEATH:  Homicide.

3811

REPORTER'S RECORD
VOLUME *18* OF *29* VOLUMES
TRIAL COURT CAUSE NO. 8871

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| VS. | ) | JASPER COUNTY, TEXAS |
| | ) | |
| SHAWN ALLEN BERRY | ) | FIRST JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GUILT/INNOCENCE TRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        On the 15th day of November, 1999 the
following proceedings came on to be heard in the
above-entitled and numbered cause before the Honorable
Joe Bob Golden, Judge presiding, held in Jasper, Jasper
County, Texas;

        Proceedings reported by machine shorthand.

COPY

Donnece Foster, CSR

09/08/03  11:12 FAX 4153802251   RICHARD ELLIS Attorney                    ✎003

239

1    sally port?

2        A    I'm not aware, sir.  I do not do that.

3        Q    You don't know one way or the other?

4        A    I do not know.

5                 MR. HAWTHORN:  That's all I have,

6    Your Honor.

7                 MR. HARDY:  Nothing else, Judge.

8                 THE COURT:  You may come down.  Thank you.

9                 Your next witness.

10               MR. HAWTHORN:  Dr. Lloyd White.

11               THE COURT:  Raise your right hand.

12               (The witness was sworn)

13               THE WITNESS:  I do.

14               THE COURT:  Have a seat.

15                      LLOYD WHITE,
     was called as a witness by the Defendant, having been
16   first duly sworn, testified as follows:

17                  DIRECT EXAMINATION

18   BY MR. HAWTHORN:

19       Q    State your name, please.

20       A    My name is Dr. Lloyd White, with two Ls.

21       Q    Okay, sir.  Where do you live, Dr. White?

22       A    I live in Corpus Christi, Texas.

23       Q    Are you employed down there?

24       A    Yes.

25       Q    What do you -- what is the nature of your

09/08/03 11:13 FAX 4153890251  RICHARD ELLIS Attorney  Case 6:02-cv-00457-LED  Document 8  Filed 09/10/03  Page 92 of 155 PageID #: 113

240

1    employment?

2        A    I'm the Nueces County medical examiner.

3        Q    All right, sir.  How long have you had that

4    position?

5        A    Since October of 1992.

6        Q    What are the duties of the medical examiner

7    there in Nueces County?

8        A    Briefly, in Texas, the medical examiner's

9    office is actually a kind of a court that operates

10   alongside the justice of the peace courts under Chapter

11   49 of the Texas Code of Criminal Procedure; and the

12   purpose of it is to conduct inquests or inquiries into

13   certain kinds of deaths that effect the public interest.

14   These are spelled out in great detail in the law.  They

15   fall in certain general categories:  Obviously anyone

16   who dies from anything other than natural causes, people

17   who are found dead, who die at home or found beside the

18   road, that sort of thing, anyone who dies in a jail or

19   prison and also the deaths of all children under the age

20   of six years.

21        What I do as a practical matter is gather

22   information from a variety of sources, medical records,

23   police reports, witness statements, and so forth.  I

24   also examine the body of the dead person, and the

25   ultimate goal is to establish two things.  One is to

1    determine what is the cause of death -- in other words,

2    what is the injury or disease that resulted in that

3    person being dead -- and, secondly, is to make a ruling

4    as to the manner of death.  In other words, was it

5    accident, suicide, homicide, natural causes, or

6    something else?

7         Q    What is your educational background?

8         A    I have a Bachelor of Science degree from the

9    University of Tulsa in Tulsa, Oklahoma.  I have a

10   medical degree, an M.D. as well as a Ph.D. in anatomy

11   from the University of Oklahoma.  I also have a degree

12   in theology from the University of Dallas.  I did my

13   postgraduate medical specialty training at Baylor

14   University Medical Center in Dallas and the University

15   of Texas Southwestern Medical Center in Dallas.  I'm

16   certified by the American Board of Pathology in the

17   medical specialty of anatomic and clinical pathology, as

18   well as in the subspecialty of forensic pathology.

19        Q    What is forensic pathology?

20        A    Forensic pathology is the application of the

21   medical specialty of pathology to the investigation of

22   injuries and death.  Pathology is basically medical

23   science such as chemistry, physiology, bacteriology,

24   anatomy, and so forth, applied to the study and the

25   diagnosis and the treatment of disease.  The hospital or

Donnece Foster, CSR

1  clinical pathologist oversees the hospital laboratory

2  and the clinical laboratory.  The forensic pathologist

3  generally functions as a coroner's pathologist or as a

4  medical examiner as part of the criminal justice system.

5       Q    Are you licensed to practice medicine in the

6  State of Texas?

7       A    Yes.

8       Q    Explain to the jury what your training and

9  experience has been.

10      A    Following my certification in pathology, I was

11  with a group of pathologists in Denton, Texas, providing

12  forensic pathology service, as well as general hospital

13  and clinical pathology service to clinics and hospitals

14  and doctors offices in Texas and Oklahoma and New

15  Mexico.  In 1989 I became the state medical examiner for

16  the State of Mississippi; and then since 1972, I've been

17  in Nueces County.

18      Q    Okay, sir.  Are you a member of any

19  professional societies, associations?

20      A    Yes.  The National Association of Medical

21  Examiners and the American Academy of Forensic Sciences.

22      Q    Have you ever taught in the field?

23      A    Have I ever --

24      Q    Have you ever taught in the field of pathology,

25  given any classes, ever been an instructor?

09/09/03 8:04 FAX 15349025J   RICHARD ELLIS Attorney   Ø007
Case 6:02-cv-00457-LED   Document 8   Filed 09/10/03   Page 95 of 155 PageID #: 116

243

1    A    Yes.  I was an instructor.  I believe my title

2  was something like visiting assistant professor at one

3  time at Baylor College of Dentistry.  I also have a

4  faculty appointment at the University of Mississippi.

5            MR. HAWTHORN:  I would tender him as an

6  expert in pathology, Your Honor.

7            MR. GRAY:  (Indicating)

8            THE COURT:  You may proceed.

9    Q    (BY MR. HAWTHORN)  Dr. White, have I asked you

10  to look at some photographs in connection with the

11  murder of James Byrd, Jr.?

12    A    Yes.

13    Q    And are those the photographs of the body of

14  James Byrd, Jr.?

15    A    Yes.

16    Q    Have I also asked you to review the autopsy

17  report of Dr. Tommy Brown?

18    A    Yes.

19    Q    And have you done that?

20    A    Yes, I have.

21    Q    Have I also asked you to review the testimony

22  that Dr. Tommy Brown gave in the trial of Bill King?

23    A    Yes.

24    Q    And have you done that?

25    A    Yes.

1        Q     Do you know Dr. Tommy Brown personally?

2        A     Yes, I do.  Dr. Brown is a friend of mine, as

3   well as an associate and a colleague.  As a matter of

4   fact, he covers for me in my office when I'm out of town

5   on some occasions.

6        Q     Did you also talk to him about his autopsy and

7   findings in connection with the death of James Byrd,

8   Jr.?

9        A     Yes, I did.

10       Q     And did I ask you to do these things in order

11  to see whether or not an opinion could be formed, with

12  any degree of medical certitude, as to whether or not

13  Mr. Byrd was conscious at the time that he was being

14  dragged?

15       A     Yes.

16       Q     And did you talk to Dr. Brown about that?

17       A     Yes.

18       Q     And did you hear what his conclusions were and

19  the reasons for his conclusions?

20       A     Yes.

21       Q     Now, after doing all of these things, in your

22  opinion, can it be determined with any degree of medical

23  certitude, from looking at the injuries on Mr. Byrd's

24  body, whether or not he was conscious or unconscious

25  while he was being dragged?

                    Donnece Foster, CSR

1      A    No, that cannot be determined with any degree

2    of medical certitude.

3      Q    Could you explain to the jury why that is?

4      A    Yes.  Quite simply for two reasons:  One, there

5    is no obvious injury, such as a massive crush injury to

6    the head or a gunshot wound to the brain, that would

7    lead us to the conclusion that he undoubtedly was

8    unconscious.  On the other hand, No. 2, there are no

9    really clear distinctive characteristic or specific

10   injuries that enable us to draw a conclusion that he

11   was, in fact, conscious.  The injuries are simply too

12   massive, too extensive, and too nonspecific to draw a

13   conclusion one way or the other with any degree of

14   medical certainty.

15     Q    There is evidence that has been introduced in

16   this trial that Mr. Byrd was kicked in the head by a

17   co-defendant, Lawrence Brewer, and was unconscious when

18   he was chained to the back of a pickup truck.  Is

19   your -- are your findings inconsistent in any way with

20   that assertion?

21     A    No.  In the sense that there is nothing about

22   these injuries as depicted in the photographs or in the

23   autopsy report that would be specifically inconsistent

24   with that assertion.

25     Q    Have I also recently talked to you about the

Donnece Foster, CSR

1    issue concerning the blood clump and the dragging of

2    Mr. Byrd's body after that blood clump?

3        A    Yes.

4        Q    I'd like to ask you some things about that now.

5    What I'd like to show you now, Doctor, is something that

6    I'm sure you have never seen before, have you?

7        A    That's correct.  I have not seen these -- this

8    diagram or these photographs.

9        Q    It's Government's Exhibit No. 5; and I just --

10   I just talked to you about this a day or so ago,

11   correct?

12       A    Correct.

13       Q    Now, I explained to you that there was a blood

14   clump found on the logging road, correct?

15       A    Correct.

16       Q    Let me show you Government's Exhibit No. 26(c),

17   which is a photograph of that blood clump, let you take

18   a look at that.

19       A    I assume the blood clump is the area that's

20   circled in red?

21       Q    Yes, sir.

22       A    Yes, I see that in the exhibit.

23       Q    It's been described as a blood clump that's

24   about the size of a dinner plate, and would you say

25   that's a fairly significant amount of blood there?

Donnece Foster, CSR

```
 1        A    Yes.

 2        Q    Okay.  And it's in sandy soil?

 3        A    Yes.

 4        Q    Now, it's the State's theory that Mr. Byrd was

 5   chained at that location, which is right down here

 6   (indicating).  This is the blood clump here

 7   (indicating).  And then he was dragged down a dirt

 8   logging road about a hundred yards or so.  At which time

 9   he came off of the chain.  The truck backed up over him.

10   Some individuals got out of the truck, noticed that he

11   was underneath the truck, pulled forward, rechained him,

12   and continued to drag him.  Okay?

13        A    Yes.

14        Q    And we've discussed that, have we not?

15        A    Yes.

16        Q    Now, is it your medical opinion that had that

17   event occurred, there would be a pool of blood at the

18   spot where the chain came off and he was left on that

19   logging road?

20        A    I don't know that there would necessarily be a

21   pool of blood, but it certainly would be my opinion that

22   it would be extremely unusual if there were not some

23   blood on the road at that point.

24        Q    Okay.  Would it be something that would

25   certainly be noticeable to an investigator looking for
```

Donnece Foster, CSR

1  evidence concerning this particular offense?

2      A    Yes.

3      Q    And it might even be the size of this blood

4  clump that's in 26(c)?

5      A    Yes, at least that size.

6      Q    Okay.

7              MR. HAWTHORN:  I pass the witness.

8                        CROSS-EXAMINATION

9  BY MR. GRAY:

10     Q    Dr. White, there is some testimony before the

11  Court that there was a blow to the head, a kick in the

12  head.  Do you recall if there were any fractures to the

13  skull?

14     A    My recollection is that there were no fractures

15  to the skull.

16     Q    Okay.  So, while it would seem apparent that

17  there was some kind of blows or licks, whatever blows or

18  licks at that scene did not cause a fracture of the

19  skull?

20     A    That's correct.

21     Q    Now, then, Doctor, if a body were

22  unconscious -- therefore, limp -- and being drug by the

23  feet, how would you expect the arms to be if the body

24  was drug?

25     A    I would expect the arms to, in essence, flail

09/08/03 11:16 FAX 4153890251 RICHARD ELLIS Attorney 013
Case 6:02-cv-00457-LED Document 8 Filed 09/10/03 Page 101 of 155 PageID #: 122

249

1    in all directions.

2         Q    I have trouble understanding that.  If it were

3    limp, it would seem to me that the arms would basically

4    be behind the head.  Explain why not.

5         A    Actually I would agree with you.

6         Q    Okay.  Basically the arms are going to be back

7    like this (indicating) if a person is limp and

8    unconscious and being drug by the feet?

9         A    Yes.  To some extent, I would expect them to be

10   in that position at least part of the time, definitely.

11        Q    And in the part of the time that they were over

12   the head, what kind of injuries would you expect to the

13   elbows?

14        A    That would depend upon how the elbows came in

15   contact with the abrasive surface.  In general the

16   elbows are a part of the arm and the upper extremity

17   where the bone is very close to the skin surface.  So,

18   almost any kind of contact is going to produce an injury

19   at that point.

20        Q    Would you expect injuries ground into the

21   elbows if the hands were, in fact, limp and backwards?

22        A    Yes.

23        Q    How would that come in contact?

24        A    As I pointed out, we have a situation where

25   what we are looking at is the end point of a long

1   process in which the body has been tumbling and turning

2   in a manner which we don't clearly have well-documented

3   and it produces numerous injuries in many areas over the

4   entire surface of the body.  I do notice in particular

5   that injuries on the posterior surface of the body -- in

6   other words, the back of the body -- are typical of

7   those in areas where the bone is very close to the skin

8   surface; and that would be the heals, the sacrum -- in

9   other words, the back of the pelvis -- and the elbows.

10      Q    Now, I want to get back to these elbows now.

11  So, your testimony is that even if a person were dead or

12  unconscious, that you would expect injuries to the

13  elbows regardless?

14      A    Yes.

15      Q    Now, then, have you examined the right and left

16  elbow of this man?

17      A    The photographs, yes.

18      Q    Do you agree with me that the degree of injury

19  to the right and left is roughly the same?

20      A    Yes.

21      Q    Now, then, Doc, do you realize under the facts

22  of this case that the body was drug over a mile after

23  the head was severed?

24      A    Yes, that is my understanding.

25      Q    So, under your testimony we should expect a

Donnece Foster, CSR

1      greater degree of injury to the arm that remained

2      attached to the body, to that elbow, than the other

3      elbow, should we not?

4          A    I don't -- I don't understand the question.  I

5      would -- I believe my answer would be no.  Again, bear

6      in mind, we're talking about massive injuries; and I

7      don't know any way at all, just as a matter of common

8      sense, how we might expect more injury in one area than

9      in another area unless we have some kind of a clear

10     demonstration of exactly what was going on with the

11     body.

12         Q    Let's keep it real simple now, Doctor.  You

13     just stated that whether a body was dead or alive,

14     conscious, limp or not, you would expect injury to the

15     elbow as it was drug?

16         A    Yes.

17         Q    All right.  If an arm and an elbow comes off at

18     one spot and if the torso with the other arm still on it

19     is drug over a mile further on a blacktop surface, you

20     would expect a greater degree of injury to the one that

21     was drug the mile further?

22         A    A greater degree in what sense?

23         Q    Any sense, more injury.

24         A    Well, I'm a scientist.  I need a measurement.

25         Q    You want to look at them?

09/08/03 11:17 FAX 4153890251 RICHARD ELLIS Attorney @016
Case 6:02-cv-00457-LED Document 8 Filed 09/10/03 Page 104 of 155 PageID #: 125

252

1       A       I've examined those under a magnifying glass.

2       Q       Aren't they both roughly the same?

3       A       Roughly the same, but I don't see what that

4   means.  I mean that could mean anything.

5       Q       Well --

6       A       "They're roughly the same" is not a

7   quantitative measurement.

8       Q       All right.  Let me do it this way.

9       A       I think anybody looking at these injuries would

10  say yes, they have about the same amount of injury on

11  the elbows.

12      Q       In the first -- the thing was 3 miles long.

13  You know that?

14      A       Yes.

15      Q       The first six tenths of it was over dirt.

16      A       Yes.

17      Q       Do you agree you wouldn't expect the same

18  degree of abrasive injury over a sandy soil that you

19  would have over a blacktop soil?

20      A       Yes, in general.

21      Q       Okay.  Now we've got roughly 2 and a half miles

22  of hard surface blacktop.

23      A       Yes, I would say more than hard surface.  It

24  was very rough actually.

25      Q       Very abrasive?

Donnece Foster, CSR

253

1    A    Yes.

2    Q    Let's just say roughly halfway.  Head and

3    shoulder's severed.

4    A    Yes.

5    Q    Now, do you agree with me that in that portion

6    there was tremendous damage done to the elbow?

7    A    Yes.

8    Q    Way up around the ball and socket off -- and

9    way up into the arm?

10    A    Yes, I would say there was a massive sort of

11    grinding, shredding injury to both of the elbows.

12    Q    Massive injury in that degree?

13    A    Yes.

14    Q    Now, then, one arm stays with the body and goes

15    on another mile.

16    A    Yes.

17    Q    Now, do you agree with me that the severity of

18    the injury to the arm that stayed with the torso is only

19    a minor amount different from the other elbow?

20    A    Well, again, I don't -- I'm not sure I see your

21    point.  I mean this wasn't a scientific experiment

22    This was a situation where a body is tumbling over and

23    over on all surfaces, front and back, over a surface

24    that is very rough, almost kind of a grinder, so to

25    speak.  There's no way of predicting, by looking at the

1    injuries, at what given point during the process any

2    particular portion of that body was in contact with

3    which surface.

4        Q    By saying it's not a scientific point, do you

5    mean that a layman, a juror over here, can look at these

6    photographs and make their own determination from that?

7        A    I think they could to some extent, yes,

8    definitely.

9        Q    Now, then, before I go any further, do you

10   agree that James Byrd, Jr., was alive up until the point

11   that his head was jerked off?

12       A    Yes, I think that is a very strong probability.

13       Q    So, as a matter of medical fact, from looking

14   at the injuries and wounds, the man was alive during a

15   large portion of the dragging?

16       A    Yes.

17       Q    We're just talking about conscious or not.

18       A    You -- we're not talking about whether he was

19   conscious or not.  He was alive.

20       Q    You agree with Dr. Brown's findings in

21   everything except up to the conscious part?

22       A    Actually I agree with Dr. Brown with respect to

23   all his findings.

24       Q    Okay.  Dr. Brown says he was conscious during a

25   large portion of this dragging.

                    Donnece Foster, CSR

1    A    Dr. Brown said that he may have been conscious

2    during part of the dragging, and I don't know of any way

3    of determining one way or the other whether he was or

4    not.

5    Q    Okay, Doc.  And you don't disagree with

6    Dr. Brown, you're just saying that from looking at it,

7    you're not sure if he was conscious or not?

8    A    That's correct.

9    Q    Okay.  Let me go a little further then.  Do you

10   agree that if an individual is drug on six tenths of

11   dirt road, that there should be abrasions to the back of

12   his head at some point?

13   A    If he were in such a position that the back of

14   his head was in contact with the road, yes.

15   Q    Okay.  And did you -- in examining these

16   photographs, did you find an absence of abrasions on the

17   back of his head?

18   A    No.  He does have injury to the back of his

19   head.

20   Q    Did you find any significant abrasions on the

21   back of his head?

22   A    There are abrasions; and there's a large gaping

23   laceration, as well, that goes across the back of the

24   head.

25   Q    No question there's a big laceration, but did

Donnece Foster, CSR

256

1   you find any abrasion that broke the skin on the back of

2   his head?

3        A    Well, an abrasion doesn't really break the

4   skin.  The abrasion is a rub mark; in other words, a

5   place where the skin came in contact with the body

6   surface.

7        Q    Well, in relative terms, then, did you find

8   abrasions all over the rest of his body, that broke the

9   skin?

10       A    That broke the skin?

11       Q    Yes, sir.

12       A    When you say break the skin, that has a

13  specific context to me or a specific meaning.  We refer

14  to that as an avulsive abrasion or laceration, and he

15  has those injuries in certain locations.  In many other

16  locations what he has is simply abrasions; in other

17  words, scrape marks on the skin.  Those are in many,

18  many areas over the body surface.

19       Q    For purposes of us talking, let's talk about an

20  abrasion -- or whatever term you want to apply to it --

21  that drags away the outer portion of the skin, that

22  causes bleeding?

23       A    Yes.  I would call that an avulsive,

24  a-v-u-l-s-i-v-e, avulsive abrasion.

25       Q    Were those on the back of the head?

                    Donnece Foster, CSR

1    A    No.  I did not see anything that I would call

2    an avulsive abrasion on the back of the head.

3    Q    So, if at any point in the -- if at any point

4    within the mile and a half until the head was jerked

5    off, if he was ever on his buttocks, his head wasn't

6    touching the surface?

7    A    I would not draw that conclusion, no.  I don't

8    know how you would -- how you would arrive at that

9    conclusion.

10   Q    Do you agree that if you drug his head along a

11   blacktop very far at all, that would cause the type of

12   abrasion that would drag the skin away and allow blood

13   to come through?

14   A    Yes.

15   Q    At any time during that, either his head was up

16   or he was never in a position where the back of his head

17   was dragging along long enough to cause blood to bleed?

18   A    Well, I can think of some other possibilities,

19   as well.

20   Q    Tell me what they are.

21   A    Well, for example, portions of the -- if the

22   head or upper body may have been protected to some

23   extent by clothing, such as the shirt.  Also, he may

24   have turned to one side or the other.  If you look at

25   the photographs, there's a massive injury to the back

Donnece Foster, CSR

09/08/03  11:19 FAX 4153890251     RICHARD ELLIS Attorney                    @022
Case 6:02-cv-00457-LED   Document 8   Filed 09/10/03   Page 110 of 155 PageID #: 131

258

1    and to the side of the head.  So, again, without a

2    videotape, you know, we don't really know what the

3    position of the body was.

4         Q    You never went to the crime scene, did you?

5         A    No.

6         Q    Did you ever look at the photographs where the

7    clothing came off up on the logging road, the shirts and

8    so forth?

9         A    I've seen some photographs with clothing.

10        Q    Were you aware that that clothing came off

11   within just a short distance on the dirt logging road?

12        A    Yes.

13        Q    All right.  So, when you're giving that

14   example, that's not accurate because once he hit that

15   blacktop, there wasn't a shirt on him?

16        A    That's correct.

17        Q    So, no shirt protected his head?

18        A    Yes, I would agree with that, at least not on

19   the blacktop.

20        Q    All right.  And there's nothing on the back of

21   his head that broke through the skin that caused it to

22   bleed?

23        A    Well, there's nothing strictly speaking on the

24   posterior surface of the head; but there's a massive

25   injury -- if you just go a few inches to the left side,

09/08/ RICHARD ELLIS Attorney

Task Force ...eport 8

The clinical principles underlying the individual and group psychotherapies are relatively straightforward. The exact approach taken will depend upon the clinician's conceptualization of why the patient is or might be violent, and how this problem might be remedied. For example, it may be helpful to teach the patient to tolerate depressive affect and, via fantasy, to experience the feelings that will be the probable outcome of his future behaviors [126]. Aggressive acting-out patients are, however, difficult to treat, and have problems in establishing continuing relationships and in reality testing. Limit setting is necessary. Without limit setting, therapy may be impossible [120]. Whether the approach is individual or in groups, a psychotherapeutic stance with a here-and-now problem solving orientation is recommended.

The principles of therapy given in the above reports make clinical sense but adequate proof of their worth in decreasing future violence is not available.

A considerable literature is developing relating behavior approaches and learning to the modification of aggressive behaviors and affects [136, 137, 138]. Treatment approaches may depend upon an initial close analysis of environmental reinforcers which may be promoting or decreasing aggressive behaviors, such as "hitting" in family groups [139]. Programs to train parents of aggressive children in the use of behavioral techniques to reduce aggression appear particularly promising [140]. The behaviorally-oriented treatments have been more adequately evaluated with respect to their efficacy than have the more traditional "psychotherapeutic" approaches [130].

Behaviorally-oriented treatments have the advantage of addressing more systematically the possible environmental precipitants of aggression in terms of the personal and behavioral characteristics of the interpersonal milieu, for example, aggression begets aggression [141]. An accurate history of when violence or aggression has occurred and the environmental stimuli which may have precipitated it may enable the clinician to recommend changes in the environment rather than directing the treatment efforts towards the violent patient per se.

Institutional and other treatments available for violent prisoners have recently been reviewed [142]. There are favorable follow-up reports in the literature citing recidivism rates as a result of such institutional treatments [134, 143, 144]. These published reports, however, have some rather severe methodological shortcomings [145] Treatment in these institutions is usually of the indeterminate type and consists of group and or individual psychotherapy and

milieu behavioral approaches (promotion to tiers on the basis of appropriateness of such institutional behavior). The constitutionality and appropriateness of such institutional sentence feature, is a matter of continued debate [146, 147, 148, 149, 150, 151].

### Biological Treatments

The literature on the pharmacologic treatment of aggression suffers from the fact that most of the studies have shown one or another medication useful for such diverse patient types as neurotic patients with aggressiveness, psychopaths, manic patients who are combative, assaultive psychotic patients, or delinquents. Few studies have tested the effects of drugs on well defined target behaviors of violence, in contrast to extensive work in the areas of depression, anxiety. The methodological problems in assessing drug efficacy have been recently described clinical aspects of human aggression have been recently described [152]. Minor (benzodiazepines) and major (butyrophenones) tranquilizers have been advocated for agitated and aggressive patients [153, 154, 155]. Additional and more adequately controlled evaluation of the use of these drugs are needed.

A recent controlled study has reported lithium to be of benefit to violent prisoners in reducing aggressiveness [156]. Amphetamines administered to children with the hyperkinetic syndrome may result in a decrease of aggressive behavior, noted in conjunction with the other behavioral effects of the drug [159]. Anticonvulsants, sometimes advocated for impulsive and aggressive behaviors [158] have not in well controlled studies been shown to be of value in comparison with placebo in, for example, the reduction of childhood temper tantrums [159] or the curtailment of disruptive or aggressive behavior of delinquents [160]. Newer hormone and anti-hormone agents (progestational analogs) are being tested on in the modification of sexual and aggressive behaviors [152, 161, 162].

Despite a paucity of rigorous data supporting the efficacy of various drugs in the treatment of aggression, the clinician should still consider empirical trials of drugs for patients are refractory to one or another form of medication when the situation warrants to one or another form of medication. Literature [163] regarding the rationales, and uses of indications, various drugs in the treatment of psychopharmacologic treatment, aggression should be consulted.

Neurosurgical procedures such as temporal lobectomy [51], amygdalotomy [164, 165, 166] and hypothalamectomy [107] have been reported to be of value in decreasing the aggressiveness of certain epileptics and non-epileptics with severe behavior disorders. Much public controversy has recently been focused on such pro-

Task Force Report 8

cedures due to ethical concerns and a need for more adequate long-term follow-up studies of patients undergoing such operations (160). Evaluation of the efficacy, possible implications, and social issues surrounding these procedures is currently under study by separate task forces of the American Psychiatric Association (Task Force on Psychosurgery), National Institute of Mental Health, and National Institute of Neurological Diseases and Stroke. (Part I of the NINDS report is now available under the title Brain Research and Violent Behavior, Arch Neurol 30:1-35, 1974.)

*Prevention*

In the area of preventive treatment experimental programs have been devised to intervene in domestic arguments which have a high potential for violence. A New York study, for example, has reported favorable preliminary results in decreasing intra-familial violence by intervention from a specially trained police unit (169). Nonmedical approaches and continuing efforts in this direction are being discussed by others (170, 24).

## WHAT CAN WE PREDICT?

### A Conceptualization of "Dangerousness"

We elaborate in greater depth on the issue of prediction, since this issue arises so commonly in the assessment of the violent patient. The question usually is: What is the potential of the violent patient? "Is this man 'dangerous'?" It is the opinion of the Task Force that such judgments are fundamentally of very low reliability, much as would be the prediction of "altruism" or other human behaviors. Furthermore, clinical judgments often have long term implications for the persons involved and the greatest caution is warranted. The following problems or issues require special comment.

Predictions of dangerousness, like those of suicide, are, with few exceptions, predictions of rare or infrequent events. For example, a clinician might be fairly confident when evaluating a parent whose past behavior has rather clearly and repetitively been that of injuring his own children, that such behavior will recur. Knowing that both the patient's two year old child and his new baby show clear evidence of abuse (e.g., burn scars, radiologic evidence of the patient's two year old has been brought to the emergency room twice in the last week where the patient was noted to have alcohol or his tures), knowing that such episodes occur especially when the patient has been drinking, knowing that such drinking is still occurring (e.g., breath), etc., the clinician then might be fairly confident that abuse will continue. Or, in the instance of a man who can find sexual release only in setting fires, the knowledge that such fires have occurred and are occurring regularly, would allow the prediction that such behavior will recur (171). The high degree of reliability of such predictions in these type cases is a function of knowing that the base rates of such behavior are very high. It would not be necessary that the patient be "mentally ill" or suffering from a psychiatric disorder in order to predict that the behavior will recur.

With respect to most predictions of violence, however, the very opposite would be the case. The likelihood of the expected behavior such as violation of parole by a released prisoner whose previous crime was one of violence (172) or the possibility of serious assault being committed by a released mental patient (98) would be very

## CLINICAL ASPECTS OF THE VIOLENT INDIVIDUAL. The

toward effect of equating dangerousness with mental illness. The Model Sentencing Act, for example, provides that offenders be considered "dangerous" for purposes of sentencing, if and when, in addition to committing a violent crime other than first degree murder, "the court finds that he is suffering from a severe mental or emotional disorder indicating a propensity towards dangerous criminal activity" [179]. Psychiatrists and behavioral scientists are expected to aid in the diagnosis of the mental disorder and dangerousness. Not all danger-ousness of this approach are quite unfortunate. Not all danger-implications of this approach are quite unfortunate. Not all danger-ous persons, even those who might be feared an appreciable risk for future violence, are mentally ill nor should they be so labeled in order that they might be found dangerous. Dangerousness be equated be equated with mental illness, nor should mental illness be equated with dangerousness.

With few exceptions present definite statements about their sons who threaten violence and who were followed for 5-6 years, it was actual violence potential. In one reported study of 100 persons who threatened violence and who were followed for 5-6 years, it was shown that three persons actually did commit murder while four shown that three persons actually did commit murder while four others committed suicide [100]. The future dangerousness of persons who threaten violence would appear to be as much to sell as to others (1, 100, 101]. In particular, attention should be given to that they who threaten violence would appear to be as much to sell as to others (1, 100, 101]. In particular, attention should be given to the suicidal potential of such persons and to any considerations that they might themselves become the victims rather than the perpetrators of violence [101].

Psychiatrists, in order to be safe, too often predict dangerous-ness, especially in the case of the mentally ill offenders. Absence of treatment resources, administrative oversights, and excessive reli-treatment resources, administrative oversights, and excessive reli-ance on conservative release policies have rather clearly resulted in severe injustice being done to such persons [182, 103].

It is too often forgotten that dangerousness is an attribute, not only of persons but of situations and environmental factors; more-correctly, dangerousness factors [184, 185], and all must be at-tended to when considering the "dangerousness" of an individual. Interaction of these various "dangerousness" factors [184, 185] and all must be at-tended to when considering the "dangerousness" of an individual.

This point, that of "interaction" between personal characteristics and situations cannot be stressed strongly enough. More recent legal standards regarding "dangerousness" stress such factors as the im-nnd situations cannot be stressed strongly enough. More recent legal mediacy of harm or the likelihood of harm that must be present if a standards regarding "dangerousness" stress such factors as the im-person is to be found "dangerous" [186]. These factors, immediacy of harm, as well as other such factors, e.g., who would very person is to be found "dangerous" [186]. These factors, immediacy of harm, likelihood of harm, as well as other such factors, e.g., who might be harmed, how much harm might be done, etc. would very clearly be a function of the potentially violent person's future or

slight. This means that even if the characteristics of such future violent patients could be specified with fairly great accuracy, predic-tions based upon such characteristics will identify far more "false positives" than "true positives" [172, 173, 174]. Even if an index of violence proneness could be developed so as to correctly identify prior to release fifty percent of those individuals who will violate parole by committing violent offenses, the actual employment of such an index would identify eight times as many "false positives" as "true positives." This means that eight of the nine persons retained in prison as a result of application of the index would not have com-mitted such offenses if released [172]. Statistically the greatest accu-racy is achieved by designating the smallest number of persons as likely to commit future violence. For further discussion of this very important issue, the clinician should consult the classical paper deal-ing with the prediction of the low rate behavior of suicide [175].

The category "dangerous" or "dangerously violent" is applied too indiscriminately. In ordinary discourse the term "dangerous" has multiple usages or meanings which vary depending upon the setting (use of the term by the lay public, the clinician, and in legal settings). With respect to the use of the term "dangerous behavior" in a legal setting (release from a mental institution, or release under supervi-sion following a finding of not guilty by reason of insanity) the con-following meanings of the term "dangerous behavior" might be con-sidered. "Dangerous behavior" might include only the crime for which the insanity defense was successfully raised; all crimes; only felonious crimes (as opposed to misdemeanors); only crimes for which a given maximum sentence or more is authorized; only crimes categorized as harmful, physical or psychological, reparable or irre-parable, to the victim; any conduct, even if not labeled criminal, categorized as violent, harmful or threatening; any conduct which may provoke violent retaliatory acts; any physical violence towards oneself; any combination of these [176]. For purposes of this report, it should therefore be remembered that violence has been defined as acts that produce physical harm or destruction, and that it is these sorts of acts that the clinician wants to predict. For example, in the case of violent offenders, the task is to determine the likelihood for violent recidivism, not just any recidivism at all. As the above list in-dicates, however, the definition of what is "dangerous behavior" has no unanimous acceptance by the various persons who are called in to deal with violent patients such as physicians, mental health adminis-trators, legal personnel, and the lay public.

Many state mental health laws regarding involuntary commit-ment [177], as well as the Model Penal Code [178] and the Model Sentencing Act [179] may as examples have the psychological and an

expected environment and not merely a function of any existing psychopathology.

Task Force Report 8

*Decision Rules and Issues of Social Policy*

Another very important point with respect to dangerousness relates to an area of behavioral science perhaps more familiar to sociologists than to clinical mental health personnel. This is the area of decision rules, types of error, and their consequences for medical judgments [104, 107].

Decision rules are guidelines for the handling of uncertainty. Such guidelines vary within professional settings and disciplines. The basic legal decision rule in criminal law states, "When in doubt, acquit" [104]. In medicine, however, where the consequence of over-looking illness may be somewhat different than the legal setting, the decision rule would lean much more heavily towards avoiding any harm consequent to missing illness than to avoiding harm consequent to suspecting it when it is absent. The medical decision rule, though certainly warranted with respect to various medical conditions, may lead to many problems when applied to issues involving judgments of dangerousness, in dealing with a patient whose violence potential is uncertain, might employ a different decision rule. For example, it would be appropriate to employ the medical decision rule in deciding to phone or check on a despondent and threatening patient or per-haps, in predicting a "violent" outcome when advising a disturbed alcoholic outpatient of the advisability of brief and voluntary hospi-talization. Legal settings (e.g. the involuntary commitment of a threatening patient brought by the police to the emergency ward, or for the purposes of the court, the "diagnosis" or "management" of offender-patients) involve a legal decision rule. These judgments clearly involve issues of a non-clinical type. They are issues relating to community tolerance of various behaviors felt to be dangerous, the definition of what is "dangerous" behavior and the specification of measures that are felt to be appropriate to deal with such behav-ior. These are essentially issues of social policy [104, 100]. In legal settings the clinician would be expected to abide by and be know-ledgeable of legal rather than medical decision rules. Determining cut-off points as to what numbers of "false positives" are acceptable to the community in allowing the retention of persons feared to be "dangerous" are socio-legal judgments and cannot and should not be made by the individual clinician [171, 100].

"Dangerousness" is neither a psychiatric nor a medical "diag-nosis".

# CLINICAL ASPECTS OF THE VIOLENT INDIVIDUAL

The Implications of the above points for the clinician who is attempting to assess a patient's potential for violence are as follows.

Clinical Issues

Predictions of "dangerousness" are judgments of a "relative" sort, statements of comparative probabilities that are usually quite low. All that may be reasonably concluded from his knowledge of the risk that in the clinician's experience, some persons are at a comparatively higher risk for future violence than are others. For example, a recent study determined that parolees with a history of previous violence followed over a fif-teen month period of release were about three times more likely to offend again with a violent offense than was associated with an increased offend again with a violent offense than were parolees without such a history [172]. Other factors were previous psychiatric referral a history of violent recidivism, history of multiple offenses, violent ability of violence potential, history of multiple offenses, violent evaluation of violence potential, Mexican-American ethnic grouping, and severe commitment offense. Noting or combining these factors (or individual alcohol problem. Noting or combining was found to be of quite limited utility. The overall case prediction was found to be of quite limited utility. The overall rate of violent recidivism for the entire group of parolees (the base expectancy rate) was only 2.4%. For the men with a history of pre-vious violence the rate was 5.2%. Such predictions for the individual case would therefore continue to identify large numbers of "false positives" even when sophisticated statistical procedures are em-ployed. The authors also noted the additional problem in such judg-ments relating to the prediction of events which may not come to be ployed. The authors also noted the additional problem in such judg-ments relating to be recorded by the authorities.

Other recent studies relevant to the prediction of individual vio-lence should be noted. In a Philadelphia study of a sample of offenders 10,000 boys followed from age 10-18, severely recidivistic offenders lence accounted for a majority of "dangerous" pati-(0.3 percent of those who offended) accounted for a majority of as-saults noted [190]. Research regarding "dangerous" pati-leased from a correctional hospital found that only 2.7% of the

---

* The clinician who deals with violent persons should be aware that much of the literature relevant to this area is not typically ... in American psychiatry. A detailed literature relevant to the British Journal of Psychiatry ... to violence. Some other journals. For example medical issues of relevance and Delinquency, Law with psychiatric ... be consulted including Crime and Delinquency Literature, Law portant journals in Criminal Law and Criminology, Criminal Law Bulletin, Law Research in Criminal Law and Criminology, Academy of Psychiatry and the Law Journal of Crim. The Bulletin of the International Journal of Offender Therapy Society Rev... The Journal of Psychiatry and Law, Correctional Psychiatry and ... The Journal of ... Criminology, Federal Probation, which annotated reviews and ... Crime and Social Problems ... Bureau of Prisons, contains ... Therapy from the Federal ... charge from the Journal of sociology, psychology, psychiatry important relevant articles from journals of sociology, psychology, psychiatry and criminology.

27

and sample were ultimately returned to the hospital [191]. These few men tended to be younger and to have a higher score on a legal dangerousness scale (a quantitative scale of the seriousness of criminal history) compared to patients not returned. However, all the men returned were not returned because of actual violent behavior. Application of scale scores to the above sample also would have resulted in over 90% of the men being misclassified as dangerous. Unfortunately, this is the state of the art. Neither psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or "dangerousness." Neither has any special psychiatric "expertise" in this area been established. Additional studies are needed with respect to determining present dangerousness, and if a person is "dangerous," for how long, and as a result of what factors such a state persist. For purposes of prediction severely recidivistic offenders (at greater risk for repeated violence) but the actual level of probability remains small. As noted above, it is the opinion of the Task Force that judgments regarding what sorts of probabilities for violence could be considered as indicating "dangerousness" should be a matter of social policy and societal judgment and not a matter of clinical determination.

Clinicians should also be familiar with a number of retrospective published reports which identify clusters of dynamics, symptoms, or other historical features of violent patients, particularly those who commit homicide. Filicide has been linked to depressed, suicidal mothers who are strongly overidentified with an "overloved" child [112]. Homicidal juveniles have been reported to show acute mood shifts, "cries for help," use of drugs, object losses, threats to manhood, somatization, an emotional crescendo, and homosexual threats [194]. Murderers have been examined and found to show intense ambivalence and inability to detach themselves from a specific relationship [194]. Impulsive homicides have been committed by emotionally, shallow individuals with severe personality disorganization [5]. Recognition of these patterns may suggest to the clinician the advisability of overnight hospitalization or close follow-up. But such clusters are undoubtedly common within the general population never seen by psychiatrists, and could not be said to establish factual dangerousness. Other workers have summarized information which suggests that certain violent patients with psychiatric disorders exhibit stereotypic behavior which may be predictable upon recurrence of the psychiatric disorder [44]. Clinical reports have to a remarkable degree [195] and with few exceptions [124] been addressed to the problem of homicidal as opposed to other assaultive patients.

## Legal Settings

The role of the psychiatrist in legal proceedings or settings relative to judgments about future dangerousness is controversial (e.g. pre or post competency to stand trial proceedings, following findings of not guilty by reason of insanity, in the assessment of dangerousness from indeterminate sentence status) [196]. In the assessment of dangerousness clinical scales have been described which lack accompanying studies of predictive validity [197]. Empirical studies (113, 198, 199). Empirical studies of predictive validity studies of predictive behavior have yielded inconclusive or contradictory results (113, 196, 199). One follow-up study of dangerous sex offenders compared post-release behavior of the patients released by the court but still felt by clinicians to be dangerous [32]. The treated patients did better in release behavior of another group of treated patients felt to be no longer dangerous [32]. The treated patients did better in the community and were less dangerous for as long as they were followed. The authors of this study find reason for optimism. Such studies are few, however, and the methodology of follow-up with respect to criticism on the basis of [200].

Two opinions of these workers though seem relevant, and in the opinion of the Task Force would apply equally well to both criminal and non-criminal patients, namely, "Dangerousness seems to be a result of multiple forces... There is no single test for it," and "No result of multiple forces... There is no single test for it," and "No tests or psychiatric examinations can dependably predict a probability of dangerous behavior in the absence of an actual history of a tests or psychiatric examinations in the absence of a severely violent assault on another person" [32].

It is known that crimes of violence, homicide, aggravated assault, rape and robbery are more likely committed by younger male persons and that recidivism for violent crimes is consistently less than that for property crimes [201]. The more serious the initial crime committed the less the chances it will be repeated [202]. Recidivism for crimes such as murder is very low, only .5 percent of released homicides offenders murder again [203]. Older first offenders would appear to be better risks than younger multiple offenders. Released homicides offenders require little psychiatric expertise. The tention to such factors requires little psychiatric expertise. It has been noted that "The essence of dangerousness appears to be a paucity of feeling concern for others. The potential for injuring another is compounded when this lack of concern is coupled with anger" [32]. Such an approach, though perhaps clinically useful with respect to character assessment, and receiving some additional support from a second rather unusual study [204], does not emphasize enough the environmental or situational determinants of dangerousness which may or may not be present in future settings [204]. The presence of psychosis would not appear to be useful for prediction unless "dangerousness" can also be present in future settings [204].

29

k Fonce ...port 8

dly be determined from other criteria such as actual previous behavior. Given such behavior, severe psychosis is felt by some to decrease the risk [32]. This opinion requires better empirical confir-mation. As noted above, follow-up studies of patients discharged from psychiatric hospitals, have given mixed results, but none would indicate any likely potential for violence on the basis of psychiatric disorder. These findings are confirmed by other follow-up studies available for patients discharged from special hospitals, e.g., post acquittal from not guilty by reason of insanity charges, sexual psycho-pathy confinements, confinements for incompetency to stand trial [15, 200].

## Psychological Tests

Certain psychological tests, when used in conjunction with clinical and historical material, may furnish clues for prediction but cannot be unduly relied upon. Among these are Megargee's MMPI scale for overcontrolled hostility [34], the 4-3 MMPI pattern of Davis and Sines [207, 200], and Sarbin, et al's., modifications and additions to the Wagner Hand Test [209]. These tests require further validation in the prediction of future violence.

In summary, the state of the art regarding predictions of violence is very unsatisfactory. The ability of psychiatrists or any other pro-fessionals to reliably predict future violence is unproved. Close monitoring, frequent follow-up, and a willingness to change one's mind about treatment recommendations and dispositions for violent persons, whether within the legal system or without, is the only acceptable practice if the psychiatrist is to play a helpful role in these assessments of dangerousness.

# HOW DO WE COMMUNICATE OUR FINDINGS?

What the psychiatrist writes, instructs or testifies about violent persons may be critical to the patient's future outcome. Such reports, whether verbal or written, must be of high quality. Whatever the setting or reason for the report, conclusory labels are of little help to anyone (e.g., this man is "schizophrenic" or this man is "danger-ous"). In fact, such labels may be very misleading and should be avoided. What is wanted are descriptions of how specifically it person has been violent, and how and under what circumstance might he be expected to be violent in the future. What personal or situational factors appear to in-crease a likelihood of future violence? The psychiatrist should pre-sent, as well as he understands it, and without the use of jargon, the dynamics of any violence that has occurred. He should discuss what might be done to treat or manage the patient, and what might be done in the future to avoid the repetition of violence. Short term recommendations are always preferable to recommendations for long term treatment and dispositions.

These matters require follow-up, not pronouncements. The physician must determine how his report will be used, by whom and what specifically the question is; he should not merely perform a psychiatric examination. Sources of data and reliability must be clearly indicated. The extent of patient cooperation, what the patient was told about its purpose, and its level of confidentiality should be clearly specified. The physician should routinely request that receive information about the uses of his report, resulting dispositi. and treatment of the patient.

31

## SUMMARY AND CONCLUSIONS

Violent behavior results from complex interactions, psychological, social, cultural, environmental-situational and biological factors. Despite various attempts at classification, there exists no adequate typology of violent persons. In this report the Task Force has identified a number of groups of persons who may be psychiatric patients and who are of clinical concern to psychiatrists. We have reviewed certain aspects of the approach to the patient, what fact need to be gathered or noted, and what are some of the treatment modalities under current study. For purposes of explanation and management a multicausal framework must be kept in mind. The immediate management of such patients, in terms of limit setting, might be equally feasible. The involuntary handling of violent and "dangerous" persons, whether such persons are mentally ill or healthy, involves concerns and issues that go considerably beyond the framework of clinical practice, and which issues are a peutic approach is clinically apparent. Longer term treatments in the judicious use of psychopharmacologic agents, and a psychotherabehavioral approaches appear promising. The clinician should not regard the prevention of future violence as within his proven capability. Similarly, we have discussed at some length another area where a great deal of "negative" information rather than neat guidelines is available, namely the prediction of future violence. It has been noted that "dangerousness" is neither a psychiatric nor a medical diagnosis, but involves issues of legal judgment and definition, as well as issues of social policy. Psychiatric expertise in the prediction of "dangerousness" is not established and clinicians should avoid "conclusory" judgments in this regard.

From the clinical perspective perhaps the most valuable "treatment" modality that the psychiatrist has to offer is his continuing interest and availability to the patient. Patients who threaten or who have accomplished violence are difficult to treat, but the psychiatrist will continue to confront such patients in a variety of settings. He should therefore be appraised of what is currently known about such patients and their management.

## WHAT DISPOSITION AND FOLLOW-UP DO WE MAKE?

Violent patients sometimes require hospitalization. If at all possible, such hospitalizations should be on a voluntary basis. Rarely, involuntary civil commitment may be warranted (171, 210, 211). Decision-making in this difficult area requires specifying the degree of immediate risk and the type of risk which the patient presents to others. It is equally important that the physician assess the actual benefits and treatments that the patient will receive as a result of hospitalization, the length of hospitalization that might be expected or warranted and whether or not less restrictive forms of treatment might be equally feasible. The involuntary handling of violent and "dangerous" persons, whether such persons are mentally ill or healthy, involves concerns and issues that go considerably beyond the framework of clinical practice, and the balancing of the issues with respect to civil commitment and the balancing of risks versus benefits should be consulted by all who deal with violent persons (171).

Follow-up care of violent persons is essential. For many such persons it is the major "treatment" that the physician has to offer. His continuing interest and availability may help to avoid tragedy for the patient or for others. Even in consultation work, single or "one shot" examinations should be very much discouraged. Repeat examinations allow the clinician to assess the patient in more than one environmental setting and aid in the distinguishing of situational contributions from characterologic factors.

Follow-up continues to be the vital way in which the physician may educate himself and help his patient.

33

# REFERENCES

1. Hagen D Q, Mikolajczak J, Wright R: Aggression in psychiatric patients. Comprehensive Psychiatry 13:481-487, 1972.

2. Marten S, Munoz R A, Gentry K A, et al: Belligerence: Its frequency and correlate in a psychiatric emergency room population. Comprehensive Psychiatry 13:241-249, 1972.

3. Lion J R, Bach-y-Rita G, and Ervin F R: Violent patients in the emergency room. American Journal of Psychiatry 125:1706-1711, 1969.

4. Jablon N C, Sadoff R L, Heller M S: A unique forensic diagnostic hospital. American Journal of Psychiatry 126:1663-1666, 1970. Critique of paper (Modlin HC) follows, pp 1666-1667.

5. Satten J, Menninger K, Rosen I, et al: Murder without apparent motive: A study in personality disorganization. American Journal of Psychiatry 117:48-53, 1960.

6. Lamberti J W, Blackman N, Weiss J M A: The sudden murderer: A preliminary report. Journal of Social Therapy 4:2-15, 1958.

7. Verma L P, Jha B K: Characteristics of murder in mental disorder. American Journal of Psychiatry 122:1296-1298, 1966.

8. Rappoport J R: A response to "Implications from the Backstrom experience". The Bulletin of the American Academy of Psychiatry and the Law 1:197-198, 1973.

9. Steele B F, Pollock C B: A psychiatric study of parents who abuse infants and children. in The Battered Child. Edited by Helfer R E, and Kempe C H. Chicago, University of Chicago Press, 1968, pp 103-147.

10. Conners C K: The syndrome of minimal brain dysfunction: Psychological Aspects. Pediatric Clinics of North America 14:749-760, 1967.

11. Wender P: Minimal Brain Dysfunction in Children. Wiley Series on Psychological Disorders. New York, John Wiley & Sons, 1971, pp 17-20, 21-24.

12. Ellinwood, E H: Assault and homicide associated with amphetamine abuse. American Journal of Psychiatry 127:1170-1175, 1971

13. Himmelhoch J, Pincus J, Tucker G, et al: Sub-acute encephalitis: Behavioural and neurological aspects. British Journal of Psychiatry 116:531-538, 1970.

14. Fenn H, Racy J, Lapham L, et al: Catatonic behavior, viral encephalopathy, and death: The problem of fatal catatonia. Archives of General Psychiatry 27:758-761, 1972.

15. Selzer M L, Rogers J E, and Kern S: Fatal accidents: The role of psychopathology, social stress, and acute disturbance. American Journal of Psychiatry 124:1028-1036, 1968.

16. Bach-y-Rita G, Lion J R, Climent C E, et al: Episodic dyscontrol: A study of 130 patients. American Journal of Psychiatry 127:1473-1478, 1971.

17. Wolfgang M E, Ferracuti F: The Subculture of Violence, Towards an Integrated Theory in Criminology. London, Social Science Paperbacks, 1967, p 153.

18. Westermeyer J: A comparison of amok and other homicide in Laos. American Journal of Psychiatry 129:703-709, 1972.

19. Burton-Bradley B G: The amok syndrome in Papua and New Guinea. Medical Journal of Australia 1:252-256, 1968.

20. Crimes of Violence. Vol. 11, Chapter 3 in Crimes and trends of Individual violence in the United States: Levels and Prevention of Violence: A Staff Report to the National Commission on the Causes and Prevention of Violence. Edited by Mulvihill D J, Tumin M M, Curtis L A: Washington, D.C., U.S. Government Printing Office, Superintendent of Documents, pp 49-139.

21. Crime in The United States, 1972. Uniform Crime Reports for the United States. Washington, D.C. Superintendent of Documents. U.S. Government Printing Office, 1973, p 34.

22. Ward D A, Jackson M, Ward R E: Crimes of violence by women. in the Causes and Prevention of Violence. Vol. 13. Edited by Mulvihill D J, Tumin M M, Curtis L A: Washington, D.C., Superintendent of Documents, U.S. Government Printing Office, 1969, pp. 843-909.

23. Crime in the United States, 1972. Uniform Crime Reports for the United States, Washington, D.C., Superintendent of Documents, U.S. Government Printing Office, 1973, p 9.

24. Field M H, Field H F: Marital violence and the criminal process: Neither justice nor peace. The Social Service Review 47:221-240, 1973.

25. Benning R C, Schroeder O: Homicide in an Urban Community. Springfield, Illinois, Charles C Thomas, 1960.

26. Iskrant A P, Joliet P V; Chapter 7, Homicide, in Accidents and Homicide. Cambridge, Harvard University Press, 1968, pp 11

27. Pokorny A D: Human Violence: A comparison of homicide, aggravated assault, suicide, and attempted suicide. Journal of Criminal Law, Criminology, and Police Science, 56:488-497, 1965.

28. Lion J R, Pasternak S A: Countertransference reactions to violent patients. American Journal of Psychiatry 130:207-210, 1973.

29. Lion J R, and Leaff L A: On the hazards of assessing character pathology in an outpatient setting. Psychiatric Quarterly, 47:104-109, 1973.

30. Cohen M L, Garofalo R, Boucher R, et al: The psychology of rapists. Seminars in Psychiatry 3:307-327, 1971.

31. Cormier B M: The dilemma of psychiatric diagnosis, in Sexual Behaviors: Social, Clinical, and Legal Aspects. Edited by Resnik H L P, Wolfgang M E, Boston, Little Brown, 1972, pp 41-61.

Task Force Report 8

32. Korol H L, Boucher R J, Garofalo R F: The diagnosis and treatment of dangerousness. Crime and Delinquency 10:371-392, 1972.

33. Megargee E I: Undercontrolled and overcontrolled personality types in extreme antisocial aggression. Psychological Monographs Whole #611, 80:1-29, 1966.

34. Megargee E I, Cook P E: Development and validation of an MMPI scale of assaultiveness in overcontrolled individuals. Journal of Abnormal Psychology 72 519-528, 1967.

35. Blackburn R: Personality in relation to extreme aggression in psychiatric offenders. British Journal of Psychiatry 114:821-828, 1968.

36. Lanyon R I: Murder and insanity: A survey. American Journal of Psychiatry 119:754-758, 1963.

37. McKnight C K, Mohr J W, Quinsey R E, et al: Mental illness and homicide. Canadian Psychiatric Association Journal 11:91-98, 1966.

38. Wiersma D: Crime and schizophrenics. Excerpta Criminologica 6:168-181, 1966.

39. Guttmacher M W: The Mind of the Murderer. New York, Farrar, Straus, and Cudahy, 1960.

40. Mowat R R: Morbid Jealousy and Murder. London, Tavistock, 1966.

41. Mowat R R: The state of mind in murder. Lancet 1:801-803, 1965.

42. Neustatter L: The state of mind in murder. Lancet 1:801-803, 1965.

43. Cole K E, Fisher G, Cole S S: Women who kill. Archives of General Psychiatry 19:1-9, 1968.

44. Spencer C: A Typology of Violent Offenders. Research Report #23 (Mimeo), Sacramento, California, Department of Corrections, September, 1966.

45. Dare T, Kupfer D J, and Taub S: The nosology of violence. In Houston Neurological Society Symposium on Neural Basis of Violence and Aggression. W S Fields (Ed.), Warren H. Green, Inc. (St. Louis, in press)

46. Lion J R: Evaluation and Management of the Violent Patient. Springfield, Illinois, Charles C Thomas, 1972.

47. Shepherd M: Morbid Jealousy: Some clinical and social aspects of a psychiatric symptom. The Journal of Mental Science 107:007-753, 1961.

48. West D J: Murder Followed by Suicide. Cambridge, Harvard University Press, 1967.

49. Monroe R R: Episodic Behavior Disorders: A Psychodynamic and Neurophysiologic Analysis. Cambridge, Harvard University Press. 1970.

50. Sweet W H, Ervin F R, Mark V H: The relationship of violent behavior to focal cerebral disease. In Aggressive Behavior. Edited by Garattini S, Sigg E B. New York, Wiley, 1969, pp 336-352.

Mark V H, Ervin F R: Violence and the Brain. New York, Harper and Row, 1970.

51. Falconer M A: Reversibility by temporal-lobe resection of the behavioral abnormalities of temporal-lobe epilepsy. New England Journal of Medicine 289:451-455, 1973.

52. Rodin E A: Psychomotor epilepsy and aggressive behavior. Archives of General Psychiatry 28:210-213, 1973.

53. Roth M: Cerebral disease and mental disorders of old age as causes of antisocial behavior. In The Mentally Abnormal Offender. Edited by de Reuck A V S, Porter R. A Ciba Foundation Symposium Boston, Little Brown, 1968. pp 35-51 (See also accompanying discussion. pp 52-58).

54. Walker A E: Murder or epilepsy. Journal of Nervous and Mental Disease 131:430-437, 1961.

55. Ounsted C H: Limbic epilepsy in childhood. The Journal of Nervous and Mental Disease 144:301-397, 1907.

56. Schmidt R P, Wilder B J: Epilepsy (Contemporary Neurology Series) Vol. 2. Philadelphia, F.A. Davis, 1968.

57. Gunn J, Fenton G: Epilepsy, automatism, and crime. Lancet 1:1173-1170, 1971.

58. Knox S J: Epileptic automatism and violence. Medicine, Science and the Law 8:98-104, 1968.

59. Gloor P: Discussion of paper by B. Kaada. In Brain Function, Vol. V. Aggression and Defense: Neural Mechanisms and Social Patterns. Edited by Clemente C D, Lindsley D B, Berkeley, University of California Press, 1967. pp 116-124.

60. Bluner D: The temporal lobes and paroxysmal behavior disorders. Scandiana

00. Bluner D: The temporal lobes and psychomotor epilepsy (for epilepsy). Scandiana A study of patients with temporal lobectomy for epilepsy: A study of patients with temporal lobectomy for epilepsy: differences. VII:271-285, 1967.

01. Small J G, Milstein V, Stevens J: Are psychomotor epilepsies different? Archives of Neurology 7:187-194, 1962.

02. Small J G, Small I F, Hayden M P: Further psychiatric investigations of patients with temporal and nontemporal lobe epilepsy. American Journal of Psychiatry 123:303-310, 1966.

03. Livingston S: Epilepsy and murder. Journal of the American Medical Association 108:172, 1964.

04. Lennox W G, Lennox M A: Epilepsy and Related Disorders. Vol. 2. Boston, Little Brown, 1960, pp 909-973.

05. Alstrom C H: A study of epilepsy in its clinical, social, and genetic aspects. Acta Psychiatrica et Neurologica. Supplement 63. 1-2n, 1950.

00. Hill D, Pond D A: Reflections on one hundred capital cases submitted to electroencephalography. Journal of Mental Science 98:23-43, 1952.

07. Sayed Z A, Lewis S A, Brittain R P: An electroencephalographic and psychiatric study of thirty-two insane murderers. British Journal of Psychiatry 115:1115-1124, 1969.

00. Williams D: Neural factors related to habitual aggression. Consideration of differences between those habitual aggressives and others who have committed crimes of violence. Brain 02:503-520, 1969.

00. Quirkin F, Klein D F: Two behavioral syndromes in young adults related to possible minimal brain dysfunction. Journal of Psychiatric Research 7:131-142, 1969.

CLINICAL ASPECTS OF THE VIOLENT INDIVIDUAL

Task Force Report 8

70. Hertocollis P: The syndrome of minimal brain dysfunction in young adult patients. Bulletin of the Menninger Clinic 32:102-114, 1968.

71. Kessler S, Moos R H: The XYY karyotype and criminality: A review. Journal of Psychiatric Research 7:153-170, 1970.

72. Owen D R: The 47, XYY male: A review. Psychological Bulletin 78: 209-233, 1972.

73. Hook E B: Behavioral implications of the human XYY genotype. Science 179:139-150, 1973.

74. Borgaonkar D S, Shah S A: The XYY chromosome male — or syndrome? In Progress in Medical Genetics, Vol. 10. Edited by Steinberg A A, Bearn A G. New York, Grune and Stratton [in press].

75. Hellman D S, Blackman N: Enuresis, firesetting and cruelty to animals: A triad predictive of adult crime. American Journal of Psychiatry 122:1431-1435, 1966.

76. Silver L B, Dublin C C, Lourie R S: Does violence breed violence? Contributions from a study of the child abuse syndrome. American Journal of Psychiatry 126:404-407, 1969.

77. Cain A C: The presuperego "turning-inward" of aggression. Psychoanalytic Quarterly 30:171-243, 1961.

78. Guze S B, Woodruff R A, Clayton P J: Psychiatric disorders and criminality. Journal of the American Medical Association 227:641-642, 1974.

79. Wolfgang M E, Ferracuti F: The Subculture of Violence, Towards an Integrated Theory in Criminology. London, Social Science Paperbacks, 1967, pp 211-220.

80. Gottschalk L A, Gleser G C, Springer K J: Three hostility scales applicable to verbal samples. Archives of General Psychiatry 9:254-279, 1963.

81. Benton A L: Psychological tests for brain damage. In Comprehensive Textbook of Psychiatry. Edited by Freedman A M, Kaplan H I. Baltimore, Williams and Wilkins, 1907, pp 530-530.

82. Ervin F R: Brain disorders. IV: Associated with convulsions [epilepsy]. In Comprehensive Textbook of Psychiatry. Edited by Freedman A M, Kaplan H I. Baltimore, Williams and Wilkins, 1967, pp 795-810.

83. Rappeport J R, Lassen G: Dangerousness — street rate comparisons of discharged patients and the general population. American Journal of Psychiatry 121:776-783, 1965.

84. Rappeport J R, Lassen G: [ine dangerousness...? of female patients: A comparison of the arrest rate of discharged psychiatric patients and the general population. American Journal of Psychiatry 123:413-419, 1966.

85. Giovannoni J M, Gurel L: Socially disruptive behavior of ex-mental patients. Archives ...? 17:146-153, 1967.

87. Culevich G D, Bourne P G: Mental illness and violence. In Violence and the Struggle for Existence. Edited by Daniels D N, Gilula M F, Ochberg F M. Boston, Little Brown, 1970, pp 309-328.

88. Rappeport J R, Lassen G, Hay N B: A review of the literature on the dangerousness of the mentally ill. In The Clinical Evaluation of the Mentally Ill. Edited by Rappeport J R. Springfield, Illinois, Charles C Thomas, 1967.

89. Brennan J J: Mentally ill aggressiveness — popular delusion or reality. American Journal of Psychiatry 120:1181-1184, 1964.

90. Culevich G D, Bourne P G: Mental illness and violence. In Violence and the Struggle for Existence. Edited by Daniels D N, Gilula M F, Ochberg F M. Boston, Little Brown, 1970, p 323.

91. The role of alcohol, narcotics, dangerous drugs in individual violence, Chapter 15 in Crimes of Violence. A Staff Report to the National Commission on the Causes and Prevention of Violence. Edited by Mulvihill D J, Tumin M M, Curtis L A. Washington, D.C. U.S. Government Printing Office. Vol. 12. Superintendent of Documents.

92. Voss R B: Alcohol is an underlying factor in behavior leading to late 1960, pp 641-651. Clinical Problems and Research on Alcoholism: Clinical and Psychological. In: Proceedings of the First Annual Alcoholism highway crashes. Special Populations. Conference of the National Institute on Alcohol Abuse and Alcoholism. DHEW Public. No. (NIH) 74-070 Wash. D.C. U.S. Government Printing Office, 1973 pp 324-331.

93. Marinacci A A: Special type of temporal lobe (psychomotor) seizure following ingestion of alcohol. Bulletin of Los Angeles Neurological Society 28:241-250, 1963.

94. Bach-y-Rita G, Lion J R, Ervin F R: Pathological intoxication: Clinical and electroencephalographic studies. American Journal of Psychiatry 127:698-703, 1971.

95. Reich P, Hepps R B: Homicide during a psychosis induced by LSD. Journal of the American Medical Association 219:869-871, 1972.

96. Tinklenberg J R, Woodrow K M: Drug use and violence among youthful offenders. To be published in Human Aggression: Proceedings of the 1972 Annual Meeting of the Association for Research in Nervous and Mental Disease. Edited by Frazier S H. Baltimore (in press)

97. Baxter J T, Reite M: Crime and LSD: The insanity plea. American Journal of Psychiatry 126:531-537, 1969.

98. Williams and Wilkins. Problem in Perspective. Second Report of the National Commission on Marihuana and Drug Abuse. Washington, D.C. U.S. Government Printing Office, 1973, pp 159-160.

99. Drug Use in America: Problem in Perspective. Second Report of the National Commission on Marihuana and Drug Abuse. Washington, D.C. U.S. Government Printing Office, 1973, pp 159-160.

90. Eckerman W C, Bates J D, Rachel J V, et al: Drug Usage and Arrest Charges. A Study of Drug Usage and Arrest Charges Among Arrestees in Six Metropolitan Areas in the United States. Final Report. UNDD No. 1.70-35. Bureau of Narcotics and Dangerous Drugs. Washington, D.C. U.S. Department of Justice, 1971, pp 138.

CLINICAL ASPECTS OF THE VIOLENT INDIVIDUAL

Task Force Report 8

100. Eckerman W C, Bates J D, Rachel J V, et al: Drug Usage and Arrest Charges. A Study of Drug Usage and Arrest Charges Among Arresters in Six Metropolitan Areas in the United States. Final Report Washington, D.C. U.S. Bureau of Narcotics and Dangerous Drugs. Washington, D.C. U.S. Department of Justice, 1971, p 100.

101. Eckerman W C, Bates J D, Rachel J V, et al: Drug Usage and Arrest Charges. A Study of Drug Usage and Arrest Charges Among Arresters in Six Metropolitan Areas in the United States. Final Report Washington, D.C. U.S. Bureau of Narcotics and Dangerous Drugs. Washington, D.C. U.S. Department of Justice, 1971, pp 1-19 (Summary and Conclusions).

102. Korin L M: Heroin maintenance for heroin addicts: Issues and Evidence. The New England Journal of Medicine 288:654-660, 1973.

103. Kozel N J, DuPont R L, Brown B S: Narcotics and crime: A study of narcotic involvement in an offender population. The International Journal of the Addictions 7:443-450, 1972.

104. Drug Usage in America: Problem in Perspective. Second Report of the National Commission on Marihuana and Drug Abuse. Washington, D.C. U.S. Government Printing Office, 1973, pp 170-173.

105. Wolfgang M E: Victim-precipitated criminal homicide, in Studies in Homicide. Edited by Wolfgang M E. New York, Harper and Row, 1967, pp 72-87.

106. Macdonald J M: The Murderer and His Victim. Springfield, Illinois, Charles C Thomas, 1961.

107. Tanay E: Psychiatric aspects of homicide prevention. American Journal of Psychiatry 128:815-818, 1972.

108. Edwards G: Murder and gun control. American Journal of Psychiatry 128:811-814, 1972.

109. Zimring F: Is gun control likely to reduce violent killings? University of Chicago Law Review 35:721-737, 1968.

110. Crime in The United States, 1972. Uniform Crime Reports for The United States, Washington, D.C. Superintendent of Documents. U.S. Government Printing Office, 1973, p 8.

111. Dalton K: Menstruation and crime. British Medical Journal 2:1752-1753, 1961.

112. Kreuz L E, Rose R M: Assessment of aggressive behavior and plasma testosterone in a young criminal population. Psychosomatic Medicine 34:321-332, 1972.

113. Persky H, Smith K D, Basu G K: Relation of psychological measures of aggression and hostility to testosterone production in man. Psychosomatic Medicine 33:265-277, 1971.

115. Rose R M, Holaday J W, Bernstein I S: Plasma testosterone, dominance rank and aggressive behavior in male rhesus monkeys. Nature 231:366-368, 1971.

116. Malamud N: Psychiatric disorder with intracranial tumors of limbic system. Archives of Neurology 17:113-123, 1967.

117. Reeves A G, Plum F: Hyperphagia, rage, and dementia accompanying a ventromedial hypothalamic neoplasm. Archives of Neurology 20:610-624, 1969.

118. Zeman W, King F A: Tumors of the septum pellucidum and adjacent structures with abnormal affective behavior: An anterior midline structure syndrome. Journal of Nervous and Mental Disease 127:490-502, 1958.

119. Crowell R M, Tew J M, Mark V H: Aggressive dementia associated with normal pressure hydrocephalus. Report of two unusual cases. Neurology 23:461-464, 1973.

120. Wolfgang M E, Ferracuti F: The Subculture of Violence. Towards an Integrated Theory in Criminology. London, Social Science Paperbacks, 1967, p 259.

121. Kinzel A F: Body-buffer zone in violent prisoners. American Journal of Psychiatry 127:59-64, 1970.

122. Haney C, Banks C, Zimbardo P: Interpersonal Dynamics in a Simulated Prison. Final report, Office of Naval Research. NR-171-814, Washington, D.C. 1972.

123. Ekblom B: Acts of Violence by Patients in Mental Hospitals Scandinavian University Books. Uppsala, Sweden, Almqvist & Wiksells Boktryckeri AB. 1970.

124. Kalogerakis M G: The assaultive psychiatric patient. Psychiatric Quarterly 45:372-381, 1971.

125. Lion J R, Levenberg L B, Strange R E: Restraining the violent patient. Journal of Psychiatric Nursing and Mental Health Services 10:9-11, 1972.

126. Lion J R: The role of depression in the treatment of aggressive personality disorders. American Journal of Psychiatry 129:347-349, 1972.

127. Tarachow S: An Introduction to Psychotherapy. New York, International University Press, 1963, pp 291-299.

128. Carney F L: Three important factors in psychotherapy 27:220-231, 1973.

129. Carney F L: Three difficulties in the treatment of the aggressive acting-out patient. American Journal of Psychotherapy 27:265-270, 1973.

130. Adler G, Shapiro L N: Some difficulties in the treatment of the aggressive acting-out patient. American Journal of Psychotherapy 27:548-556, 1973.

131. Lion J R, Bach-y-Rita G: Group psychotherapy with violent outpatients. International Journal of Group Psychotherapy 20:185-191, 1970.

132. Carney F L: Some recurring therapeutic issues in group psychotherapy with criminal patients. American Journal of Psychotherapy 20:34-41, 1972.

133. Botiello J: Patients with acting-out character disorders. American Journal of Psychotherapy 27:4-14, 1973.

# CLINICAL ASPECTS OF THE VIOLENT INDIVIDUAL

Task Force Report 8

135. Redl F, Wineman D: Controls From Within: Techniques for the Treatment of the Aggressive Child. Glencoe, Illinois, Free Press, 1952.

134. Sturup G K: Treating the "Untreatable". Chronic Criminals at Herstedvester. Baltimore, The Johns Hopkins Press, 1968.

135. Sturup G K: The therapeutic use of a token economy to manage a young and assaultive inpatient population. The Journal of Nervous and Mental Disease 157:1-9, 1973.

130. Rimm D C, de Groot J C, Boord P, et al: Systematic desensitization of an anger response. Behaviour Research and Therapy 9:273-280, 1971.

137. Foxx R M, Azrin N H: Restitution: A method of eliminating aggressive-disruptive behavior of retarded and brain damaged patients. Behavior Research and Therapy 10:15-27, 1972.

138. Wallace C J, Teigen J R, Liberman R P, et al: Destructive behavior treated by contingency contracts and assertive training: A case study. Journal of Behavior Therapy and Experimental Psychiatry 4:273-274, 1973.

139. Patterson G R, Cobb J A: A dyadic analysis of "aggressive" behaviors. in Minnesota Symposia on Child Psychology, Vol. 5. Edited by Hill J P. Minneapolis, University of Minnesota Press, 1971, pp 72-129.

140. Berkowitz B P, Graziano A M: Training parents as behavior therapists: A review. Behavior Research and Therapy 10:297-317, 1972.

141. Moss R H: Conceptualizations of human environments. American Psychologist 28:652-605, 1973.

142. Berlin A: Treatment for the violent offender. Crime and Delinquency Psychologist 4:101-115, 1972.

143. Sturup G K: Will this man be dangerous?, in The Mentally Abnormal Offender. A Ciba Foundation Symposium. Edited by de Reuck A V S, Porter R. Boston, Little Brown, 1968, pp 5-18.

144. Hodges E F: Crime prevention by the indeterminate sentence law. American Journal of Psychiatry 128:291-295, 1971.

144. Stone A A: Discussion of Hodges' paper "Crime prevention by the indeterminate sentence law." American Journal of Psychiatry 128:295, 1971.

145. Schreiber A M: Indeterminate therapeutic incarceration of dangerous criminals: Perspectives and problems. Virginia Law Review 56:602-634, 1970.

147. Discussion concerning Patuxent Institution. Bulletin of the American Civil Liberties Union of Maryland III (1), February, 1973, pp 4-5.

148. "Defective delinquent" still an elusive concept in Maryland. Psychiatric News 6: ...

149. Patuxent Institution — the problem of direction. Psychiatric News 8: April 4, 1973, pp 3, 35.

150. Patuxent claims success as controversy rolls. Psychiatric News 8: July 4, 1973.

150. ... May 2, 1973, pp 1, 20.

151. Stone A A, Crowley B: Letters to editor, Psychiatric News ...

152. Drug in the treatment of human aggression. Audio-Digest Foundation. Psychiatry, Vol. 2, No. 14, July 30, 1973. 1250 S. Glendale Ave., Glendale, California 91205.

153. DeMascio A: The effects of benzodiazepines on aggression: Reduced or increased?, In: The Benzodiazepines. Edited by Garattini S, Mussini E, Randall L O. New York, Raven Press, 1973, pp 433-440.

154. Darling H F: Haloperidol in 60 criminal psychotics. Diseases of the Nervous System 32:31-34, 1971.

155. Sangiovanni F, Taylor M A, Abrams R, et al: Rapid control of psychotic excitement states with intramuscular haloperidol. American Journal of Psychiatry 130:1155-1156, 1973.

156. Sheard M H: Effect of lithium on human aggression. Nature 230:113-114, 1971.

157. Arnold L E, Wender P H, McCloskey K, Snyder S H: Levoamphetamine and dextroamphetamine: Comparative efficacy in the hyperkinetic syndrome. Archives of General Psychiatry 27:816-822, 1972.

158. Resnick O: The psychoactive properties of diphenylhydantoin. Experiences with prisoners and juvenile delinquents. International Journal of Neuropsychiatry, Supplement 2, 3:S30-S48, 1967.

159. Looker A, Conners C K: Diphenylhydantoin in children with severe temper tantrums. Archives of General Psychiatry 23:80-89, 1970.

160. Lefkowitz M M: Effects of diphenylhydantoin on disruptive behavior. Study of male delinquents. Archives of General Psychiatry 20:643-651, 1969.

101. Money J: Use of an androgen-depleting hormone in the treatment of male sex offenders. The Journal of Sex Research 6:165-172, 1970.

102. Cooper A J, Ismail A A A, Phanjoo A L, et al: Antiandrogen (Cyproterone Acetate) therapy in deviant hypersexuality. British Journal of Psychiatry 120:59-63, 1972.

103. Lion J R, and Monroe R R (Eds): Drugs in the Treatment of Human Aggression. (Special Section) J. Nerv. Ment. Dis. In Press.

104. Narabayashi H, Nagao T, Saito Y, et al: Stereotaxic amygdalotomy for behavior disorders. Archives of Neurology 9:1-16, 1963.

105. Heimburger R F, Whitlock C C, Kalsbeck J E: Stereotaxic amygdalotomy for epilepsy with aggressive behavior. Journal of the American Medical Association 198:741-745, 1966.

106. Vernet K, Madsen A: Stereotaxic amygdalotomy and basofrontal tractotomy in psychotics with aggressive behavior. Journal of Neurology, Neurosurgery and Psychiatry 33:858-863, 1970.

107. Sano K, Mayanagi Y, Sekino H, et al: Results of stimulation and destruction of the posterior hypothalamus in man. Journal of Neurosurgery 33:689-707, 1970.

108. Brown B S, Wienckowski L A, Bivens L W: Psychosurgery: Perspectives on a current problem. National Institute of Mental Health Publication. Washington, D.C., U.S. Government Printing Office, (HSM) 73-6119. 1973.

09/09/03  FAX 4153809351  RICHARD ELLIS Attorney  @027

CLINICAL ASPECTS OF THE VIOLENT INDIVIDUAL

Task Force Report 8

169. Bard M: The study and modification of intra-familial violence, in The Control of Aggression and Violence, Cognitive and Physiological Factors. Edited by Singer J L. New York, Academic Press, 1971, pp 149-164.

170. Bittner H A: Police crisis intervention and the prevention of violence. The American Journal of Psychoanalysis 32:211-215, 1972.

171. Livermore J M, Malmquist C P, Meehl P E: On the justifications for civil commitment. University of Pennsylvania Law Review 117:75-90, 1968.

172. Wenk E A, Robison J O, Smith G W: Can violence be predicted? Crime and Delinquency 18:393-402, 1972.

173. von Hirsch A: Prediction of criminal conduct and preventive confinement of convicted persons. Buffalo Law Review 21:717-758, 1972.

174. Dershowitz A M: The law of dangerousness: Some fictions about predictions. Journal of Legal Education 23:24-47, 1970-71.

175. Rosen A: Detection of suicidal patients: An example of some limitations in the prediction of infrequent events. Journal of Consulting Psychology 19:397-403, 1954.

176. Goldstein J, Katz J: Dangerousness and mental illness: Some observations on the decision to release persons acquitted by reason of insanity. The Yale Law Journal 70:225-239, 1960.

177. Brakel S J, Rock R S (Eds): The Mentally Disabled and the Law. Chicago, The University of Chicago Press, 1971, p 36.

178. Model Penal Code: Proposed Official Draft. The American Law Institute, Philadelphia, Pa. 1962, pp 109-110.

179. Model Sentencing Act, Second Edition. Council of Judges of the National Council on Crime and Delinquency. Crime and Delinquency 18:335-370, 1972.

180. Macdonald J M: Homicidal Threats. Springfield, Illinois, Charles C Thomas, 1968.

181. Tuason V B: The psychiatrist and the violent patient. Diseases of the Nervous System 32:764-768, 1971.

182. Rubin B: Prediction of dangerousness in mentally ill criminals. Archives of General Psychiatry 27:397-407, 1972.

183. Steadman H J, Keveles G: The community adjustment and criminal activity of the Baxstrom patients: 1966-170. American Journal of Psychiatry 129:304-310, 1972.

184. Shah S A: Crime and mental illness: Some problems in defining and labeling deviant behavior. Mental Hygiene 53:21-33, 1969.

185. Wenk E A, Emrich R L: Assaultive youth: An exploratory study of the assaultive experience and assaultive potential of California Youth Authority wards. Journal of Research in Crime and Delinquency 9:171-196, 1972.

186. Lessard V Schmidt: 349 F. Supp. 1078 (1972).

187. Scheff T J: Decision rules, types of error, and their consequences in medical diagnosis. Behavioral Science 8:97-107, 1963.

188. McGarry A L: Psychiatry and the dangerous offender. The Medical Journal of Australia 1:1-3, 1972.

189. Morris N: Psychiatry and the dangerous criminal. Southern California Law Review 41:514-547, 1968.

190. Recidivism over the criminal career: Chapter 12, in Crimes of Violence: A Staff Report to the National Commission on the Causes and Prevention of Violence. Vol. 12. Edited by Mulvihill D I, Tumin M M, Curtis L A. Washington, D.C., Superintendent of Documents, U.S. Government Printing Office, 1969, p 549-552.

191. Steadman H J: Follow-up on Baxstrom patients returned to hospitals for the criminally insane. American Journal of Psychiatry 120:317-319, 1973.

192. Resnick P J: Child murder by parents: A psychiatric review of filicide. American Journal of Psychiatry 126:325-334, 1969.

193. Malmquist C P: Premonitory signs of homicidal aggression in juveniles. American Journal of Psychiatry 120:461-465, 1971.

194. Cormier B M, Augliker C C J, Boyer R, et al: The psychodynamics of homicide committed in a specific relationship. Canadian Journal of Criminology and Corrections 13:1-8, 1971.

195. Greenland C: Evaluation of violence and dangerous behavior associated with mental illness. Seminars in Psychiatry 3:345-356, 1971.

196. Steadman H J: Some evidence on the inadequacy of the concept and determination of dangerousness in law and psychiatry. The Journal of Psychiatry and Law 1:409-426, 1973.

197. Marcus A M: Encounters with the dangerous sex offender. Canada's Mental Health 18:9-14, 1970.

198. Skelton W D: Prison riot: Assaulters vs. defenders. Archives of General Psychiatry 21:359-362, 1969.

199. Sheppard C: The violent offender: Let's examine the taboo. Federal Probation 35:12-19, 1971.

200. Cocozza J J: Letter to editor. Psychiatric News 0: August 15, 1973, p 2.

201. Glaser D, O'Leary V: Personal Characteristics and Parole Outcome. Parole Decision-Making. U.S. Department of HEW, Office of Juvenile Delinquency and Youth Development. JD-5002-Parole Series. Wash., D.C. Superintendent of Documents. U.S. Government Printing Office, 1966.

202. Recidivism over the criminal career: Chapter 12 in Crimes of Violence: A Staff Report to the National Commission on the Causes and Prevention of Violence. Vol. 12. Edited by Mulvihill D I, Tumin M M, Curtis L A. Washington, D.C., Superintendent of Documents, U.S. Government Printing Office, 1969, p 566.

203. Genet P J: A 20 year comparison of releases and recidivist youth. Harrisburg, Pennsylvania Board of Parole, 1966. Cited in Macdonald J M, Homicidal Threats. Springfield, Illinois, Charles C Thomas, 1968, p 30.

204. Lachman J H, Cravens J M: The murderers — before and after. Psychiatric Quarterly 43:1-11, 1969.

205. McGarry A L: The fate of psychotic offenders returned for trial. American Journal of Psychiatry 127:1181-1104.

AMERICAN
PSYCHIATRIC
ASSOCIATION
MUSEUM

Library

Presented by

Additional copies of this publication are available at $2.50 each from Publication Services Division, American Psychiatric Association, 1700 18th Street, N.W., Washington, D.C. 20009. Write for discounts on quantity purchases.

final 27/26

Task Force Report 8

206. Morrow W R, Peterson D B: Follow-up of discharged psychiatric offenders -- "Not guilty by reason of insanity" and "Criminal sexual psychopaths". The Journal of Criminal Law, Criminology and Police Science 57:31-34, 1966.

207. Davis K R, Sines J O: An antisocial behavior pattern associated with a specific MMPI profile. Journal of Consulting and Clinical Psychology 36:229-234, 1971.

208. Persons R W, Marks P A: The violent 4-3 MMPI personality type. Journal of Consulting and Clinical Psychology 36:189-196, 1971.

209. Sarbin T R, Wenk E A, Sherwood D W: An effort to identify assault-prone offenders. Journal of Research in Crime and Delinquency 5:00-71, 1968.

210. Position statement on Involuntary Hospitalization of the Mentally Ill. American Journal of Psychiatry 128:1480, 1972.

211. McGarry A L, Greenblatt M: Conditional voluntary mental-hospital admission. New England Journal of Medicine 287:279-280, 1972.

RECEIVED APR 0 8 2002

COPY



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. 73,641

**LAWRENCE RUSSELL BREWER, Appellant**

v.

**THE STATE OF TEXAS**

### ON DIRECT APPEAL
### FROM JASPER COUNTY[1]

Keasler, J., *delivered the opinion of the Court joined by* Keller, P.J., *and* Meyers, Price, Womack, Hervey, Holcomb, *and* Cochran, J.J.   Johnson, J., *concurred in the result.* Cochran, J., *filed a concurring opinion.*

### OPINION

Lawrence Russell Brewer was convicted in September 1999 of capital murder.[2]

Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal

---

[1]   The case was tried in Brazos County on change of venue and transferred back to Jasper County following the trial.

[2]   TEX. PENAL CODE ANN. § 19.03(a).

Procedure art. 37.071 §§ 2(b) and 2(e), the trial judge sentenced Brewer to death.[3]  Direct appeal to this Court is automatic.[4]  Brewer raises twelve points of error challenging his conviction and sentence.  We find his contentions meritless and affirm the conviction and sentence.

In his first point of error, Brewer claims the trial court erred in granting the State's challenge for cause against venireperson Joyce based on her religious views against the death penalty.  Brewer argues that although Joyce held strong religious views about the sanctity of human life, she would nonetheless follow her oath by attempting to find reasons within the evidence to answer the special issues in such a way that a life sentence would result.

Joyce's answers during voir dire fluctuated.  Initially, she agreed with the prosecutor that she had stated on her juror questionnaire that she could never under any circumstances return a verdict assessing the death penalty.  She further agreed that her religious beliefs would substantially impair or prevent her from answering the mitigation issue in such a way as to result in the execution of the defendant.  She agreed with the prosecutor that she felt "very strong[ly] about that" and that "nothing" could "change her opinion."

Defense counsel then explained to Joyce that she would be answering each special issue as a fact question and based on the evidence presented.  She acknowledged that, as a

---

[3] Article 37.071, § 2(g).  Unless otherwise indicated all future references to Articles refer to the Texas Code of Criminal Procedure.

[4] Article 37.071, § 2(h).

juror, she would be required to take an oath that she would follow the law, and she agreed with defense counsel that she would not intentionally violate that oath. She then expressed difficulty with the mitigation issue because "the defendant is a human being and just the sanctity of life." She consistently stated that answering that special issue would be "difficult." But when asked whether she could answer the question in the negative if no mitigating evidence was introduced, she conceded that she "would have to" because of the oath.

Joyce agreed with the prosecutor that her religious views would "probably" impair her ability to "fairly judge the evidence." While she subsequently agreed with defense counsel that it would "depend upon the evidence," she also told the prosecutor that "because of [her] religious beliefs, [she] would look very strongly to find some reason to answer [the punishment questions] so that it's a life sentence." The trial court granted the State's challenge for cause against Joyce, stating, "Having considered all of the answers of the juror, having observed her demeanor, tone of her voice; having observed her throughout the period of questioning in regard to all the manners [*sic*] the Court will grant the challenge."

In *Wainwright v. Witt*,[5] the Supreme Court of the United States held that a prospective juror may be excluded for cause when his views on capital punishment would "prevent or substantially impair the performance of his duties in accordance with his instructions and his

---

[5] 469 U.S. 412 (1985).

oath." A trial court that sustains a challenge for cause on these grounds is afforded great deference by its reviewing court.[6] The *Witt* court recognized that, "[d]espite . . . lack of clarity in the printed record, . . . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law."[7] It is for this reason that "deference must be paid to the trial judge who sees and hears the jurors."[8]

Despite Brewer's arguments to the contrary, Joyce was a classic vacillating juror whose strongly-held religious views troubled her to a point that she was uncertain as to how they would affect her in responding to the issues. Brewer argues that Joyce's responses were no different than the jurors' answers in *Ex parte Williams*,[9] *Clark v. State*,[10] and *Riley v. State*,[11] cases in which we found the trial court erred in granting the State's challenge. But those cases are distinguishable. In *Williams*, the juror merely stated that "his views in

---

[6]  *Vuong v. State*, 830 S.W.2d 929, 943-44 (Tex. Crim. App.), *cert. denied*, 506 U.S. 997 (1992).

[7]  *Witt*, 469 U.S. at 425-26; *see also Vuong*, 830 S.W.2d at 943.

[8]  *Id.*

[9]  748 S.W.2d 461 (Tex. Crim. App. 1988).

[10]  929 S.W.2d 5 (Tex. Crim. App. 1996).

[11]  889 S.W.2d 290 (Tex. Crim. App. 1994) (op. on reh'g), *cert. denied*, 515 U.S. 1137 (1995).

opposition to the death penalty would 'affect' him in his deliberations."[12] In *Clark*, the juror

firmly and repeatedly stated that she could follow the court's instructions and answer the

questions based on the evidence.[13] And in *Riley*, the juror "consistently affirmed that she

could answer the questions in accordance with the evidence."[14] In contrast, juror Joyce was

entirely inconsistent, stating that her religious beliefs would substantially impair her ability

to consider the evidence, her beliefs would probably impair her ability to consider the

evidence, and that she would follow the oath if she had to. The trial judge did not abuse his

discretion in granting the State's challenge for cause. Point of error one is overruled.

In his second point of error, Brewer claims the trial court erred in failing to grant his

challenge for cause against venireperson Murphy. Brewer claims Murphy was challengeable

for cause under Article 35.16(c)(2) and (a)(9) because he had formed an opinion about

Brewer from news accounts and therefore could not afford Brewer his presumption of

innocence.

When questioned by defense counsel, Murphy stated that he had heard only some

preliminary news reports about the facts of the case. He stated his understanding from the

news reports that "three guys took an innocent man and did something they shouldn't have";

he stated, "that's all I gathered from it." When defense counsel asked whether Murphy had

---

[12] *Williams*, 748 S.W.2d at 464.

[13] *Clark*, 929 S.W.2d at 8.

[14] *Id.*; *Riley*, 889 S.W.2d at 300.

formed a conclusion as to Brewer's guilt, Murphy responded, "Well, yeah, I guess I have in a way." But when asked whether those conclusions would affect his ability to sit as a juror, Murphy said, "Well, I don't think so because I would still need to hear, like, exactly what happened...."

The prosecutor's questioning then focused on explaining to Murphy that just knowing "that some crime occurred" is not enough to disqualify him – the issue was whether Murphy had formed an opinion about Brewer's guilt in the crime. Murphy made clear that he had not. Defense counsel then twice more asked Murphy whether he had formed an opinion that a crime had been committed, and Murphy answered that he was not "sure," but he knew "that something happened there. That's all." Brewer's challenge for cause against Murphy was denied.

Brewer argues that since Murphy was convinced that a murder had occurred, he was challengeable for cause. In *Kemp v. State,*[15] venireperson Rygg stated his belief that someone had murdered the victim because a murder had "obviously occurred." Despite this, he also stated that "he would specifically require the State to prove the occurrence of the murder beyond a reasonable doubt." We concluded that, although the juror had some media exposure to the case, "[p]rior knowledge of a crime from the news media and community discussion is not sufficient grounds to require that a venireman be excused for cause. The

---

[15]   846 S.W.2d 289, 298-99 (Tex. Crim. App. 1992), *cert. denied*, 508 U.S. 918 (1993).

sole question for determination is whether a juror can put aside prior knowledge and opinion and render an impartial verdict." We concluded, based on the entirety of the voir dire, that Rygg was capable of discarding any preconceived conclusions he had and following the law.

Murphy's statements do not even rise to the level of the venireperson's in *Kemp* because Murphy did not say definitively that he believed a crime had occurred. Although the prosecutor used the phrase about "some crime" having occurred, Murphy himself only stated the he believed that "something" had happened. Even if his belief that "something" had happened rises to the level of believing that a crime had occurred, the totality of Murphy's voir dire reflects that he was capable of, and indeed, sought to, hear the evidence and make a conclusion based on the evidence. The trial court did not abuse its discretion in denying Brewer's challenge for cause against Murphy. Point of error two is overruled.

In point of error three, Brewer claims the trial court erred in overruling his challenge for cause against venireperson Pilant because he, like Murphy, had formed an opinion about Brewer from news accounts and therefore could not afford Brewer his presumption of innocence. Brewer again relies on Article 35.16(c)(2) and (a)(9).

Pilant testified that he had read numerous newspaper accounts about the offense. He stated that, if the facts as he had read them in the papers were proven at trial to be true, then his opinion would be that Brewer was guilty. When defense counsel phrased this as a "bias or prejudice," Pilant restated it as an "inclination":

A.  Well, I would characterize it as an inclination. I'm not sure bias or

prejudice would exactly characterize it. . . . A bias or prejudice would seem to suggest to me that even in the face of facts notwithstanding that I would still carry on with the same opinions, and that I don't think is the case. . . . If the evidence were presented that would be contrary to something that I read in the newspaper, I mean that would – I would certainly have no trouble –

Q.  Discounting the –

A.  – the other stuff.  Just be an incorrect piece of fact that was relayed by the media which is not surprising.

Pilant never stated that because of the news accounts he had read he would not be able to follow his oath or the law and be unable to presume Brewer innocent.  Nor did Pilant ever state he would not require the State to prove the elements of the offense beyond a reasonable doubt.  Although he indicated that there was a "possibility" that such outside information "would push me that little bit over the middle if [his position on reasonable doubt was] right exactly 50 percent," he also stated that he would "endeavor to listen to everything I can and form the best balanced decision that I could possibly do."

The record does not establish that Pilant's beliefs or opinions about Brewer's guilt would substantially impair the performance of his duties in accordance with his instructions or oath.  Therefore, the trial court did not abuse its discretion in denying Brewer's challenge. Point of error three is overruled.

In his fourth point of error, Brewer claims the trial court erred in denying his challenge for cause against Shahady.  Brewer contends that Shahady had a bias against Brewer's Fifth Amendment right to remain silent.

Shahady, a lawyer, stated that his "legal background" gave him a problem with the Fifth Amendment because he realized that there was a "tactic behind it." He consistently stated that he would require the State to prove all the elements beyond a reasonable doubt but stated that he "personally" had a problem with the Fifth Amendment. When repeatedly questioned by defense counsel as to whether this problem meant that he would require something from Brewer, Shahady maintained that he would not expect or require anything in doing his duty as a juror. He stated, however, that he would be "personally" disappointed if a person was accused of something and refused to tell him he didn't do it. But Shahady never wavered in stating that he could follow the law and his oath in discharging his duties as a juror. The court did not abuse its discretion in denying Brewer's challenge for cause. Point of error four is overruled.

In his fifth point of error, Brewer claims the trial court erred in ordering him to submit to an examination by the State's psychiatrist. The State filed a pretrial motion, based on *Lagrone v. State*,[16] *Soria v. State*,[17] and *Chamberlain v. State*,[18] requesting that Brewer be required to submit to an interview by State's psychiatrist Dr. Edward Gripon or, in the alternative, notifying Brewer that the State would object at trial to any psychiatric expert testimony offered by Brewer based upon interviews with his own psychiatric expert. The

---

[16] 942 S.W.2d 602 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997).

[17] 933 S.W.2d 46 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1253 (1997).

[18] 998 S.W.2d 230 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000).

trial court granted the State's motion compelling Brewer to disclose whether he intended to offer such testimony.  The defense objected to the court's order on the grounds that it violated the attorney/client privilege, the Sixth Amendment right to counsel and the Fifth Amendment privilege against self-incrimination.  Thereafter, defense counsel disclosed that they intended to use testimony of their psychologist who had interviewed Brewer.  The trial court granted the State's motion for examination by Dr. Gripon.  Gripon testified for the State at punishment.

We have held that "when the defendant initiates a psychiatric examination and based thereon presents psychiatric testimony on the issue of future dangerousness, the trial court may compel an examination of [the defendant] by an expert of the State's or court's own choosing . . . ."[19]  We took this holding a step further in *Lagrone*, holding that trial courts may "order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, *or plans to introduce*, its own future dangerousness expert testimony."[20]

Brewer claims the emphasized portion of this holding is "unsound."  He argues that only when the defendant's expert testifies on the basis of an interview with the defendant has the defendant constructively taken the stand and waived his Fifth Amendment rights.  He further argues that he might have decided not to call his own expert as a witness at trial,

---

[19] *Soria,* 933 S.W.2d at 57-58.

[20] *Lagrone*, 942 S.W.2d at 611 (emphasis in original).

using his services for consulting purposes only. He claims he had a right to consult with his own experts and plan trial strategy without having to submit to an examination by the State's expert. Brewer is essentially requesting that we overrule *Lagrone*. His arguments are similar to those made by the concurring opinions in *Lagrone*. Brewer has not persuaded us to overrule *Lagrone*.

Within this point of error, Brewer also complains that Dr. Gripon testified concerning Brewer's future dangerousness during the State's case-in-chief at punishment, before Brewer waived his Fifth Amendment rights by presenting his own psychologist's testimony. But Brewer waived any error in this procedure by failing to object at trial. Point of error five is overruled.

In his sixth point of error, Brewer claims the trial court erred in "ordering [Brewer] to disclose the fact that he had enlisted the assistance of a psychologist to assist in the preparation of the defense." Brewer argues that under *Ake v. Oklahoma*[21] and *Williams v. State*,[22] he was entitled to enlist the assistance of an expert *ex parte* and without the knowledge of the State. He reasons that because he is entitled to the *ex parte* appointment of an expert he should also be protected from disclosing the existence of that expert, whether the expert has interviewed the defendant, and whether the expert will testify.

In *Ake v. Oklahoma*, the United States Supreme Court held that due process entitles

---

[21]   470 U.S. 68 (1985).

[22]   958 S.W.2d 186 (Tex. Crim. App. 1997).

an indigent criminal defendant to the appointment of an expert to assist in his defense upon a preliminary showing that the issue for which he seeks expert assistance is "likely to be a significant factor at trial."[23] We have held that the preliminary showing under *Ake* is required to be made on the basis of more than unsupported assertions and, upon proper request, can be made *ex parte*.[24] The reason for holding the hearing *ex parte* is because, in order to make a threshold showing, "the defendant necessarily has to explain his theories and describe with some specificity how an expert would assist him."[25]

We perceive no conflict between the holdings in *Ake* and *Williams* and the trial court's actions in this case. Brewer received an *ex parte* hearing concerning the appointment of defense experts pursuant to *Ake* and *Williams*. As explained in *Williams*, an *ex parte* hearing is necessary in these circumstances because a defendant is placed in the position of disclosing his legal theories and strategies in some detail. Here, however, Brewer was required to reveal nothing about his strategies, theories or work product. His only compelled disclosure was that at the punishment phase he planned to call as a witness a psychologist who had interviewed him. This is not a violation of due process under *Ake* or *Williams*. Moreover, Brewer did not claim it was a violation under *Ake* or *Williams* at trial. Point of error six is overruled.

---

[23]  470 U.S. at 74.

[24]  *Williams*, 958 S.W.2d at 193.

[25]  *Id.* (citations omitted).

In points of error seven and eight, Brewer claims that the "trial court erred in allowing speculation concerning certain sexually explicit statements and correspondence by [Brewer]" as a confession to capital murder at guilt/innocence and as evidence of future dangerousness at punishment.  A letter written by Brewer to another inmate was read aloud to the jury by the prosecutor without objection.  The portion of the letter at issue stated as follows:

> ANY WAY NICK JASON 'RED ARM' WORKED IN KITCHEN WITH ME AT A CERTAIN TIME ASK HIM IF HE REMEMBERS WHEN WE WERE DISCUSSING MATTERS ON THE TIRE HE WANTED TO ROLL THE HILL & WHAT I WANTED TO DO – HA! ☺ WELL I DID IT; AND NO LONGER AM I A VIRGIN!  IT <u>WAS</u> A RUSH & IM STILL LICKIN MY LIPS FOR MORE → ~~PUSSY~~ VIRGINA (JUST IN CASE FEATHER WOOD READS THIS NO DISRESPECT TO THE LADY FOLKS) EATIN!! ☺ HE'LL KNOW ASK HIM – HE BETTER REMEMBER ☺!

The State's witnesses at guilt/innocence interpreted certain statements within the letter to be a reference to an assault or criminal act against a black person.  One State's witness also relied on the same interpretation of the letter as evidence of future dangerousness at punishment. Brewer argues before this Court that these witnesses' testimony was "improper speculation," should have been limited by Rules of Evidence 701 and 702, and that such "improper speculation and beliefs are not proper subjects of expert testimony" and do not "meet the standard for admissibility under *Daubert*."  Brewer objected at trial that the witnesses' testimony regarding Brewer's letter was "pure speculation" and "invaded the province of the jury."  Brewer's complaints on appeal are more expansive than his objections at trial.  We address only Brewer's objections advanced at trial.

The State called three witnesses at guilt/innocence to testify to the meaning of the letter. Mo Johnson, the jail administrator, testified that she received the letter to be mailed on Brewer's behalf. On direct examination, she testified without objection that "a tire" was a derogatory term used to refer to black people. On cross, Johnson admitted that the words in the passage referring to the female anatomy would not fit with the word "tire" if "tire" referred to a black man. On re-direct, the prosecutor read the passage again and asked Johnson, "What is he talking about? Sex? What is he talking about?" Brewer objected that the prosecutor's question "calls for pure speculation" and the trial court sustained the objection. Thus, Johnson never gave objectionable testimony regarding the complained-of "rolling a tire" passage.

William Kirk, a sergeant specializing in prison gang intelligence, was called by the State. Kirk testified that he read approximately thirty to seventy pieces of inmate correspondence a day. The prosecutor read the passage to Kirk and then the following exchange occurred:

Q.[Prosecutor]. Have you ever heard of the term "tire"?

A.[Kirk]. Yes, sir.

Q.[Prosecutor]. And "rolling"?

A.[Kirk]. Yes, sir.

Q.[Prosecutor]. And how is that used in the vernacular with gangs and cliques where you work, sir?

A.[Kirk].  In a prison setting the word or the term "rolling" or "to roll" somebody generally refers to a physical assault of some form or another to varying degrees all the way up to an attempted murder, if you will – you know, physical assault with a weapon.

Q.[Prosecutor].  That's what rolling means?

A.[Kirk].  Rolling –

Q.[Prosecutor].  In the vernacular you see?

A.[Kirk].  Very – it means to assault.  Okay?  To do somebody wrong – bodily wrong, but it can vary from beating somebody up to assaulting with a weapon.

Q.[Prosecutor].  What does "tire" mean?  Have you ever heard that term used?

A.[Kirk].  Yes, sir, I have.

Q.[Prosecutor].  What does that mean?

A.[Kirk].  One of the many derogatory terms for a black offender or a member of the black race.

Q.[Prosecutor].  Okay.  You just heard me read that portion?

A.[Kirk].  Yes, sir.

Q.[Prosecutor].  You've been in this business nine years, you've been in your position for two years.  What did that mean to you, what I just read to you?

At this point, Brewer objected that the question "calls for speculation and invades the province of the jury."  But Kirk had already conveyed the same information to the jury without objection -- that "tire" referred to a black person and "rolling" meant assault of some kind.  Therefore, the court did not abuse its discretion in overruling the objection.  The court discussion continued:

Q.[Prosecutor].  What did the author of that statement say when he wrote that, to you in your experience and training and your position, sir?

A.[Kirk].  To me it sounds like he's stating that he has physically assaulted a member of the black race in one form or another and that at one time prior to that incident that he had discussed it – something similar with somebody of like mind.

Q.[Prosecutor].  "& IM STILL LICKIN MY LIPS FOR MORE."  What does that mean?

A.[Kirk].  Sounds as though he enjoyed it.

Q.[Prosecutor].  Wants to do it again?

A.[Kirk].  Yes, sir.

Q.[Prosecutor].  That's a confession to a crime, isn't it?

This question brought another objection as an invasion of the "province of the jury" and asserting a "personal opinion by this prosecutor – a leading question asking the witness simply to agree with his personal opinion."  The first objection was overruled, the second objection sustained, and the prosecutor was allowed to rephrase the question.  He did so without objection.  That an opinion "invades the province of the jury" is no longer a valid objection, in light of Rule of Evidence 704.[26]  Rule 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  So Brewer's first objection was properly overruled.  And by failing to pursue his second objection to an adverse ruling, Brewer waived

---

[26] *Ortiz v. State*, 834 S.W.2d 343, 348 (Tex. Crim. App. 1992).

any error.

The State also called Mark Postell, an inmate and member of a white supremacist prison gang. When the prosecutor asked Postell to interpret Brewer's letter, defense counsel objected that Postell was not qualified as an expert on gang intelligence and that "it calls for speculation on his part to interpret what a letter from one person to another person means." The trial court overruled the objection, and Postell responded that "it was pretty stupid for [Brewer] to write a letter like that." Then on cross-examination Postell testified concerning the actual language of the letter, in response to defense counsel's questions about the letter's sexual nature. Postell never testified about the "rolling a tire" reference. Given the brevity of Postell's testimony concerning the letter and its lack of reference to the "rolling a tire" language, any error in allowing it was harmless beyond a reasonable doubt.[27]

Finally, at punishment, the State called Robert Strickland, a deputy sheriff with the Harris County Sheriff's Department and specialist on prison and street gangs. The prosecutor asked the following questions of which Brewer now complains:

> Q.[Prosecutor]. And have you heard the term "tire" being used in a derogatory fashion toward referring to someone as the black race?
>
> A.[Strickland]. Yes, sir.
>
> *               *               *               *
>
> Q.[Prosecutor]. And rolling a tire, what would that mean?

---

[27] TEX. R. APP. P. 44.2 (b).

A.[Strickland].  The term rolling, talking about causing harm or death or something like that to someone – an attack of some type.

Q.[Prosecutor].  This portion that I've just read about rolling the tire, licking my lips for more – from your experience and training and your understanding of the slang usage, what does that mean to you?

A.[Strickland].  That's telling me that he's discussed the matter with someone about the – rolling the tire – possibly rolling the black man and licking his lips as something that, you know, he's gotten some excitement from it – it fulfilled a thought that he had or some kind of a feeling.

Q.[Prosecutor].  Is there an indication in that portion – from the writer of this letter that shows that he experienced pleasure in harming a black person?

A.[Strickland].  Yes.  When he's talking about that he got a rush from it.

Q.[Prosecutor].  I'm still licking my lips for more.  What does that mean?

A.[Strickland].  It's – it was exciting to him and he can't wait to do it again. It was a fulfillment to him.

Q.[Prosecutor].  So if this is talking about harming a black person and I'm licking my lips for more, does that indicate to you the writer of this letter would be a future danger to someone in the black race, assaulting someone?

At this point, Brewer objected.  He stated, "I haven't objected to his speculation so far, but that invades the province of the jury and is pure speculation." The trial court overruled the objection and Strickland ultimately responded affirmatively to the question.

As stated previously, that an opinion "invades the province of the jury" is no longer a valid objection, in light of Rule of Evidence 704.  Further, with regard to the speculation, Strickland had testified, without objection, to an interpretation of the letter suggesting that Brewer had harmed a black person and had attained some gratification from the act.  Based

on that interpretation, the trial court did not abuse its discretion in overruling Brewer's objection that it was "pure speculation" for Strickland to further testify that Brewer, as the writer of such a letter, would be a danger to black persons in the future. Points of error seven and eight are overruled.

In point of error nine, Brewer claims the "trial court erroneously admitted a scrapbook containing writings purported to be authored by [Brewer] in the complete absence of any authentication that it was in fact his writings." In his brief, Brewer argues the writings were unauthenticated and that they were hearsay. But at trial, when the exhibit was introduced, Brewer lodged the following bare objection: "We would object, Your Honor." This objection was insufficient to inform the court of the grounds for the objection.[28] Point of error nine is overruled.

In his tenth and eleventh points of error, Brewer claims the State was allowed to "impugn and violate" both the work product privilege and the attorney/client privilege, "abrogating his Sixth Amendment right to counsel."

At guilt/innocence, Brewer called former warden and current consultant Terry Pelz as an expert on prison gangs. Pelz testified that he had reviewed over 2000 pages of documents relating to Brewer, including his prison and disciplinary records and those of his co-defendant, William King. Pelz opined that King was the aggressor and leader in the

---

[28] TEX. R. APP. PROC. 33.1.

instant offense, not Brewer.  At one point on recross-examination, the prosecutor questioned

Pelz about "some of the papers that were received from the defense." The prosecutor pointed

to "handwritten notes" and asked Pelz whether they were his own notes or those of defense

counsel.  Pelz responded that they were a compilation of counsel's questions and his own

notes.  The prosecutor then asked Pelz a series of questions demonstrating that, since going

into private practice, Pelz worked exclusively for the defense, and rarely, if ever, for the

prosecution.  Thereafter, the following exchange took place:

> Q.[Prosecutor].  Well, do you believe that a fair verdict should be reached in this case?
>
> A.[Pelz].  Absolutely.
>
> Q.[Prosecutor].  Do you believe that the prosecution team in this case is committed to fairness and doing all it can to –
>
> [Defense attorney]: Your Honor, I'll have to object to that, asking for his opinion as to whether they're being fair or not.  That's just – we could all try to parade witnesses up there to say who's being fair.
>
> [Prosecutor]: I'll rephrase the question, your Honor.
>
> Q.[Prosecutor].  Do you feel like fairness should be done in this case?
>
> A.[Pelz].  Absolutely, and in Mr. Brewer's case as well.
>
> Q.[Prosecutor]. Well, in some of these – some of this information that you've provided that's so helpful to the defense, why didn't you run like the wind to the State of Texas with this information?
>
> [Defense attorney]: Your Honor, I object to that.  He's trying to get him to invade the work product of this – of the defense table.  He's – [the prosecutor] knows he's prohibited from doing that.

A. [Pelz]. I gave it to [defense counsel].

Regarding the attorney/client privilege, Brewer's first objections were sustained by the trial court. Since Brewer requested no further relief from the trial court, no error was preserved as to those objections. Subsequently, Brewer "renew[ed] those same objections" to the prosecutor's asking Pelz whether the trial was the first time he had "provided this information in a public forum." The trial court overruled that objection. We will assume that Brewer's "renewal" of "those same objections" was sufficient to adequately inform the trial court that he was complaining of a violation of the attorney/client privilege. The trial court overruled that objection, so error was preserved as to that question. But the question itself was not improper. The attorney/client privilege prevented the disclosure of confidential communications and information which came to Pelz's knowledge as a result of the attorney/client relationship.[29] In the question at issue, the prosecutor asked only whether it was the first time Pelz had provided information to the State; the question did not require disclosure of confidential communications or information which came to Pelz's knowledge as a result of the attorney/client relationship. Point of error eleven is overruled.

Turning to the work product question, a document contains privileged "work product" if it contains "comments by the attorney concerning his trial strategy or opinions of the

---

[29] *See* TEX. R. EVID. 503(b)(1), (b)(2).

THE COURT: Objection is overruled.

A.[Pelz].  Your question again, please?

Q.[Prosecutor].  With this information that you were able to get that seemed to be so helpful to the defense, why didn't you provide it to the State until this morning, an hour and a half ago, so we could research this and help see what the fair thing could be done in this case so we know your side?

A.[Pelz].  What situation?  You talking about the notes?

Q.[Prosecutor].  Yes.  The notes and this data that you're testifying on the defense for.

[Defense counsel]: May I add one thing to my objection, Your Honor? He's also asking him to invade the attorney/client privilege – the ability to hire experts.

THE COURT:  Sustained.

[Defense counsel]: And additionally invades the provisions of the Code of Criminal Procedure that affords the filing of ex parte motions for the assistance of expert assistance in a case.

THE COURT:  Sustained.

Q. [Prosecutor].   The fact is this is the first time you have provided this information in a public forum or to the Government; isn't that true?

[Defense counsel]: Renew those same objections to that question, Your Honor.

THE COURT: Overruled.

A.[Pelz].  Your question again?

Q. [Prosecutor] Today is the first time you've tendered the information to us, anyway?

exhibit following Brewer's testimony, on direct and cross-examination, in which he testified to his criminal history, detailing to a large degree his prior convictions, his paroles, his parole revocations, and prison conditions.  Even if the exhibit was inadmissible hearsay, virtually the same information had previously been admitted without objection.  Any error, therefore, was harmless beyond a reasonable doubt.[33]  Point of error twelve is overruled.

The judgment of the trial court is affirmed.

DATE DELIVERED: April 3, 2002

DO NOT PUBLISH

---

[33] *See Id.*

strengths and weaknesses of the case."[30]  The work product doctrine extends to materials

prepared by an attorney as well as those prepared by an agent for an attorney, such as an

expert.[31]  It is not completely clear from the prosecutor's questions in the instant case what

he thought Pelz should have turned over to the State.  Assuming that the prosecutor was

suggesting Pelz should have turned over work product generated and prepared by Pelz, such

suggestion was improper and the trial court should have sustained Brewer's objection.  But

the prosecutor had requested and been given reports with Pelz's notes at the beginning of

cross-examination and the notes were in the possession of the prosecutor and were referred

to directly by the prosecutor when asking Pelz questions, without objection.  Thus, the failure

to overrule the objection to the prosecutor's question suggesting that Pelz should have turned

the work product notes over at an earlier date was harmless beyond a reasonable doubt.[32]

Point of error ten is overruled.

In his twelfth point of error, Brewer claims the trial court erred in admitting State's

Exhibit 117.  State's Exhibit 117 is a two-page timeline of Brewer's criminal history,

including  the dates of his convictions, the sentences imposed, the dates of his releases on

parole, and his arrest dates.  Brewer objected to the exhibit as hearsay.  The State offered the

---

[30]  *Williams*, 958 S.W.2d at 193 n.7.

[31]  *Skinner v. State*, 956 S.W.2d 532, 538 (Tex. Crim. App. 1997), *cert. denied*, 523 U.S. 1079 (1998).

[32]  *See* TEX. R. APP. P. 44.2(b).



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. 73,641

### LAWRENCE RUSSELL BREWER

#### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM JASPER COUNTY

**Cochran, J.,** *delivered a concurring opinion.*

## O P I N I O N

I join the majority opinion. I add this concurrence to appellant's fifth point of error to re-emphasize the wisdom of the trial court's protective escrow procedure in *Lagrone.*

### I.

Appellant filed an *ex parte* motion several months before his capital murder trial, asking the court to advance funds with which to pay a mental health expert. Defense counsel anticipated that, should the jury return a guilty verdict, the State would subsequently argue at the punishment

phase that appellant would constitute a future danger to society.[1] The expert would assist defense counsel in evaluating and preparing a mental disorders mitigation defense. The trial judge granted the *ex parte* request.[2]

Immediately before trial, the State filed a motion in which it sought to have its own mental health expert examine appellant. The parties argued the motion during a break in *voir dire*. In its brief, the State explains that: (1) it advised the court and appellant that it was proceeding under the holdings in *Lagrone*[3] and *Chamberlain*;[4] (2) its purpose was to avoid delay during trial and to ensure an orderly trial proceeding; and (3) it did not seek the identity of defense experts, but sought only to examine appellant "in the event that appellant intended to produce testimony at trial based upon his participation with the defense expert."

Over objection, the trial judge ordered defense counsel to disclose whether or not a mental health expert had met with appellant for a "face-to-face evaluation." Defense counsel revealed that a psychologist had indeed made such an evaluation.

The State then gave notice that it would object, at trial, to any defense attempt to introduce mental health expert testimony on appellant's behalf unless the State's own mental health expert

---

[1] *See* Tex. Code Crim. Proc. art. 37.071, § 2 (b)(1).

[2] It is well-settled that a criminal defendant does not waive his Fifth Amendment privilege against self-incrimination merely by requesting the court to appoint a mental health expert, nor by submitting to a competency and sanity examination. *Estelle v. Smith*, 451 U.S. 454 (1981); *Wilkes v. State*, 847 S.W.2d 547, 550 (Tex. Crim. App. 1992); *Hernandez v. State*, 805 S.W.2d 409 (Tex. Crim. App. 1990); *Battie v. Estelle*, 655 F.2d 692, n.9 (5th Cir. 1981). An indigent defendant has a right to an *ex parte* hearing regarding his request for expert assistance under due process and work product principles. *See Ake v. Oklahoma*, 470 U.S. 68 (1985); *Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997).

[3] 942 S.W.2d 602 (Tex. Crim. App. 1997).

[4] 998 S.W.2d 230 (Tex. Crim. App. 1999).

were afforded the same opportunity to interview appellant. The trial court ordered defense counsel,

again over his objection, to reveal whether or not he intended to use such testimony. Appellant's

counsel said that he did plan to introduce expert witness testimony. The trial court then ordered

appellant to submit to an examination by the State's expert, psychiatrist Ed Gripon, M.D. Appellant

complied.

Appellant did not offer any mental health expert testimony during the guilt/innocence phase

of the trial. During its case-in-chief at the punishment stage, the State called Dr. Gripon as a witness.

and elicited his expert opinion that appellant posed a future danger to society.[5] Dr. Gripon testified

that he formed his opinion based on his court-ordered 2 ½ hour interview with appellant, information

provided to him regarding appellant's criminal record and prison terms, and a review of collateral

information he learned at the trial of appellant's co-defendant.[6] Later, during his case-in-chief at

punishment, appellant offered the testimony of Dr. Roberts, a psychologist, to rebut Dr. Gripon's

testimony regarding appellant's future dangerousness.

## II.

Appellant argues that this Court should overrule *Lagrone v. State*, 942 S.W.2d 602 (Tex.

Crim. App. 1997) and *Soria v. State*, 933 S.W.2d 46 (Tex. Crim. App. 1996),[7] because they are

---

[5] Appellant did not object to the timing or content of Dr. Gripon's testimony.

[6] Dr. Gripon testified as the State's mental health expert at the trial of John William King, one of appellant's co-defendants.

[7] In *Soria*, this Court started from the premise that "a defendant waives his Fifth Amendment rights to a limited extent by presenting psychiatric testimony on his behalf." 933 S.W.2d at 53. We explained that when a defendant presents psychiatric testimony based on the expert's personal examination of the defendant, the defendant waives his Fifth Amendment privilege to the same extent he would if he had chosen to take the witness stand himself. *Id.* at 54. Therefore, we reasoned, "once a defendant has executed a limited waiver of the Fifth Amendment's protection by constructively testifying through an expert on the issue of future dangerousness, the trial court may order that defendant to submit

"unsound." They are not. Both *Lagrone* and *Soria* represent a careful balancing of interests in light

of "the unique circumstances" and potential for abuse that arise when a capital murder defendant

presents expert testimony on the issue of his future dangerousness.[8] In *Lagrone,* this Court stated:

> [p]rohibiting the trial court from ordering a psychiatric exam until after the defense
> has actually presented his own expert testimony is bound to work against the State
> in almost every case. Indeed, we have already recognized that a trial court cannot
> actually force the defendant to cooperate with the State's expert, and the sanction of
> limiting the testimony of further defense witnesses is virtually worthless since the
> defense has already had the benefit of their own expert's testimony. Our sense of
> justice will not tolerate allowing criminal defendants to testify through the defense
> expert and then use the Fifth Amendment privilege against self-incrimination to
> shield themselves from cross-examination on the issues which they have put in
> dispute.[9]

The trial court in *Lagrone* crafted a Solomonic solution when presented with these competing

interests.[10] After an "extensive" pretrial hearing, the trial court granted the State's motion to require

---

to a state-sponsored future dangerousness examination." *Id.* at 58-60.

[8] *Lagrone*, 942 S.W.2d at 611.

[9] *Id. See also United States v. Hall*, 152 F.3d 381, 398 (5th Cir. 1998), *cert. denied*, 526 U.S.
1117 (1999). As the Fifth Circuit stated in *Hall*:
This court has long recognized that "a defendant who puts his mental state at issue with
psychological evidence may not then use the fifth amendment to bar the state from
rebutting in kind." This rule rests upon the premise that "it is unfair and improper to
allow a defendant to introduce favorable psychological testimony and then prevent the
prosecution from resorting to the most effective and in most instances the only means of
rebuttal: other psychological testimony.
152 F.3d at 398 (citations omitted); *see also Vanderbilt v. Collins*, 994 F.2d 189, 196 (5th Cir. 1993) ("[i]f
a defendant requests a [psychiatric] examination on the issue of future dangerousness or presents
psychiatric evidence at trial, the defendant may be deemed to have waived the fifth amendment
privilege").

[10] Factually, the situation in *Lagrone* is very similar to the present scenario. The capital murder
defendant in *Lagrone* filed a motion seeking the assistance of independent mental health expert
witnesses. 942 S.W.2d at 609. The defendant alleged that his mental condition would be contested
during the punishment phase of the trial, and that he suffered from "mental disorders." *Id.* The trial
court granted the defendant's motion. *Id.* The State then filed a motion asking for an independent
mental examination of the defendant for the purpose of rebutting any mental health testimony that the
defendant presented. *Id.* at 610. The State also requested the trial court to exclude the testimony of

Mr. Lagrone to be examined by an independent mental health expert, but imposed several restrictions

to safeguard the defendant's Fifth Amendment right against self-incrimination:

1.  State shall notify the defendant's counsel, in advance of the time and place of the examination.  Defendant's counsel may not be present during the examination.  The defendant may recess the interview and consult with counsel.

2.  [The State's expert] shall not relate by any manner or means his conversations, findings, conclusions and opinions with any State prosecutors or agents.  [The State's expert] shall reduce his findings, conclusions and opinions to writing and deliver the same to the Court for in-camera inspection.

3.  The Court, after examination of [the State's expert's] report, will decide whether to release the ultimate conclusions only.  If the Court determines the report to contain Brady material, it shall release that [material] to the attorneys.

4.  The State may have [its expert] present in court if the defense presents a mental health expert to testify.

5.  If the defense calls a mental health expert to testify, at that time, [the State's expert's] report shall be turned over to the State by the Court.[11]

By granting the State's motion but requiring the State's expert to report directly and solely to the

court, the trial judge essentially held the substance of the State's expert's interview with defendant

in escrow, pending defense counsel's actual introduction of mental health expert testimony.  This

Court praised his actions:

Because the defendant has not actually waived his Fifth Amendment protection prior to the presentation at trial of future dangerousness expert testimony, it is crucial for the trial court to protect the defendant's Fifth Amendment rights.  Indeed, in this case, the trial court deserves commendation for its efforts in ensuring that the defendant's Fifth Amendment rights were protected to the greatest possible extent.

---

defendant's mental health expert if the defendant did not cooperate with the State's expert. *Id.*

[11] 942 S.W. 2d at 602, n.6.

Other courts would do well in the future, in fact, to follow the guidelines adhered to by the trial court in this case.[12]

Those guidelines were not followed in this case. Here, the prosecution had access to the substance of Dr. Gripon's interview with appellant and to Dr. Gripon himself well in advance of the punishment phase. At the punishment trial, before appellant had an opportunity to offer any testimony from a mental health expert, the State (during its case-in-chief) offered Dr. Gripon's expert opinion that appellant posed a future danger to society. The cart came before the horse.

In this case any purported error was neither preserved nor harmful. Appellant did not object to the timing of Dr. Gripon's testimony. Appellant did not request the trial judge to keep the results of Dr. Gripon's interview in escrow. He also did not object to the fact that the State may have had access to the contents of Dr. Gripon's interview with appellant before appellant was deemed to have waived his Fifth Amendment right by sponsoring mental health testimony based upon an interview with his own expert. His sole objection in the trial court was to the trial court's order, made pursuant to *Lagrone*, that the State's expert be allowed to interview appellant. That is his sole complaint on appeal as well.[13] Moreover, since appellant did indeed present expert testimony during his own case-in-chief (and did not claim that he presented it solely to rebut the State's expert testimony), he did not argue or show any harm from this backwards timing. Finally, Dr. Gripon's testimony, with minor exceptions, did not depend upon appellant's interview statements. Most of the information that Dr. Gripon relied upon was already part of the trial record.

---

[12] *Id.* at 602, n.8.

[13] In his sixth point of error, appellant complains that the trial court erred in requiring him to disclose the fact that he had enlisted the assistance of a psychologist. That complaint, however, has nothing to do with the content or timing of Dr. Gripon's testimony.

I add this concurrence solely to re-emphasize both the logical rationale of *Lagrone* and the importance of keeping sealed the content of the court-ordered expert's interview with a capital murder defendant until and unless that defendant actually does waive his Fifth Amendment right by sponsoring expert mental health testimony based upon his own interview with the defendant. Although the trial court's escrow procedure in *Lagrone* is not constitutionally required,[14] it is highly recommended because it fairly balances the competing interests at stake.

Cochran, J.

Delivered:      April 3, 2002

Do Not Publish

---

[14] *See Hall*, 152 F.3d at 399 (acknowledging that adoption of a rule sealing the results of a court-ordered psychiatric examination in a capital murder prosecution "is doubtless beneficial to defendants and that it likely advances interests of judicial economy by avoiding litigation over whether particular pieces of evidence that the government seeks to admit prior to the defendant's offering psychiatric evidence were derived from the government psychiatric examination, we nonetheless conclude that such a rule is not constitutionally mandated").